UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| WALTON TENNESSEE, LLC, | ) | |
| | ) | |
| STEPHEN MISCH, individually and as beneficiary and trustee of the Misch, Stephen John Burrus Ridge Revocable Trust, | ) ) ) ) ) | |
| | ) | |
| JASON VANCE, individually and as beneficiary and trustee of the Vance, Jason Floyd Burrus Ridge Revocable Trust and as beneficiary and trustee of the Vance, Jason Floyd Cane Ridge Landing Revocable Trust, | ) ) ) ) ) ) ) | |
| | ) | |
| ALESSANDRO SILVESTRONI, individually and as beneficiary and trustee of the Silvestroni, Alessandro Burrus Ridge Revocable Trust and as beneficiary and trustee of the Silvestroni, Alessandro Cane Ridge Landing Revocable Trust, | ) ) ) ) ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter, | ) ) ) ) | |
| | ) | |
| TRE HARGETT, in his official capacity as the Secretary of State of Tennessee, *and* | ) ) ) | |
| | ) | |
| CHARLIE HATCHER, in his official capacity as the Commissioner of Agriculture of Tennessee, | ) ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.      On January 1, 2025, Tennessee makes criminals of certain foreign individuals and entities, as well as their agents, who currently, lawfully own land in Tennessee. Tennessee also makes criminals of these individuals' agents as well as businesses owned by these individuals.

2.      The Tennessee General Assembly passed Public Chapter 995 of the Tennessee Public Acts of 2024 ("Public Chapter 995"), which is codified at Tenn. Code Ann. § 66-2-301–308. Public Chapter 995 bans from owning an interest in agricultural land citizens or residents of any country subject to the International Traffic in Arms Regulations ("ITAR") and their agents (each, a "Prohibited Party"). It also bans from owning agricultural land in Tennessee entities like trusts and limited liability companies whose controlling interest is owned by a Prohibited Party or its agent (each, a "Prohibited Business"). Prohibited Businesses are also banned from owning an interest in non-agricultural land in Tennessee. (A Prohibited Party or Prohibited Business owning an interest in agricultural land, or a Prohibited Business owning an interest in non-agricultural land are referred to collectively as "Prohibited Owners"; conversely, individuals and entities who own an interest in agricultural land or non-agricultural land and are not banned from doing so under Public Chapter 995 are referred to collectively as "Permitted Owners").

3.      Public Chapter 995 does not just ban Prohibited Parties and Prohibited Businesses from future land acquisitions. It also retroactively bans Prohibited Owners from maintaining their ownership interests in their land, forcing them to divest their land by January 1, 2025 or incur criminal punishment and civil penalties. Prohibited Owners who do not or cannot divest their ownership interests in their land by January 1, 2025 must self-report their newly-minted criminal status to the State by registering their ownership interests (as well as their birthplace, nationality,

and other personal information) with the State, which may ultimately take the land through escheatment without compensation to the landowner.

4.     Public Chapter 995 threatens Plaintiff Walton Tennessee, LLC's ("Walton Tennessee") existence by criminalizing Walton Tennessee's business model. Walton Tennessee is a Tennessee limited liability company that facilitates real estate investment by identifying and purchasing undeveloped land and providing an opportunity for individuals, acting through trusts, to purchase undivided interests in the land as tenants in common with each other and with Walton Tennessee. (Those individuals, acting through trusts, who acquire an interest in land, are referred to herein as "Individual Owners"). These Individual Owners own their interests in the land as the beneficiary and trustee of their trusts. Walton Tennessee is an agent of the trustees; the Individual Owners are Walton Tennessee's principals. Walton Tennessee retains an undivided ownership interest in the land as a tenant in common with the Individual Owners. Walton Tennessee also manages, markets, and ultimately facilitates the sale of the land to a third-party buyer for the benefit of the Individual Owners and itself. The Individual Owners get the benefit of Walton Tennessee's expertise in land acquisition and management, as well as Walton Tennessee's relationships with developers who will eventually purchase and develop the land. In addition to managing the land, Walton Tennessee handles the taxes, closings, and other administrative tasks on behalf of the Individual Owners and itself. But for Public Chapter 995, Walton Tennessee would continue doing business in Tennessee, acquiring additional Tennessee properties and selling interests therein to additional Individual Owners.

5.     Walton Tennessee's business model depends on its and its principals' ability to own interests in land in Tennessee and on Walton Tennessee's ability to manage that land on behalf of the Individual Owners—many of whom are citizens of, live in, and/or are domiciled in China and

other countries subject to ITAR. Public Chapter 995 bans both the Individual Owners who are Prohibited Parties or Prohibited Businesses as well as Walton Tennessee from continuing to own their interests in agricultural land in Tennessee. Public Chapter 995 also bans the Individual Owners who are Prohibited Businesses from continuing to own an interest in non-agricultural land in Tennessee. Public Chapter 995 bans Prohibited Parties and Prohibited Businesses from acquiring new land in Tennessee.

6.     Come January 1, 2025, Walton Tennessee and the Individual Owners who are Prohibited Owners will be criminals, subject to jail time, as well as criminal and civil fines, unless they divest their interests in their land. If they do not divest, they must incriminate themselves by registering their interests in their land with the State. Failure to self-report results in civil fines. Divesting their interests in the land by January 1, 2025 is not only practically impossible but also contrary to Walton Tennessee's and the Individual Owners' best interests, forcing them to prematurely divest their interests in the land at a potential loss of millions of dollars. But for Public Chapter 995, Walton Tennessee and these Individual Owners would not divest their lawfully owned interests in the land by January 1, 2025 or thereafter register their interests in the land with the State. In other words, Walton Tennessee and the Individual Owners intend to continue to own their interests in land in Tennessee, but they face a credible threat from the State of criminal prosecution and fines as well as escheatment of their land unless they divest.

7.     Public Chapter 995 is unconstitutional many times over and should be preliminarily enjoined until this Court can strike it down as unconstitutional on its face and as applied to Walton Tennessee and the Individual Owners, including Plaintiffs Jason Vance, Stephen Misch, and Alessandro Silvestroni (the "Individual Plaintiffs"), all of whom are adversely affected by this law.

4

Plaintiffs challenge several provisions of Public Chapter 995 that are unconstitutional on their face and as applied to Walton Tennessee and the Individual Owners, including the Individual Plaintiffs:

a) Tenn. Code Ann. §§ 66-2-303(b)–(d) and 66-2-305(a)–(c) unconstitutionally create criminal liability without due process, criminalize previously lawful behavior, and ban owning an interest in agricultural and/or non-agricultural land based on national origin.

b) Tenn. Code Ann. §§ 66-2-302(1), (9) and (12), which define "agricultural land," "prohibited foreign party," and "resident alien," respectively, are unconstitutionally vague because they fail to provide sufficient notice of who is banned from owning an interest in land in Tennessee.

c) Tenn. Code Ann. §§ 66-2-304 and 306 unconstitutionally require Prohibited Owners to incriminate themselves, are unconstitutionally vague because they fail to provide sufficient notice of when certain criminal penalties attach, and criminalize previously lawful behavior.

d) Tenn. Code Ann. § 66-2-307(c)(2) unconstitutionally permits the State to take land through escheatment without just compensation.

e) The entirety of Public Chapter 995 is impliedly preempted—through field and conflict preemption—by federal law, which pervasively regulates the field of foreign investment in real estate transactions.

5

**JURISDICTION AND VENUE**

8.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

9.       Plaintiffs seek remedies pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1651, 2201, and 2202.

10.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

**PARTIES**

11.      Walton Tennessee is a limited liability company formed and existing under the laws of the State of Tennessee, with its principal place of business in Arizona. Walton Tennessee brings this action to protect its ownership and business interests that are adversely affected by Public Chapter 995. Walton Tennessee owns undivided interests in land in Tennessee as a tenant in common with the Individual Owners. Walton Tennessee is a Prohibited Party because it is an agent of the Individual Owners, many of whom are Prohibited Parties. Public Chapter 995 injures Walton Tennessee by requiring it to divest its interests in the land by January 1, 2025, or face the credible threat of criminal and civil penalties, the registration requirements, and escheatment.

12.      Walton Tennessee also brings this action on behalf of the Individual Owners, which include the Individual Plaintiffs, who are adversely affected by Public Chapter 995. The Individual Owners own undivided interests in agricultural land and/or non-agricultural land managed by Walton Tennessee. Public Chapter 995 bans the Individual Owners that are Prohibited Owners from owning an interest in land in Tennessee. Public Chapter 995 injures these Individual Owners by requiring them to divest their interests in the land by January 1, 2025 or face the credible threat of criminal and civil penalties, the registration requirements, and escheatment. Public Chapter 995 injures the Individual Owners who are Permitted Owners because (a) they either (i) own undivided interests in agricultural land as tenants in common with Walton Tennessee, which is a Prohibited

6

Party, and other Individual Owners who are Prohibited Parties or Prohibited Businesses, or both, or (ii) own undivided interests in non-agricultural land as tenants in common with other Individual Owners who are Prohibited Businesses, or both; and (b) Public Chapter 995 provides that if an interest in the subject land is owned by a Prohibited Party or Prohibited Business, as applicable, the subject land (not merely the interest in the subject land that is owned by a Prohibited Party or a Prohibited Business, as applicable) is subject to escheatment without compensation. Thus, these Permitted Owners must divest themselves of their interest in the subject land by January 1, 2025 or be subject to a credible threat of escheatment without compensation.

13. Plaintiff Stephen Misch is a United States citizen who was born and raised in Michigan and is now residing in Shanghai, China, where he is the Chief Physician at the Sino United Health New Bund Medical and Surgical Center. He is nevertheless domiciled in the United States because he plans on living here for the permanent and foreseeable future. He is an Individual Owner who acquired each of his interests in land in Tennessee as an investor through Walton Tennessee. Dr. Misch is the trustee and beneficiary of the Misch, Stephen John Burrus Ridge Revocable Trust, which owns a 1/1025th undivided tenant-in-common interest in Burrus Ridge, located within the corporate limits of the City of White House, Tennessee. The deed conveying the Misch, Stephen John Burrus Ridge Revocable Trust the interest in Burrus Ridge was executed on December 16, 2014. Dr. Misch has the controlling interest in his trust. He has designated Walton Tennessee as the agent for his trust. Because he resides in China, Dr. Misch is a Prohibited Owner. His ownership interest is criminalized as of January 1, 2025. But for Public Chapter 995, he would not divest his interest in the land or register his interest with the State. He is subject to a credible threat from the State of criminal prosecution and fines, as well as escheatment of his interest in land, unless he divests.

7

14.     Plaintiff Jason Vance is a United States citizen residing in South Carolina. He is domiciled in the United States because he plans on living here for the permanent and foreseeable future. He is an Individual Owner who acquired each of his interests in land in Tennessee as an investor through Walton Tennessee. Mr. Vance is the trustee and beneficiary of the Vance, Jason Floyd Burrus Ridge Revocable Trust, which owns a 1/1025th undivided tenant-in-common interest in Burrus Ridge, located within the corporate limits of the City of White House, Tennessee. The deed conveying the Vance, Jason Floyd Burrus Ridge Revocable Trust the interest in Burrus Ridge was executed on March 30, 2015. He is also the trustee and beneficiary of the Vance, Jason Floyd Cane Ridge Landing Revocable Trust, which owns a 1/440th undivided tenant-in-common interest in Cane Ridge Landing, part of which is located within the corporate limits of the Metropolitan Government of Nashville and Davidson County, Tennessee and part of which is located within Williamson County, Tennessee. The deed conveying the Vance, Jason Floyd Cane Ridge Landing Revocable Trust the interest in Cane Ridge Landing was executed on March 30, 2015. Mr. Vance has the controlling interest in both of his trusts. He designated Walton Tennessee as the agent for both trusts. Mr. Vance is not a Prohibited Owner. Nevertheless, there is a credible threat that the State of Tennessee will escheat the Burrus Ridge and Cane Ridge Landing properties without compensation, including Mr. Vance's interests in those properties, because at least one of the co-owners of Burrus Ridge and Cane Ridge Landing is a Prohibited Owner.

15.     Plaintiff Alessandro Silvestroni is an Italian citizen residing in Hong Kong. He is domiciled in Italy because he plans on living there for the permanent and foreseeable future. He is an Individual Owner who acquired each of his interests in land in Tennessee as an investor through Walton Tennessee. Mr. Silvestroni is the trustee and beneficiary of the Silvestroni, Alessandro Burrus Ridge Revocable Trust, which owns a 2/1025th undivided tenant-in-common interest in

Burrus Ridge, located within the corporate limits of the City of White House, Tennessee. The deed conveying the Silvestroni, Alessandro Burrus Ridge Revocable Trust the interest in Burrus Ridge was executed on July 23, 2014. He is also the trustee and beneficiary of the Silvestroni, Alessandro Cane Ridge Landing Revocable Trust, which owns a 3/440th undivided tenant-in-common interest in Cane Ridge Landing, part of which is located within the corporate limits of the Metropolitan Government of Nashville and Davidson County, Tennessee, and part of which is located within Williamson County, Tennessee. The deed conveying the Silvestroni, Alessandro Cane Ridge Landing Revocable Trust the interest in Cane Ridge Landing was executed on July 22, 2014. Mr. Silvestroni has the controlling interest in both of his trusts. He has also designated Walton Tennessee as an agent for both trusts. Because he resides in Hong Kong, Mr. Silvestroni is a Prohibited Owner. His ownership interests are criminalized as of January 1, 2025. But for Public Chapter 995, he would not divest his interests in the land or register his interests with the State. He is subject to a credible threat from the State of criminal prosecution and fines, as well as escheatment of his interests in land, unless he divests.

16.     Defendant Jonathan Skrmetti (the "Attorney General") is Tennessee's Attorney General and Reporter. As Attorney General, he is responsible for directing and supervising the prosecution of all offenses against Tennessee's criminal law, including Public Chapter 995. The Attorney General is headquartered at 500 Dr. Martin Luther King Jr. Blvd, Nashville, TN 37219. Defendant Skrmetti is sued in his official capacity.

17.     Defendant Tre Hargett (the "Secretary") is Tennessee's Secretary of State. As Secretary, he is responsible for directing, supervising, and enforcing Public Chapter 995's registration requirements set forth in Tenn. Code Ann. § 66-2-306. The Secretary is also responsible for assessing civil penalties for registration violations for non-agricultural landowners

and for reporting non-agricultural-land violations to the Attorney General. The Secretary is headquartered at 312 Rosa L Parks Ave., Nashville, TN 37243. Defendant Hargett is sued in his official capacity.

18.     Defendant Charlie Hatcher (the "Commissioner") is the Commissioner of Agriculture of Tennessee and heads the Tennessee Department of Agriculture. As Commissioner, he is responsible for directing, supervising, and enforcing Public Chapter 995's registration requirements for agricultural landowners set forth in Tenn. Code Ann. § 66-2-304. The Commissioner is also responsible for assessing civil penalties for registration violations and for reporting agricultural-land violations to the Attorney General. The Commissioner is headquartered at 440 Hogan Road, Nashville, TN 37220. Defendant Hatcher is sued in his official capacity.

## FACTUAL BACKGROUND

### A.  Walton Tennessee owns and manages land on behalf of the Individual Owners.

19.     Walton Tennessee owns an undivided interest in several properties that are adversely affected by Public Chapter 995. These properties are owned by Walton Tennessee and the Individual Owners as tenants in common, each with an undivided interest in their property. Walton Tennessee also manages each of these properties as an agent of the Individual Owners, many of whom are Prohibited Parties and Prohibited Businesses.

20.     The properties include:

a)  Burrus Ridge, which is non-agricultural land. Burrus Ridge is located within the corporate limits of the City of White House, Tennessee, and consists of approximately 412.53 acres of land. It has more than 500 unique tenants in common, each owning an undivided interest in the land. Upon information and belief, at least one of the Individual Owners of Burrus Ridge is a Prohibited Business. At Burrus Ridge, therefore,

10

Walton Tennessee and the Individual Owners are each adversely affected by Public Chapter 995.

b) Cane Ridge Crossing, which is non-agricultural land. Cane Ridge Crossing is located within the corporate limits of the Metropolitan Government of Nashville and Davidson County, Tennessee, and consists of approximately 108.11 acres of land. It has more than 200 unique tenants in common, each owning an undivided interest in the land. Upon information and belief, at least one of the Individual Owners of Cane Ridge Crossing is a Prohibited Business. At Cane Ridge Crossing, therefore, Walton Tennessee and the Individual Owners are each adversely affected by Public Chapter 995.

c) Cane Ridge Landing, which includes both agricultural and non-agricultural land. A portion of Cane Ridge Landing is located within the corporate limits of the Metropolitan Government of Nashville and Davidson County, Tennessee, and a portion of Cane Ridge Landing is located in Williamson County, Tennessee. Cane Ridge Landing consists of approximately 103.30 acres of land. It has more than 200 unique tenants in common, each owning an undivided interest in the land. Upon information and belief, at least one of the Individual Owners of Cane Ridge Landing is a Prohibited Party and a Prohibited Business. At Cane Ridge Landing, therefore, Walton Tennessee and the Individual Owners are each adversely affected by Public Chapter 995.

d) Pine Groves, which is agricultural land. Pine Groves is located in Loudon County, Tennessee and consists of approximately 398.773 acres of land. It has more than 100 unique tenants in common, each owning an undivided interest in the land. Upon information and belief, at least one of the Individual Owners of Pine Groves is a Prohibited Party and a Prohibited Business. At Pine Groves, therefore, Walton Tennessee and the Individual Owners are each adversely affected by Public Chapter 995.

e) Soddy-Daisy, which is non-agricultural land. Soddy-Daisy is located within the corporate limits of the City of Soddy-Daisy, Tennessee and consists of approximately 186.891 acres of land. It has more than 100 unique tenants in common, each owning an undivided interest in the land. Upon information and belief, at least one of the Individual Owners of Soddy-Daisy is a Prohibited Business. At Soddy-Daisy, therefore, Walton Tennessee and the Individual Owners are each adversely affected by Public Chapter 995.

21. Should Walton Tennessee's properties escheat to the State, Walton Tennessee and the Individual Owners would incur an economic loss of well over 100 million dollars.

22. Each transaction between Walton Tennessee and an Individual Owner follows the same process:

a) Walton Tennessee purchases land from a third-party seller.

b) After Walton Tennessee purchases the land, it records a certain Declaration of Covenants, Conditions, and Restrictions that encumbers and runs with the land.

c) Walton Tennessee sells undivided interests in the land to the buyers, who own their undivided interests as tenants in common with each other. To accomplish a purchase and sale, Walton Tennessee and each buyer enter into a Purchase and Sale Agreement, which references the Declaration of Covenants, Conditions, and Restrictions. Pursuant to the Purchase and Sale Agreement, each buyer forms a separate trust governed by Tennessee law and assigns the Purchase and Sale Agreement to that trust. At closing, Walton Tennessee executes a deed conveying the undivided interest in the land to the trustee of that trust, and the trustee takes title to its undivided interest in the land as trustee of that trust.

d) Each Individual Owner takes title to its undivided interest in the land subject to the previously recorded Declaration of Covenants, Conditions, and Restrictions, which outlines the agreement among the Individual Owners to the land and includes a provision appointing Walton Tennessee as agent to the Individual Owner. As agent of the Individual Owners, Walton Tennessee is authorized to handle property expenses, including taxes and maintenance costs, zoning activities, obtaining governmental approvals, working with utility providers, and all other related planning activities.

e) Walton Tennessee retains a small undivided ownership interest in the land as a tenant in common with the other Individual Owners.

f) Walton Tennessee manages and markets each property until Walton Tennessee, with approval from the Individual Owners, sells the property to a third-party buyer, typically to a builder or developer. When Walton Tennessee receives an offer to purchase a property, Walton Tennessee takes the offer to a vote of the Individual Owners. If approved, Walton Tennessee and the Individual Owners then sell the property to the third-party buyer.

g) Walton Tennessee and the Individual Owners then receive their share of the net proceeds.

**B. Tennessee's prior anti-foreign land investment regime banned certain nonresidents from acquiring new land in Tennessee.**

23.     Prior to 2023, Tennessee had no law regulating foreign investment in real estate transactions.

24.     In 2023, the Tennessee General Assembly enacted Title 66 Chapter 2 Part 3 of the Tennessee Code, placing restrictions on land purchases by sanctioned nonresident aliens, sanctioned foreign businesses, and sanctioned foreign governments.

25.     The 2023 law based its determination of sanctioned nonresident aliens, sanctioned foreign businesses, and sanctioned foreign governments on the Office of Foreign Assets Control's ("OFAC") list of sanctions programs and country information list. *See* Tenn. Code Ann. § 66-2-302(a)(1) (2023).

14

26.     The 2023 law prohibited the purchase of new property but contained a grandfather provision permitting any prohibited foreign party "who h[eld] real property in [Tennessee] on July 1, 2023, [to] continue to own or hold the real property." *Id.* § 66-2-302(c) (2023).

### C. Public Chapter 995 bans Prohibited Owners from owning an interest in agricultural land in Tennessee.

27.     The very next year, Tennessee enacted Public Chapter 995, rewriting Title 66 Chapter 2 Part 3 of the Tennessee Code.

28.     Public Chapter 995 bans Prohibited Owners from owning an interest in agricultural land in Tennessee: a Prohibited Party or Prohibited Business "shall not acquire by grant, purchase, devise, descent, or otherwise an interest in agricultural land in this state regardless of whether the prohibited foreign party or prohibited foreign-party-controlled business intends to use the agricultural land for nonfarming purposes." *See* Tenn. Code Ann. § 66-2-303(b)(1)(A); *see also id.* §§ 66-2-302(9) (defining Prohibited Parties) and 66-2-302(10) (defining Prohibited Businesses). Public Chapter 995 further bans parties from "hold[ing] agricultural land as an agent, trustee, or other fiduciary for a prohibited foreign party or prohibited foreign-party-controlled business." *Id.* § 66-2-303(b)(1)(B).

29.     Public Chapter 995 defines "agricultural land" as (A) land in Tennessee that is outside the corporate limits of a municipality and is "(i) Used for forestry production, including, without limitation, land exceeding ten (10) acres in which ten percent (10%) or more of the land is stocked by trees of any size, including land that formerly had trees of any size covering the land that will be naturally or artificially regenerated; or (ii) Currently used for, or, if currently idle, land last used within the past five (5) years, for farming, ranching, or timber production, except land not exceeding ten (10) acres in the aggregate, if the annual gross receipts from the sale of the farm, ranch, or timber products produced on the land do not exceed one thousand dollars ($1,000),

including, without limitation, land used by persons and entities for activities regulated under title 70; and (B) [d]oes not include oil, gas, and all other minerals, including coal, lignite, brine, and all minerals known and recognized as commercial minerals underlying the land." *Id.* § 66-2-302(1).

30. Walton Tennessee and some of the Individual Owners, including Plaintiffs Vance and Silvestroni, own interests in agricultural land in Tennessee.

31. Relevant here, a Prohibited Party includes "[a] citizen or resident of a country subject to international traffic in arms regulations under 22 C.F.R. § 126.1." *Id.* § 66-2-302(9)(A)(i). (Countries regulated by ITAR are referred to collectively herein as "ITAR Countries"). A Prohibited Party also includes "[a]n agent, trustee, or other fiduciary of a [citizen or resident of an ITAR Country]." *Id.* § 66-2-302(9)(A)(vi). The United States Department of State is responsible for the regulation of export and temporary import of defense articles and services governed by 22 U.S.C. § 2778 of the Arms Export Control Act ("AECA") and Executive Order 13637. That section of the AECA is implemented by ITAR, 22 C.F.R. parts 120–130.

32. A Prohibited Party "[d]oes not mean a resident alien," which Public Chapter 995 defines as someone who is "not a citizen of the United States" and is a "resident of . . . the United States" or a "State." Tenn. Code Ann. § 66-2-302(9)(B), (12). Public Chapter 995 does not define the term "resident" but defines the term "residence" to mean "a person's principal dwelling place where the person intends to remain permanently for an indefinite period of time." *Id.* § 66-2-302(11). The term "residence" is not used in Public Chapter 995 outside of its definition.

33. Walton Tennessee owns interests in agricultural land in Tennessee as a tenant in common with Individual Owners who are Prohibited Parties. Walton Tennessee is also an agent for Individual Owners who are Prohibited Parties. Walton Tennessee is therefore a Prohibited Party, and, accordingly, a Prohibited Owner.

**D. Public Chapter 995 bans Prohibited Businesses from owning an interest in non-agricultural land in Tennessee.**

34.     Public Chapter 995 also regulates who may own an interest in non-agricultural land. "'Non-agricultural land' means all public or private land in [Tennessee] other than agricultural land." *Id*. § 66-2-302(7).

35.     Public Chapter 995 regulates non-agricultural land in a way parallel with the way it regulates agricultural land, with one key difference: the ownership ban applies only to Prohibited Businesses. *See id*. § 66-2-305(a).

36.     Walton Tennessee and some of the Individual Owners, including each of the Individual Plaintiffs, own interests in non-agricultural land in Tennessee.

**E. Public Chapter 995 imposes criminal and civil liability, as well as escheatment, if Prohibited Owners do not divest their lawfully owned interests in land.**

37.     Public Chapter 995's ban on owning an interest in agricultural land carries criminal and civil penalties. "A prohibited foreign party or prohibited foreign-party-controlled business owning an interest in agricultural land in [Tennessee] on or after January 1, 2025, commits a Class A misdemeanor, punishable by a fine of one thousand five hundred dollars ($1,500) or confinement for not more than eleven (11) months and twenty-nine (29) days, or both." *Id.* § 66-2-303(d).

38.     Public Chapter 995 also has registration requirements. Prohibited Owners must register his interests in agricultural land with the Commissioner within 60 days of Public Chapter 995's effective date or within 60 days of acquiring the property interest. *See id.* § 66-2-304(b). The registration requirements mandate that a Prohibited Owner provide the Commissioner with the personal information of the Prohibited Owner, or the Prohibited Party that owns a controlling interest in the Prohibited Owner, as applicable, the personal information of the agent, trustee, or other fiduciary of the Prohibited Owner, a statement of purpose for conducting business in Tennessee, a description of the business purpose for owning an interest in the agricultural land,

17

and the personal information of a Prohibited Owner's affiliates. *See id.* § 66-2-304(c). For Prohibited Owners, the registration requirements create a classic Catch-22. Should a Prohibited Owner choose to register his ownership interests in agricultural land with the Commissioner, the Commissioner is required to report the violation to the Attorney General. *See id.* § 66-2-304(d). Should a Prohibited Owner not register his ownership interests in agricultural land with the Commissioner, the Commissioner is required to assess a civil penalty of $2,000 for each violation. *See id.* § 66-2-304(e).

39.    Public Chapter 995 also requires registration of a Prohibited Owner's affiliates. In particular, a Prohibited Owner must list "all other interests in agricultural land that are held directly or indirectly by the registering party, parent of the registering party, or subsidiary or intermediary of the parent in the United States that exceeds, in the aggregate, two hundred fifty (250) acres." *Id.* § 66-2-304(c)(7). The registration requirements apply to Walton Tennessee, requiring Walton Tennessee to list thousands of acres of land in the United States (but outside of Tennessee) held by Walton Tennessee's affiliates.

40.    Non-agricultural land has the same registration requirements (except that the Prohibited Business must register its interests in non-agricultural land with the Secretary of State) that present the same Catch-22. Prohibited Businesses must provide the Secretary with the personal information of the Prohibited Party that owns a controlling interest in the Prohibited Business, the personal information of the agent, trustee, or other fiduciary of the Prohibited Business, a statement of the purpose for conducting business in Tennessee, a description of the business purpose for owning an interest in the non-agricultural land, and the personal information of a Prohibited Business's affiliates. *See id*. § 66-2-306(c).

41.    But for Public Chapter 995, Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, would not divest their interests in their agricultural land or non-agricultural land, as applicable, by January 1, 2025, or register their interests within 60 days thereafter with the Commissioner or the Secretary, as applicable. If Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, choose not to or otherwise fail to divest their interests in their agricultural land or non-agricultural land, as applicable, they face a credible threat of criminal prosecution and civil penalties from the State.

42.    In addition to the criminal penalties for Prohibited Owners, and the fines for registration violations, the Attorney General may also initiate an escheatment action to enforce Public Chapter 995 against Prohibited Owners. *See id.* § 66-2-307(a). This occurs if a Prohibited Owner has not divested its interest in land within two years "of the date the entity is found to be in violation." *Id.* § 66-2-303(c) (agricultural land); *id*. § 66-2-305(b) (non-agricultural land). If a court finds that a Prohibited Owner has an interest in the agricultural land or non-agricultural land in violation of Public Chapter 995, "then the court shall declare the agricultural land or non-agricultural land escheated to the state and order the sale of the agricultural land or non-agricultural land in the manner provided by law for the foreclosure of a mortgage on real estate for default of payment. The proceeds of the sale must be used to pay court costs, and the remaining funds, if any, must be disbursed to lien holders, in the order of priority, except for liens which under the terms of the sale are to remain on the land." *Id.* § 66-2-307(c)(2). In other words, the State takes land with no compensation. Moreover, as relevant to Permitted Owners like Plaintiff Vance, if even one undivided interest in land is owned by a Prohibited Owner, then the entire property, including the other undivided interests in the land from Permitted Owners, is taken by the State, injuring everyone alike, regardless of their status under Public Chapter 995.

19

**F. Walton Tennessee and the Individual Owners cannot satisfy Public Chapter 995's safe harbors.**

43.     Public Chapter 995 provides two safe harbors. First, licensed real estate agents, attorneys, title companies, banks, mortgage lenders, and the like are exempted from liability if they are involved in a prohibited transaction. *See id.* § 66-2-308(a). Walton Tennessee and the Individual Owners do not meet this exception.

44.     Public Chapter 995 also exempts Prohibited Owners that own an interest in agricultural or non-agricultural land, provided that the Prohibited Owner is "duly registered" and in good standing with the Secretary as of January 1, 2025, *and* has:

> a) Been approved by the Committee on Foreign Investment in the United States ("CFIUS"); or
>
> b) Previously received a determination that there are no unresolved national security concerns or that pending actions under Section 721 of the Defense Production Act of 1950 (50 U.S.C. App. 2170) are concluded with respect to a covered transaction, as defined in 31 C.F.R. § 800.213; provided, that [the Prohibited Owner] has not undergone a change in control constituting a covered control transaction, as defined in 31 C.F.R. § 800.210, since such determination.

Tenn. Code Ann. § 66-2-308(b). Walton Tennessee and the Individual Owners cannot satisfy this safe harbor because the safe harbor conflicts with CFIUS, which approves covered **transactions**, **not parties**. In any event, Section 308(b) is impossible for Walton Tennessee and the Individual Owners to comply with by January 1, 2025 because the CFIUS approval process takes months. It is also impossible for any of the Individual Owners who are Prohibited Owners to comply with Section 308(b) because they are trustees or trusts that are neither required nor permitted under

20

Tennessee law to be "duly registered and in good standing" with the Secretary. Compliance with an exemption under Section 308(b) is also impracticable for the Individual Owners because the CFIUS approval process, albeit for transactions instead of parties, is too time consuming and cost prohibitive, often taking many months—if not years—and the time, attention, and expense of specialized lawyers.

### G. The federal government pervasively regulates the field of foreign investment.

45. The federal government pervasively regulates the field of foreign investment in real estate transactions through statutes, regulations, and executive power such that Congress left no room for the states to supplement the federal government's regulations in this field.

46. This regulatory regime pervasively regulates the field of foreign investment in real estate transactions for the purpose of maintaining national security and engaging in foreign affairs. Public Chapter 995 conflicts with the delicate balance that the federal government has struck regulating foreign investment in real estate transactions, thereby encroaching on the federal government's national security and foreign affairs aims.

47. The Constitution vests in the federal government exclusive regulation over foreign investment, foreign affairs, and national security, forbidding the states to act in those areas. "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspections Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress." U.S. Const. art I, sec. 10, cl. 2. Likewise, only the President has the power to make treaties, *see id.* art. II, sec. 2, cl. 2, a power that states are expressly prohibited from exercising, *see id.* art. I, sec. 10, cl. 1.

48.     Congress has also made clear that only the federal government may regulate foreign investment in real estate transactions. CFIUS, for instance, is the interagency committee of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including in real estate transactions. Since 1988, CFIUS has had a broad mandate and significant authority to advise the President on foreign investment transactions and to recommend that some transactions be suspended or blocked. *See* Pub. L. No. 100-418, codified as 50 U.S.C. § 2170. Over time, CFIUS's scope has been focused "to reform the process by which [foreign] investments are examined for any effect they may have on national security." Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246.

49.     In 2018, the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA") was signed into law, Pub. L. No. 115-232, §§ 1701–28, 132 Stat. 1636, 2174–2207. FIRRMA was a significant expansion of CFIUS's authority to investigate and review foreign investments, including real estate transactions in which a foreign government may have a direct or indirect substantial interest. FIRRMA was based on concerns that "the national security landscape has shifted in recent years, and so has the nature of the investments that pose the greatest potential risk to national security. . . ." Fed. Reg. Vol. 83, No. 197 (Oct. 11, 2018), at 51323. FIRRMA further authorized CFIUS to consider whether some countries were of "special concern" to national security. 132 Stat. 2176.

50.     Unlike Public Chapter 995, CFIUS does not ban investments from any one country or any individual or entity from any one country. *See* CFIUS Frequently Asked Questions, *Post-FIRRMA Regulations* ("FIRRMA does not prohibit investments from any country."), *available at* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-frequently-asked-questions (last accessed 10/30/2024).

22

51. CFIUS's coverage of individual transactions instead of parties requires individualized determinations that significantly decrease the likelihood of the discrimination evident throughout Public Chapter 995.

52. Congress also chose to not impose criminal penalties simply for engaging in a real estate transaction. Criminal liability attaches only where a person has made false statements to CFIUS. *See* 31 C.F.R. § 802.901(a)–(c), (g).

53. CFIUS is not the only tool at the federal government's disposal to oversee foreign investment in real estate transactions. The United States Treasury Department also has OFAC. OFAC primarily administers and enforces economic and trade sanctions in support of national security and foreign policy objectives. *See* International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29.

54. OFAC maintains a list of Specially Designated Nationals and Blocked Persons ("SDN List") whose assets are blocked, and with whom U.S. persons are generally prohibited from engaging in business transactions. *See* Data Center – SDN List, *available at* https://sanctionslist.ofac.treas.gov/Home/SdnList (last accessed 10/30/2024).

55. Congress further chose for the federal government to regulate foreign investment in real estate transactions through the Agricultural Foreign Investment Disclosure Act ("AFIDA"), which became law in 1978. Pub. L. 95-460. AFIDA established a nationwide system for collecting information pertaining to foreign ownership of agricultural land in the United States. The Farm Service Agency implements AFIDA through regulations codified at 7 C.F.R. part 781, *et seq*., and submits an annual report to Congress detailing foreign agricultural land ownership by county.

56. Public Chapter 995 mirrors AFIDA's regulations in several ways, including, in particular, the definitions of "agricultural land." *Compare* 7 C.F.R. § 781.2(b), *with* Tenn. Code

Ann. § 66-2-302(1). AFIDA also has registration requirements for "[a]ny foreign person who held, holds, acquires, or transfers any interest in . . . agricultural land." 7 C.F.R. § 781.3(b). To comply, a foreign person must file an FSA-153 report containing: the legal name and address of the foreign person; for individuals, the individual's citizenship; for entities, the principal place of business and country of organization; the type of interest held by the foreign person who acquired or transferred the interest in agricultural land; the legal description and acreage of the agricultural land; the purchase price; the name, address, and citizenship of anyone the foreign person transferred its interest in the agricultural land to; agricultural purposes of the land; when applicable, the name, address, and relationship of the representative who completes the FSA-153 form for the foreign person; the relationship of the foreign person to the previous landowner; and the date the interest in the agricultural land was acquired or transferred. *See id.* § 781.3(e). But AFIDA's registration requirements, and AFIDA's definition of "foreign person," for that matter, do not include agents of foreign persons. *See id.* § 781.2 (defining "foreign person" as a (1) an individual who is not a citizen or national of the United States, or who is not lawfully admitted to the United States for permanent residence; (2) an entity organized under the laws of a foreign government or with its principal place of business outside of the United States; (3) any foreign government; and (4) an entity organized under a U.S. state's laws that has a significant interest directly or indirectly held by any of the former definitions of "foreign person"). And registration reporting violations result in fines, but no criminal penalties. *See id.* § 781.4.

57.     Unlike Public Chapter 995, AFIDA does not ban investments from any one country.

**COUNT ONE**

**42 U.S.C. § 1983 Violation of the Due Process Clause Under the Fourteenth Amendment**

58.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

24

59. The Due Process Clause of the Fourteenth Amendment provides: "No State shall … deprive any person of life, liberty, or property, without due process of law[.]"

60. The Fourteenth Amendment protects the fundamental rights and liberty interests of all persons within a State's boundaries and to all upon whom the State would impose the obligations of its laws.

61. The Due Process Clause protects against arbitrary, discriminatory, and vague government action, with procedural due process guaranteeing, at a minimum, fair notice and an opportunity to be heard.

62. Public Chapter 995 violates the Due Process Clause under the Fourteenth Amendment, both on its face and as applied to Walton Tennessee's principals, including the Individual Plaintiffs, in several respects.

63. Public Chapter 995 is impermissibly vague, indefinite, and ambiguous because it fails to clearly define **who** is a Prohibited Owner. Public Chapter 995 does not define "resident" but defines a Prohibited Party as one who is a "citizen" or "resident" of an ITAR Country. This undefined term has multiple, conflicting meanings. Black's Law Dictionary defines "resident" as "[s]omeone who lives permanently in a particular place; specif., a person who has established a domicile in a given jurisdiction" or "[s]omeone who has a home in a particular place." *Resident* (noun), Black's Law Dictionary (12th ed. 2024). Rather than define the term "resident," Public Chapter 995 defines the term "residence" to mean, synonymous with one's domicile, "a person's principal dwelling place where the person intends to remain permanently for an indefinite period of time." As written, Public Chapter 995 does not give fair notice to Walton Tennessee or its principals, including the Individual Plaintiffs, or its prospective principals, of whether an Individual Owner is a "resident" of an ITAR Country and therefore whether such Individual Owner

is a Prohibited Owner subject to criminal penalties on January 1, 2025. As written, Public Chapter 995 does not give fair notice to Walton Tennessee whether a prospective Individual Owner is a "resident" of an ITAR Country and therefore whether Walton Tennessee may sell an undivided interest to that prospective Individual Owner.

64. Public Chapter 995 is also impermissibly vague, indefinite, and ambiguous because it fails to clearly define **when** a Prohibited Owner must divest its interest in land. Public Chapter 995 states that a Prohibited Owner "shall divest itself of the interest in [the applicable] land within two (2) years of the date the entity is found to be in violation," Tenn. Code Ann. §§ 66-2-303(c)(1); 66-2-305(b)(1), suggesting that the Attorney General cannot commence an action for at least two years after the Attorney General receives a report from the Commissioner or the Secretary that the Prohibited Owner owns an interest in land in Tennessee. But Public Chapter 995 also states that a Prohibited Owner must divest his interest in land on or before January 1, 2025 or be fined civilly and punished criminally: "A prohibited foreign party or prohibited foreign-party-controlled business owning an interest in agricultural land in this state on or after January 1, 2025, commits a Class A misdemeanor, punishable by a fine of one thousand five hundred dollars ($1,500) or confinement for not more than eleven (11) months and twenty-nine (29) days, or both." *Id*. § 66-2-303(d); *see also id*. § 66-2-305(c). Public Chapter 995's registration requirements compound this confusion because, although Prohibited Owners may or may not be required to divest their land under threat of imprisonment, they are also required to register their land interests with the Commissioner or the Secretary within 60 days of January 1, 2025. If the Commissioner or the Secretary finds that a Prohibited Owner owns an interest in land, then the Commissioner or the Secretary, as applicable, shall report the violation to the Attorney General. These three inconsistent

deadlines cannot be reconciled, leaving Prohibited Owners with inadequate notice of when they must divest their interest in land.

65. Public Chapter 995 is further impermissibly vague, indefinite, and ambiguous because, in addition to the Attorney General initiating an enforcement action based on a report from the Commissioner or Secretary, the Attorney General "may also initiate an action . . . based upon the receipt of information by means other than a report." *Id.* § 66-2-307(a). This sudden-death enforcement method provides no notice to Prohibited Owners that they have violated Public Chapter 995 until the Attorney General files an enforcement action.

66. Public Chapter 995 is also impermissibly vague, indefinite, and ambiguous because its definition of "agricultural land" contains undefined and conflicting terms such that Walton Tennessee and the Individual Owners have insufficient notice whether they own interests in "agricultural land" under Public Chapter 995. Specifically, the term "production" is undefined. *See* Tenn. Code Ann. § 66-2-302(1)(A). Parties thus have no guidance on what "forestry production" or "timber production" mean. The term "production" suggests that some type of action needs to take place beyond just having trees on the land, but the definition is unclear. The definition of "agricultural land" is further vague because the two size limitations conflict. Subsection (A)(i) defines "agricultural land" as land "[u]sed for forestry production, including, without limitation, land exceeding ten (10) acres . . . ." Yet the next Subsection's definition counts "land last used … for farming, ranching, or timber production, *except* land not exceeding ten (10) acres in the aggregate." *Id.* § 66-2-302(1)(A)(ii) (emphasis added). So in one Subsection, Public Chapter 995 uses "including," and in the other, "except." If these terms are to have different meanings, then there is no amount of land used for forestry production that is *not* agricultural land. But that interpretation reads out the "not exceeding ten (10) acres" limitation. Either way, a party with land

27

less than ten acres with forestry on the property has insufficient notice whether its land is agricultural land under Public Chapter 995.

67.    Public Chapter 995 also violates the Due Process Clause by imposing criminal penalties without sufficient procedural due process or any pre- or post-deprivation remedy. On January 1, 2025, Prohibited Owners, like Walton Tennessee and Plaintiffs Misch and Silvestroni, commit a Class A misdemeanor punishable by criminal fine and imprisonment. *See* Tenn. Code Ann. § 66-2-303(d). Public Chapter 995 provides no hearing, before or after that criminal finding, to procedurally safeguard Prohibited Owners' liberty.

68.    The enactment and credible threat of enforcement of Public Chapter 995 will cause Walton Tennessee and the Individual Owners, including the Individual Plaintiffs immediate, ongoing, and irreparable harm.

69.    In implementing and enforcing the provisions of Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of their liberty or property without due process of law in violation of the Fourteenth Amendment.

**COUNT TWO**

**42 U.S.C. § 1983 Violation of the Right Against Self-Incrimination Under the Fifth and Fourteenth Amendments**

70.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

71.    The Fifth Amendment states: "No person … shall be compelled in any criminal case to be a witness against himself." The right against self-incrimination has been incorporated to the states by the Fourteenth Amendment.

72.     The registration requirements target Prohibited Owners. *See* Tenn. Code Ann. §§ 66-2-304(a); 66-2-306(a).

73.     Complying with the registration requirements compels testimony of criminal activity. *See id.* §§ 66-2-304(d)–(e); 66-2-306(d)–(e).

74.     The enactment and credible threat of enforcement of Public Chapter 995 will cause Walton Tennessee and the Individual Owners, including Plaintiffs Misch and Silvestroni, ongoing and irreparable harm.

75.     In implementing and enforcing Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of their right against self-incrimination in violation of the Fifth and Fourteenth Amendments.

### COUNT THREE

### 42 U.S.C. § 1983 Violation of the Takings Clause Under the Fifth and Fourteenth Amendments

76.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 75 as though fully set forth herein.

77.     Because the Fourteenth Amendment incorporates the Takings Clause to the states, the Takings Clause of the Fifth Amendment prohibits States from taking private property "without just compensation."

78.     Public Chapter 995 permits the State to take private property without just compensation, requiring that a successful enforcement action by the Attorney General results in escheatment to the State without compensation to the landowner. *See* Tenn. Code Ann. § 66-2-307(c)(2).

79.     Public Chapter 995's remedy that requires agricultural land and non-agricultural land escheat to the state and sold constitutes a taking. *Id.*

80.     Public Chapter 995's requirement that "proceeds of the sale must be used to pay court costs, and the remaining funds, if any, must be disbursed to lien holders, in the order of priority," constitutes a taking without compensation for a private use.

81.     Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, have an ownership interest in their land as tenants in common.

82.     Plaintiffs' only alternative to escheatment is to divest their land.

83.     In implementing and enforcing Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of their property rights without just compensation in violation of the Fifth and Fourteenth Amendments.

## COUNT FOUR

### Violation of the Supremacy Clause by Enacting a Law Preempted by Federal Laws

84.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83 as though fully set forth herein.

85.     The Supremacy Clause affirms that the "Constitution, and the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

86.     Naturally flowing from the Supremacy Clause is the doctrine of preemption.

87.     The federal government pervasively regulates the field of foreign investment in real estate transactions. It does so through executive action and through agency action, and Congress

30

has also occupied the field with CFIUS, FIRRMA, AFIDA, OFAC, IEEPA, and ITAR, among other federal government agencies and actions.

88.     Even when Congress does not expressly preempt state law with federal law, federal law impliedly preempts state law that conflicts with federal regulation and creates barriers to the accomplishment of federal objectives.

89.     Public Chapter 995 conflicts with the goals of federal regulation that pervasively regulates the field of foreign investment in real estate transactions, comprehensively providing for the Nation's security and foreign affairs. Tennessee may not establish its own foreign policy, its own treaties, or impose its own taxes on foreign countries.

90.     Public Chapter 995 seeks to enact its own foreign investment policy that contradicts the federal government's comprehensive and intentional regulatory regime.

91.     Tennessee takes it upon itself to designate certain countries—and their citizens and residents as well as those who are domiciled there and their agents—as per se banned from owning land in Tennessee, even though the federal government has its own system for vetting and evaluating such transactions and the national security concerns and foreign affairs considerations present with each transaction. The federal government does not categorically ban individuals or their agents from any country from investing in a real estate transaction.

92.     Public Chapter 995 conflicts with the federal government's power to regulate commerce generally. It also frustrates the purpose of other foreign affairs priorities, like foreign trade. Public Chapter 995's ban on certain foreign investments could lead other countries to reciprocate, potentially banning American investments against the wishes and priorities of the federal government.

93.     Public Chapter 995 conflicts with the intentional, comprehensive regime the federal government has in place to regulate foreign affairs and national security. Public Chapter 995 is preempted by federal law.

94.     The enactment and credible threat of enforcement of Public Chapter 995 will cause Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, ongoing and irreparable harm.

95.     In implementing and enforcing Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of their right to be governed by federal law in a field that the federal government pervasively regulates in violation of the Supremacy Clause.

## COUNT FIVE

### Violation of United States and Tennessee Constitutions in Enacting and Enforcing an Ex Post Facto Law

96.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 95 as though fully set forth herein.

97.     The United States Constitution prohibits state legislatures from enacting ex post facto laws, U.S. Const. art. 1 § 10, cl. 1, including retroactive application of penal legislation or legislation that imposes a new disability based upon considerations already past. A new disability includes the forfeiture of a right possessed before the enactment of the statute.

98.     Article I, Section 11 of the Tennessee Constitution similarly forbids ex post facto laws.

99.     Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, lawfully purchased land in Tennessee before the enactment of Public Chapter 995. But on January 1, 2025, through no action of Walton Tennessee or the Individual Owners, including the Individual

Plaintiffs, and without a sufficient grace period during which they could bring themselves into compliance with the law, Prohibited Owners, including Walton Tennessee and Plaintiffs Misch and Silvestroni, will be criminally and civilly liable for violating Public Chapter 995 just for being landowners, punishing their prior acts that were lawful at the time. Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, will further be subject to having their land escheat to the State.

100. Public Chapter 995 is punitive, carrying with it criminal penalties, including imprisonment. Public Chapter 995 also imposes a new disability on Walton Tennessee and the Individual Owners, including the Individual Plaintiffs. Public Chapter 995 forfeits their right to possess land despite their prior legal right to do so.

101. The enactment and credible threat of enforcement of Public Chapter 995 will cause Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, ongoing and irreparable harm.

102. In implementing and enforcing Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of their right under the United States and Tennessee Constitutions to be free from ex post facto laws imposing punitive liability for lawful acts previously committed.

**COUNT SIX**

**42 U.S.C. § 1983 Violation of the Right to Equal Protection Under the Fourteenth Amendment**

103. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 102 as though fully set forth herein.

33

104.     The Equal Protection Clause of the Fourteenth Amendment provides that: "No State shall … deny to any person within its jurisdiction the equal protection of the laws."

105.     The Equal Protection Clause prohibits States from denying any person equal protection of the laws based on the person's race, ethnicity, alienage, or national origin. This includes laws appearing neutral on their face but that result in discriminatory practices or disparate treatment.

106.     Public Chapter 995 bans U.S. citizens who are a "resident" of an ITAR Country, like Plaintiff Misch, from owning an interest in land in Tennessee.

107.     Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, intend to maintain their land interests in Tennessee and would continue to do so without registering their land interests with the Commissioner or the Secretary but for Public Chapter 995's prohibitions and registration requirements detailed above.

108.     The discriminatory classifications, penalties, and prohibitions that Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, are subject to under Public Chapter 995 are based on the Prohibited Owners' national origin. Other landowners are not subject to Public Chapter 995's discriminatory bans.

109.     Public Chapter 995 was enacted with the purpose and intent to discriminate against persons based on national origin.

110.     Public Chapter 995 makes impermissible classifications based on national origin that are not justified by a compelling state interest.

111.     The Equal Protection Clause also prohibits states from treating similarly situated persons differently.

112.    Public Chapter 995 treats Prohibited Owners differently than other landowners based on where they reside. This disparate treatment impacts the fundamental right to own land.

113.    Public Chapter 995 is not narrowly tailored to meet a compelling state interest. The federal regimes regulating foreign investments in real estate, for instance, make individualized determinations of transactions based on several factors.

114.    Public Chapter 995 deprives Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, from equal protection of the laws, including laws prohibiting the exercise of their fundamental rights.

115.    The enactment and credible threat of enforcement of Public Chapter 995 will cause Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, ongoing and irreparable harm. Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, will be discriminated against, treated differently than other similarly situated landowners, face criminal and civil liability, and have their land escheated to the State with no compensation.

116.    In implementing and enforcing Public Chapter 995, Defendants are acting under color of state law to deprive Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and others similarly situated, of equal protection of the law in violation of the Fourteenth Amendment.

**COUNT SEVEN**

**42 U.S.C. § 1983 Violation of Criminalizing an Individual's Status as a Landowner Under the Eighth and Fourteenth Amendments**

117.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 116 as though fully set forth herein.

118.    A statute that criminalizes someone's status, without requiring unlawful conduct, violates the Eighth and Fourteenth Amendments.

35

119.     Public Chapter 995 is an unconstitutional status crime because it does not require any conduct to impose punishment but rather penalizes a person for mere status as a landowner.

120.     Walton Tennessee and the Individual Plaintiffs lawfully purchased land in Tennessee prior to Public Chapter 995's enactment.

121.     Once Public Chapter 995 becomes effective on January 1, 2025, Walton Tennessee and the Individual Plaintiffs will be committing a Class A misdemeanor punishable by fine and imprisonment, *see* Tenn. Code Ann. §§ 66-2-303(d) and 66-2-305(c), based solely on their status. No other conduct, lawful or otherwise, is required.

122.     The enactment and credible threat of enforcement of Public Chapter 995 against Walton Tennessee and the Individual Plaintiffs for their status as landowners will cause ongoing and irreparable harm.

123.     In implementing and enforcing Public Chapter 995, Defendants are acting under the color of state law to deprive Walton Tennessee and the Individual Plaintiffs, and others similarly situated, of their Eighth and Fourteenth Amendment right to be free from criminal punishment for their status as landowners.

## PRAYER FOR RELIEF

**WHEREFORE**, Walton Tennessee and the Individual Plaintiffs respectfully request the Court enter judgment in their favor and:

A.     Declare that Public Chapter 995 violates the Fifth, Eighth, and Fourteenth Amendments, is preempted by federal law, and is impermissibly ex post facto and is therefore unconstitutional as applied to Walton Tennessee and the Individual Owners, including the Individual Plaintiffs, and on its face, invalid, and devoid of any legal force or effect.

B. Preliminarily and permanently enjoin Defendants from implementing and enforcing Public Chapter 995.

C. Award Walton Tennessee and the Individual Plaintiffs nominal and compensatory damages pursuant to 18 U.S.C. § 1983.

D. Award Walton Tennessee and the Individual Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

E. Grant any other relief this Court deems just and proper.

Dated: October 31, 2024                       Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

/s/ *Van P. East, III*
Van P. East, III
Connor M. Blair
Timothy A. Rodriguez (admission pending approval)
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 252-3887
Facsimile: (615) 252-6348
veast@bradley.com
cblair@bradley.com
trodriguez@bradley.com

John Parker Sweeney (*pro hac vice* forthcoming)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 719-8216
Facsimile: (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs*