# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

|  |  |  |
|---|---|---|
| WALTON TENNESSEE, LLC, ET AL., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | No. 3:24-cv-01308 |
| | ) | |
| JONATHAN SKRMETTI, ET AL., | ) | District Judge Eli J. Richardson |
| | ) | Magistrate Judge Barbara Holmes |
| **Defendants.** | ) | |

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Pursuant to Fed. R. Civ. P. 65, Defendants, **Jonathan Skrmetti**, in his official capacity as the Tennessee Attorney General and Reporter, **Tre Hargett**, in his official capacity as the Secretary of State of Tennessee, **Charlie Hatcher**, in his official capacity as the Commissioner of Agriculture of Tennessee, **Russell Johnson**, in his official capacity as the District Attorney General for the 9th Judicial District of Tennessee, **Coty Wamp,** in her official capacity as the District Attorney General for the 11th Judicial District, **Robert Nash**, in his official capacity as the District Attorney General for the 19th Judicial District, **Glenn Funk**, in his official capacity as the District Attorney General for the 20th Judicial District, and **Stacey Edmonson**, in her official capacity as the District Attorney General for the 21st Judicial District, hereby respond in opposition to the Motion for Preliminary Injunction filed by Plaintiffs in this action.

Plaintiffs are challenging the constitutionality of 2024 Tenn. Pub. Acts, ch. 995 (the "Act"), which was passed by the Tennessee General Assembly on April 24, 2024, and signed into law by Tennessee Governor Bill Lee on May 21, 2024, with an effective date of January 1, 2025.[1]

---

[1] *See* 2024 Tenn. Pub. Acts, ch. 995 and § 4.

Plaintiffs' complaint includes claims that the Act (1) violates their due-process rights under the Fourteenth Amendment of the United States Constitution, (2) infringes on their rights against self-incrimination under the Fifth and Fourteenth Amendments, (3) operates to deprive Plaintiffs of their property in violation of the Takings Clause under the Fifth and Fourteenth Amendments, (4) is preempted by existing federal law, (5) constitutes an ex post facto law that is unenforceable under the United States and Tennessee Constitutions, (6) violates Plaintiffs' equal-protection rights under the Fourteenth Amendment, and (7) criminalizes Plaintiffs' status as Tennessee landowners in violation of the Eighth and Fourteenth Amendments. Plaintiffs seek declaratory and injunctive relief, as well as monetary damages.[2]

The Court should deny Plaintiffs' request that it preliminarily enjoin implementation and enforcement of specific portions of the statutes amended by the Act. For the reasons discussed below, Plaintiffs are unlikely to succeed on the merits of their claims and will not be irreparably harmed in the absence of a preliminary injunction. Specifically—and contrary to Plaintiffs' primary argument for why they need preliminary injunctive relief—Plaintiffs will *not* "suddenly find themselves criminals" nor be subject to criminal prosecution "at the stroke of midnight on December 31, 2024."[3] Consequently, Plaintiffs are also unlikely to establish standing to sue or to overcome Defendants' sovereign immunity.

## BACKGROUND

### I.    An Overview of the Act

The bulk of the Act amends Tennessee law regarding the acquisition and ownership of Tennessee land by certain aliens. 2024 Tenn. Pub. Acts, ch. 995, § 1 (deleting Part 3 of Chapter 2

---

[2]   In their Motion for Preliminary Injunction, Plaintiffs do not rely on the Equal Protection (Count Six) and landowner status criminalization claims (Count Seven) asserted in their Amended Complaint. Consequently, Defendants will not address those claims in this Response.

[3]   (Mem. in Support of Pls.' Mot. for Prelim. Inj. ("Plaintiffs' Memo in Supp."), 1.)

of Title 66 and replacing with Tenn. Code Ann. §§ 66-2-301 through -308).[4]  As amended, § 66-2-301 reiterates that, except as otherwise provided, "all aliens are capable of taking, by deed or will, lands and tenements in fee simple, or other less estate, and of holding, aliening, and devising them."[5]  And §§ 66-2-303 through -307 set forth the exceptions to that general rule.  The Act creates two separate but similar statutory schemes—one applying to agricultural land and administered by the Tennessee Commissioner of Agricultural, *see* Tenn. Code Ann. §§ 66-2-303, -304, -307, and the other applying to non-agricultural land and administered by the Tennessee Secretary of State, *see* Tenn. Code Ann. §§ 66-2-305, -306, -307.[6]  Finally, § 66-2-308 provides exclusions from the Act's coverage.

### A.  Acquisition and ownership of agricultural land

Section 66-2-303 prohibits a "prohibited foreign party" (hereinafter "Prohibited Party") or a "prohibited foreign-party-controlled business" (hereinafter "Prohibited Business") from "acquir[ing]" an interest in agricultural land in Tennessee.  Tenn. Code Ann. § 66-2-303(b)(1)(A).  It also prohibits a "party" from "hold[ing]" agricultural land as an "agent, trustee, or other fiduciary for a [Prohibited Party] or [Prohibited Business]" in violation of the section.[7]  *Id.* § 66-2-303(b)(1)(B).

---

[4]  Unless otherwise noted, all statutory citations will be to the amended, 2025 versions of the statutes.

[5]  *See also* Tenn. Code Ann. §§ 66-2-101 and -102, which were not amended by the Act.

[6]  "Agricultural land" means land in the State that is outside the corporate limits of a municipality and is: (1) used for forestry production, or (2) currently used (or used within the past five years) for farming, ranching, or timber production.  Tenn. Code Ann. § 66-2-302(1)(A).  Agricultural land does not include oil, gas, and all other minerals, including coal, lignite, brine, and all minerals known and recognized as commercial minerals underlying the land.  *Id.* § 66-2-302(1)(B).  "Non-agricultural land" means all public or private land in the State that is not agricultural land.  *Id.* § 66-2-302(7).

[7]  The Act defines "party" as a "person, corporation, company, association, firm, partnership, society, joint-stock company, trust, estate, or other legal entity."  Tenn. Code Ann. § 66-2-302(8).

The term "prohibited foreign party" (Prohibited Party) does not include a resident alien[8] but does mean: (1) a citizen or resident of a country subject to international traffic-in-arms regulations under 22 C.F.R. § 126.1; (2) a foreign government formed within a country subject to such international traffic-in-arms regulations; (3) a party, other than an individual or a government, created or organized under the laws of a foreign government within a country subject to such international traffic-in-arms regulations; (4) a party, other than an individual or a government, created or organized under the laws of a state, federal district, or territory of the United States and in which a significant interest or substantial control is held or capable of being exercised by any individual, government, or party previously referred to or a combination thereof; (5) an "entity of particular concern;[9] and (6) an agent, trustee, or other fiduciary of any of the previously listed persons or entities. Tenn. Code Ann. § 66-2-302(9). The term "prohibited foreign-party-controlled business" ("Prohibited Business") means a "corporation, company, association, firm, partnership, society, joint-stock company, trust, estate, or other legal entity whose controlling interest is owned by a prohibited foreign party." Tenn. Code Ann. § 66-2-302(10).

Any Prohibited Party or Prohibited Business that violates § 66-2-303(b) must divest itself of the agricultural-land interest within two years of the date on which it is found to be in violation. *Id.* § 66-2-303(c)(1).[10] If a Prohibited Party or Prohibited Business fails to divest in accordance with the statute, the Tennessee Attorney General may commence an enforcement action under § 66-2-307. *Id.* § 66-2-303(c)(2). In addition to a possible enforcement action, owning an interest

---

[8]  A "resident alien" is a person who is not a citizen of the United States but resides within the United States. *See* Tenn. Code Ann. § 66-2-302(12).

[9]  The Act defines "entity of particular concern" as an entity so designated by the United States Department, including certain specified entities. Tenn. Code Ann. § 66-2-302(3).

[10]  Findings that a Prohibited Party or Prohibited Business is in violation of § 66-2-303 are made by the Commissioner of Agriculture under Tenn. Code Ann. § 66-2-304(d), which also requires the Commissioner to report such violations to the Tennessee Attorney General.

in agricultural land in violation of § 66-2-303 constitutes a Class A misdemeanor. *Id.* § 66-2-303(d).

Section 66-2-304 requires all Prohibited Parties and Prohibited Businesses that hold an interest in agricultural land in Tennessee to register that interest with the Commissioner of Agriculture. Tenn. Code Ann. § 66-2-304(a)-(c). If the Commissioner finds that a Prohibited Party or Prohibited Business has failed to timely register as required, the Commissioner shall assess a civil penalty not to exceed $2,000 for each such violation. *Id.* § 66-2-304(e).

## B. Acquisition and ownership of non-agricultural land

Section 66-2-305 prohibits (only) a Prohibited Business from "acquir[ing]" an interest in non-agricultural land in Tennessee. Tenn. Code Ann. § 66-2-305(a)(1). It also prohibits a "party" from "hold[ing]" an interest in non-agricultural land as an "agent, trustee, or other fiduciary for a [Prohibited Business]." *Id.* § 66-2-305(a)(2).

Any Prohibited Business that violates § 66-2-305(a) must divest itself of the non-agricultural-land interest within two years of the date on which it is found to be in violation. Tenn. Code Ann. § 66-2-305(b).[11] If a Prohibited Business fails to divest in accordance with the statute, the Tennessee Attorney General may commence an enforcement action under § 66-2-307. *Id.* § 66-2-305(b)(2). In addition to a possible enforcement action, violation of § 66-2-305 constitutes a Class A misdemeanor. *Id.* § 66-2-305(c).

Section 66-2-306 requires all Prohibited Businesses that hold an interest in non-agricultural land in Tennessee to register that interest with the Secretary of State. Tenn. Code Ann. § 66-2-306(a)-(c). If the Secretary finds that a Prohibited Business has failed to timely register as required,

---

[11] Findings that a Prohibited Business is in violation of § 66-2-305 are made by the Secretary of State under Tenn. Code Ann. § 66-2-306(d), which also requires the Secretary to report such violations to the Tennessee Attorney General.

the Secretary shall assess a civil penalty not to exceed $2,000 for each such violation.  *Id.* § 66-2-304(e).

### C.  Enforcement Actions by the Tennessee Attorney General

Section 66-2-307 provides for the institution of enforcement actions by the Tennessee Attorney General when the Attorney General has received a report of a statutory violation from either the Commissioner of Agriculture (under § 66-2-304(d)) or the Secretary of State (under § 66-2-306(d)).   Tenn. Code Ann. § 66-2-307(a).[12]  The Attorney General may commence such an action when a Prohibited Party or Prohibited Business named in such a report has failed to divest itself of its interest in agricultural or non-agricultural land as prescribed by statute.  *Id.* § 66-2-303(c)(2); § 66-2-305(b)(2).  If the Attorney General initiates such an action and the court finds that an interest in the land in question has been "acquired or held in violation of" the applicable statutes, the court "shall enter an order so declaring" and "shall declare the agricultural land or non-agricultural land escheated to the [S]tate and order the sale of the agricultural or non-agricultural land."  *Id.* § 66-2-307(c).

### D.  Exclusions from Liability under and Application of the Act.

Section 66-2-308 sets forth exclusions under §§ 66-2-301 to -307, both from the imposition of liability under these statutes and from their application.  Liability may not be imposed on specific persons and entities, including certain real-estate brokers, attorneys, banks, credit unions, and mortgage lenders.  Tenn. Code Ann. § 66-2-308(a).  And the statutes do not apply to any Prohibited Party or Prohibited Business possessing an interest in agricultural or non-agricultural land that is "duly registered and in good standing with the [S]ecretary of [S]tate as of January 1,

---

[12]   The statute further provides that the Attorney General "may also initiate an action to enforce this part based upon the receipt of information by means other than a report from the commissioner of agriculture or secretary of state that the attorney general determines indicates that a violation of this part has occurred."  *Id.*

2025," provided that it has received the necessary approvals from the federal Committee on Foreign Investment and other federal authorities. *Id.* § 66-2-308(b).

## II. Plaintiffs' Business Activities and Real Estate Holdings in Tennessee

*Plaintiff Walton Tennessee, LLC*

Walton Tennessee, LLC ("Walton") is a Tennessee limited-liability company with its principal place of business located in Arizona. Walton has one member/owner—Walton International Group USA, Inc.—an Arizona corporation with its principal place of business also located in Arizona. See Walton's Business Entity Disclosure filed in this action.

Walton's business operations in Tennessee involve purchasing large tracts of undeveloped land located in Tennessee, managing and improving the land, and later selling the land to development companies for residential and commercial construction. (D.E. 25-1, Nixon Decl. ¶¶ 6-8.)

After acquiring a tract of land, Walton sells fractional tenant-in-common ownership interests in the land to overseas investors, acting through revocable trusts, while retaining a controlling ownership interest in the land. Each investor receives a warranty deed from Walton for the purchased tenant-in-common interest, which is recorded in the register's office of the county where the land is located. (D.E. 25-1, Nixon Decl. ¶¶ 6-8; See also copies of Deeds issued by Walton to Individual Plaintiffs attached as **Exhibits Nos. 9-13**.)

The business relationship between Walton and its co-owners for each development project is governed by a written document entitled "Declaration of Covenants, Conditions, and Restrictions" ("CCR Declaration"), which is also recorded in the appropriate register's office. The CCR Declaration for each development "authorizes Walton Tennessee to act as an agent for each investor, giving Walton Tennessee authority to handle property expenses, taxes, zoning activities, obtaining governmental approvals, working with utility providers, bringing legal challenges to

7

protect the property as a going concern, and the like." (D.E. 25-1, Nixon Decl. ¶¶ 6-8; See also CCR Declarations for Walton land developments in Tennessee attached as **Exhibit Nos. 2, 4, 6, 8**.)

Walton has identified five residential development projects in Tennessee that it contends are adversely affected by the Act: (1) Burrus Ridge, located in Robertson County; (2) Cane Ridge Landing, located in Davidson County; (3) Cane Ridge Crossing, located in Davidson and Williamson Counties; (4) Soddy-Daisy, located in Hamilton County; and (5) Pine Groves, located in Loudon County. (D.E. 25-1, Nixon Decl. ¶ 13.)

Burrus Ridge, which is located inside the city limits of White House, Tennessee, was acquired by Walton in 2014. Copies of Walton's deeds for the Burrus Ridge properties are attached as **Exhibit 1**. Burrus Ridge is currently under contract for purchase by a third-party development company. (D.E. 25-1, Nixon Decl. ¶ 18.) The CCR Declaration for Burrus Ridge is duly recorded in the Robertson County Register's Office. A copy of the Burrus Ridge CCR, as amended, is attached as **Exhibit 2**.

Cane Ridge Crossing and Cane Ridge Landing, which are located partly in Davidson County and partly in Williamson County, were acquired by Walton in 2014. Copies of Walton's deeds for the Cane Ridge properties are attached as **Exhibit 3**. Both developments are currently under contract for purchase by a third-party development company. (D.E. 25-1, Nixon Decl. ¶ 18.) The CCR Declarations for Cane Ridge Crossing and Cane Ridge Landing are duly recorded in the Davidson County Register's Office. Copies of the CCR Declarations, as amended, for the Cane Ridge properties are attached as **Exhibit 4**.

Soddy-Daisy, which is located within the city limits of Soddy-Daisy, Tennessee, was acquired by Walton in 2022. A copy of Walton's deed for the Soddy-Daisy property is attached

as **Exhibit 5**.  The CCR Declaration for Soddy-Daisy is duly recorded in the Hamilton County Register's Office. A copy of the CCR Declaration for Soddy-Daisy is attached as **Exhibit 6**.

Pine Groves, which is located in Loudon County, was acquired by Walton in 2022.  A copy of Walton's deed for the Pine Groves property is attached as **Exhibit 7**.  The CCR Declaration for Pine Groves is duly recorded in the Loudon County Register's Office.  A copy of the CCR Declaration for Pine Groves is attached as **Exhibit 8**.

*Plaintiff Stephen Misch*

Stephen Misch has sued the Defendants in his individual capacity and as beneficiary and trustee of the Misch, Stephen John Burrus Ridge Revocable Trust ("Misch Trust").  Misch currently resides in China but is domiciled in (and a citizen of) the United States.  The Misch Trust acquired a 1/1025th undivided tenant-in-common ownership interest in the Burrus Ridge development in 2014 and continues to own the interest.  The Misch Trust's ownership interest is reflected in a Special Warranty Deed from Walton that was recorded in the Robertson County Register's Office on January 6, 2015. A copy of the Misch Deed is attached as **Exhibit 9**.

*Plaintiff Jason Vance*

Jason Vance has sued the Defendants in his individual capacity and as beneficiary and trustee of the Vance, Jason Floyd Burrus Ridge Revocable Trust ("Vance Burrus Ridge Trust") and as beneficiary and trustee of the Vance, Jason Floyd Cane Ridge Landing Revocable Trust ("Vance Cane Ridge Trust").  Vance is a resident and citizen of the United States.  (D.E. 25-1, Vance Decl. ¶¶ 3-4, 8-11.)

The Vance Burrus Ridge Trust acquired a 1/1025th undivided tenant-in-common ownership interest in the Burrus Ridge development in 2015 and continues to own the interest. The Vance Burrus Ridge Trust's ownership interest is reflected in a Special Warranty Deed from

Walton that was recorded in the Robertson County Register's Office on May 4, 2015. A copy of the Vance Burrus Ridge Deed is attached as **Exhibit 10**.

The Vance Cane Ridge Trust acquired a 1/440th undivided tenant-in-common ownership interest in the Cane Ridge Landing development in 2015 and continues to own the interest. The Vance Cane Ridge Trust's ownership interest is reflected in a Special Warranty Deed from Walton that was recorded in the Davidson County Register's Office on May 19, 2015. A copy of the Vance Cane Ridge Deed is attached as **Exhibit 11**.

*Plaintiff Alessandro Silvestroni*

Alessandro Silvestroni has sued the Defendants in his individual capacity and as beneficiary and trustee of the Silvestroni, Alessandro Burrus Ridge Revocable Trust ("Silvestroni Burrus Ridge Trust") and as beneficiary and trustee of the Silvestroni, Alessandro Cane Ridge Landing Revocable Trust ("Silvestroni Cane Ridge Trust").[13] Silvestroni currently resides in Hong Kong but is domiciled in (and a citizen of) Italy. (D.E. 25-4, Silvestroni Decl. ¶¶ 3-5, 7-10.)

The Silvestroni Burrus Ridge Trust acquired a 2/1025th undivided tenant-in-common ownership interest in the Burrus Ridge development in 2014 and continues to own the interest. The Silvestroni Burrus Ridge Trust's ownership interest is reflected in a Special Warranty Deed from Walton that was recorded in the Robertson County Register's Office on October 15, 2014. A copy of the Silvestroni Burrus Ridge Deed is attached as **Exhibit 12**.

The Silvestroni Cane Ridge Trust acquired a 3/440th undivided tenant-in-common ownership interest in the Cane Ridge Landing development in 2014 and continues to own the interest. The Silvestroni Cane Ridge Trust's ownership interest is reflected in a Special Warranty

---

[13] Plaintiffs Misch, Vance, and Silvestroni will be collectively referred to as the "Individual Plaintiffs."

Deed from Walton that was recorded in the Davidson County Register's Office on August 27, 2014. A copy of the Silvestroni Cane Ridge Deed is attached as **Exhibit 13**.

**ARGUMENT**

Plaintiffs seek the "extraordinary and drastic remedy" of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Id.* To carry that burden, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 535-36 (citing *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012)). The preliminary injunction elements are "factors that are to be balanced against each other.*" Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). While the factors are to be balanced, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

Plaintiffs here have not carried their burden. Plaintiffs are unlikely to succeed on their claims because they are unlikely to establish standing to sue or that their claims are not barred by sovereign immunity. *See Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) ("In addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction."). Plaintiffs are also unlikely to succeed on the merits of their claims. Furthermore, Plaintiffs will not suffer irreparable harm in the absence of preliminary relief, and the balance of equities and the public interest weigh

against granting injunctive relief. Plaintiffs' motion for preliminary injunction should therefore be denied.[14]

## I. Plaintiffs Are Not Likely to Succeed on their Claims.

### A. Plaintiffs have not shown that they have standing to sue.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to cases and controversies, and a series of "justiciability doctrines" enforce that limitation. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). One of these doctrines is standing, which requires the plaintiff to demonstrate that (1) he has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely the injury will be redressed by a favorable decision. *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). In short, "an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to

---

[14] Plaintiffs' delay in bringing this litigation further counsels against granting the extraordinary preliminary relief they seek. The Act was passed by the General Assembly on April 24, 2024, and signed by the Governor on May 21, 2024, with an effective date of January 1, 2025. Yet Plaintiffs did not file the initial complaint or their motion seeking preliminary relief until October 31, 2024 (D.E. 1; D.E. 6) over six months after the Act's passage. That decision to delay suit is not attributable to fact development, since Plaintiffs allege that they have maintained the relevant ownership interests in land since prior to the Act's passage. (See D.E. 24, Am. Compl. ¶¶ 13-15). And it has prejudiced Defendants and this Court, which are now left with a shortened period of time to sort through lengthy, complex filings raising intricate constitutional questions. The effect of this unreasonable delay on a movant's request for extraordinary preliminary relief—whether viewed through the framework of laches or as undercutting Plaintiffs' need for immediate relief— "is a question primarily addressed to the discretion of the trial court." *Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956)). As in other cases involving similar delay, Plaintiffs' choice to seek relief so close to the effective date of the statute renders their request for injunctive relief inappropriate. *See, e.g., A.S. v. Lee*, No. 3:21-CV-00600, 2021 WL 3421182, at *9 (M.D. Tenn. Aug. 5, 2021); *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013); *Corizon, LLC v. Wainwright*, 2020 WL 6323134, at *7 (M.D. Tenn. Oct. 28, 2020).

ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2). The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute an injury in fact," and that 'allegations of possible future injury' are not sufficient.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). *See Reform Am. v. City of Detroit*, 37 F.4th 1138, 1148 (6th Cir. 2022); *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curiam).

An Article III injury can sometimes be established *before* the enforcement of a statute. To do so, however, a plaintiff must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act. *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted). A plaintiff must then prove "a *certainly impending"* threat of prosecution if the plaintiff does indeed engage in that conduct. *Id.* at 455; *see also Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024).

Furthermore, "standing is not dispensed in gross." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Plaintiffs must demonstrate standing for each of their claims, and they must show "how the requested relief against *each* of the defendants could redress plaintiffs' alleged injuries-in-fact." *Id.* (emphasis in original).

Plaintiffs have not demonstrated that they have suffered or will suffer the requisite injury-in-fact. In support of their argument for standing, Plaintiffs assert that on the Act's effective date, "Plaintiffs will be in violation of [the Act], rendering each Plaintiff subject to imprisonment and a fine," and that "Plaintiffs must … self-report their criminal status with the State, . . . [which] uses that information to escheat Plaintiffs' land." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 16.) But

these assertions are incorrect.  First, Plaintiffs have failed to show that they are Prohibited Parties or Prohibited Businesses under the Act.  But even if Plaintiffs are able to make such a showing, they acquired their land holdings before January 1, 2025, and the divestment, escheatment, and criminal provisions of the Act do not apply to land holdings acquired by Prohibited Parties and Prohibited Businesses before January 1, 2025. (D.E. 25.1-25.4).

### 1.  Plaintiffs have not shown they are subject to the Act as Prohibited Parties or Prohibited Businesses.

Plaintiffs lack standing because the Act applies only to Prohibited Parties and Prohibited Businesses, and Plaintiffs have not shown that they fit the definition of either.  See Tenn. Code Ann. § 66-2-302(9), (10).

*Individual Plaintiffs*

The Individual Plaintiffs—Vance, Misch, and Silvestroni—fail to establish that they and/or their respective Trusts are Prohibited Parties or Prohibited Businesses subject to the Act.

Vance is a resident and citizen of the United States, and he is the trustee and beneficiary of the Vance Burrus Ridge Trust and the Cane Ridge Landing Trust.  He does not allege that he is a Prohibited Party or that his Trusts are Prohibited Businesses under the Act.  (D.E. 25-3, Vance Decl.)  Indeed, Plaintiffs assert that "Vance is not a Prohibited Party or Prohibited Business." (D.E. 26-1, Plaintiffs Memo in Supp., p. 16.)

Misch is a United States citizen and the trustee and beneficiary of the Misch Burrus Ridge Trust.  Although Misch currently resides in China, his place of "residence" for purposes of the Act (as that term is defined in Tenn. Code Ann.§ 66-2-302(11)) is the United States, because he allegedly is "domiciled in the United States" and plans on living in the United States "for the permanent and foreseeable future."  (D.E. 24, Am. Compl. ¶ 13; D.E. 25-2, Misch Decl. ¶ 5.)  He therefore would not be a "resident of a country subject to international traffic in arms regulations." Tenn. Code Ann. § 66-2-302(9)(A)(i).

Silvestroni is an Italian citizen, and he is the trustee and beneficiary of the Silvestroni Burrus Ridge and Cane Ridge Landing Trusts. Although he currently lives in Hong Kong, Silvestroni's place of "residence" for purposes of the Act (as that term is defined in Tenn. Code Ann.§ 66-2-302(11)) is Italy, because he allegedly plans on "returning to Italy and living there for the permanent and foreseeable future." (D.E. 25, Am. Compl. ¶ 15; D.E. 25-4, Silvestroni Decl. ¶ 5.) And Italy is not a "country subject to international traffic in arms regulations." Tenn. Code Ann. § 66-2-302(9)(A)(i).

The Individual Plaintiffs all claim, as does Walton, that their ownership interests in the Walton developments (specifically the Burrus Ridge and Cane Ridge Landing developments) are subject to escheatment and other legal jeopardy because of their "understanding" that some of the co-owners in the two developments are Prohibited Businesses. (D.E. 25-3, Vance Decl. ¶¶ 13 and 14; Misch Decl. ¶ 10; D.E. 25-4, Silvestroni Decl. ¶¶ 12 and 13.) But as discussed below, this statement does not suffice to confer standing to sue.

*Plaintiff Walton*

Walton does not allege that it is a Prohibited Business; instead, it claims that it is a Prohibited Party because it acts as an agent for certain unnamed parties who are Prohibited Parties and Prohibited Businesses. (D.E. 24, Am. Compl. ¶ 11.) Beyond identifying the named Plaintiffs, though, Walton supports its assertion only with vague, generalized, and unspecified allegations that some of the co-investors in its Tennessee projects are Prohibited Parties and Prohibited Businesses. (D.E. 24, Am. Compl. ¶¶ 11, 24-25). These allegations do not give Walton standing to bring suit to challenge the Act.

Under § 66-2-302(9)(A)(vi), a Prohibited Party includes any "agent, trustee, or other fiduciary of a person or entity named in subdivisions (9)(A)(i)-(iv)"—i.e., a person or entity otherwise meeting the definition of a Prohibited Party. *Cf.* Tenn. Code Ann. §§ 66-2-303(b)(1)(B);

66-2-305(a)(2) (prohibiting a party from holding an interest in agricultural or non-agricultural land "as an agent, trustee, or other fiduciary for a [Prohibited Party] or [Prohibited Business]").  Walton has alleged that it acts as an agent for the Individual Plaintiffs—none of whom have been shown to be Prohibited Parties or Prohibited Businesses.  And Walton is unlikely to establish standing based on its vague allegations that it acts as an agent for other owners, "many of whom are Prohibited Parties and Prohibited Businesses" or include Prohibited Parties and Prohibited Businesses "upon information and belief."  See *Rice v. Village of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022) ("To establish standing at the summary judgment stage, we require 'a factual showing of perceptible harm.'  The plaintiff cannot rest on 'mere allegations,' like at the pleading stage, but must "set forth" by affidavit or other evidence "specific facts" demonstrating standing's three elements.").

Moreover, Walton is not a Prohibited Party by virtue of Tenn. Code Ann.§ 66-2-302(9)(A)(vi) because it does not hold title to any of the tenant-in-common interests it sells to investors, including the unnamed investors it claims are Prohibited Parties and/or Prohibited Businesses.  Instead, revocable trusts created by the investors receive title to the purchased interests, and the transfer of ownership occurs through the execution of warranty deeds by Walton which are recorded in the Register's Office of the county where the development is located.  (D.E. 24, Am. Compl. ¶ 22; D.E., 25-1, Nixon Decl. ¶ 9.)  Further, pursuant to the CCR Declarations for the Burrus Ridge, Cane Ridge Crossing, Cane Ridge Landing, Soddy-Daisy, and Pine Groves developments, Walton serves as the agent for the co-owners solely in business matters related to the administration and development of the properties.

Walton alleges that its ownership interests in the Burrus Ridge, Cane Ridge Crossing, Cane Ridge Landing, Soddy-Daisy, and Pine Groves developments are subject to escheatment and other legal jeopardy because of the "belief" that some of the co-owners in the developments are

Prohibited Businesses and/or Prohibited Parties. (D.E. 24, Am. Compl. ¶ 20; D.E. 25-1, Nixon Decl. ¶ 14.) But this allegation is insufficient to confer standing on Walton for two reasons. First, as discussed above, the Act does not authorize escheatment actions against land holdings acquired by Prohibited Parties or Prohibited Businesses before January 1, 2025. Second, even if escheatment were a possibility, the interests subject to escheatment under the Act are those ownership interests acquired by the Prohibited Parties and Prohibited Businesses in violation of the Act—not those of Walton.

Walton also alleges that the Act threatens its business model and its business operations as a going concern because the Act would stop or hinder it from acquiring and owning additional Tennessee properties in the future. (D.E. 24, Am. Compl. ¶ 8; D.E. 25-1, Nixon Decl. ¶ 10.) But again, Walton does not allege that it is a Prohibited Business, and it alleges it is a Prohibited Party based only on its role as an agent. The Act would therefore not preclude Walton itself from buying and selling additional land in Tennessee after January 1, 2025. Moreover, such allegations of "possible future injury" are purely speculative and wholly insufficient to create standing since they fail to show a "concrete, particularized, and actual or imminent injury." *Clapper*, 568 U.S. at 409.

Finally, Walton has not shown that it has third-party standing—standing to sue on behalf of the unnamed third-party investors it claims are Prohibited Parties and/or Prohibited Businesses. Generally, "a plaintiff must 'assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Coyne ex rel. Ohio v. Am. Tobacco Co*., 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); see *United States v. Ovalle*, 136 F.3d 1092, 1100-01 (6th Cir. 1998); *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). The rare "third-party standing" exception to this requirement allows federal courts to hear cases in which a plaintiff can "show that (1) it has suffered an injury in fact; (2) it has a close relationship to the third party; and (3) there is some hindrance to the third party's ability to protect

his or her own interests." *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 404 (6th Cir. 1999); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998). Walton has failed to make any showing that would entitle it to challenge the Act on behalf of unnamed third-party investors.

First, Walton has failed to show it has suffered any injury in fact. Although Walton alleges that it will be forced to divest its current land holdings and will be subject to the Act's criminal and civil penalties, the registration requirements, and possible escheatment (D.E. 24, Am. Compl. ¶ 11), the divestment, escheatment, and criminal provisions of the Act do not apply to lands acquired before January 1, 2025, as discussed, and Walton has failed to show that it is a subject to these requirements as a Prohibited Party anyway.

Second, Walton has not shown that it has a "close relationship" with any third party, such as the doctor-patient relationship recognized as a basis for third-party standing in *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (discussing *Griswold v. Connecticut*, 381 U.S. 479 (1965). Unlike the highly confidential relationship between a doctor and patient, the business relationships between Walton and its co-investors are the product of sophisticated arm's length business transactions, which are memorialized in deeds of conveyance and other property-record filings. (*See* Exhibits 1-13.)

Third, Walton has failed to show why the unnamed Prohibited Parties and Prohibited Businesses, which purportedly engaged in sophisticated arm's length business transactions with Walton, are now incapable of acting on their own behalf. Moreover, since these land transactions are a matter of public record, there is no privacy concern for the unnamed Prohibited Parties and Prohibited Businesses in coming forward. Cf. *Singleton*, 428 U.S. at 115. Although Walton alleges that "the time and expense of traveling from overseas to Tennessee to litigate their rights" is preventing the unnamed Prohibited Parties and Prohibited Businesses from challenging the Act

directly (D.E. 26-1, Plaintiffs' Memo in Supp, p. 19), Walton fails to explain why they are unable to retain and utilize counsel in Tennessee through email and other electronic communications, none of which would require traveling to Tennessee.

### 2. The Act does not apply to Plaintiffs' ownership of previously acquired land.

Section 66-2-303(b)(1)(A) goes into effect on January 1, 2025, and precludes Prohibited Parties and Prohibited Businesses from "acquir[ing]" interests in agricultural land. Because statutes are presumed to operate prospectively, *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998), this provision does not preclude Prohibited Parties or Prohibited Businesses from continuing to own interests in agricultural land that they acquired before January 1, 2025. Any Prohibited Party or Prohibited Business that acquires such a land interest on or after January 1, 2025, and is therefore found "in violation of" § 66-2-303(b), must divest itself of the interest within two years of such a finding. Tenn. Code Ann. § 66-2-303(c)(1). A failure to divest within two years may lead to an enforcement action and escheatment of the land, see Tenn. Code Ann. §§ 66-2-303(c)(2), 66-2-307(a), (c), but neither the divestment requirement nor the escheatment provision applies to interests in agricultural land that were acquired by Prohibited Parties and Prohibited Businesses before January 1, 2025. The criminal provision in § 66-2-303(d) likewise applies only to those Prohibited Parties and Prohibited Businesses owning an interest in agricultural land on or after January 1, 2025, in violation of § 66-2-303(b)—i.e., that acquire such land on or after January 1, 2025, and fail to divest their interest as required by § 66-2-303(c).

Section 66-2-305 works similarly with respect to non-agricultural land. Section 66-2-305(a)(1) precludes Prohibited Businesses from "acquir[ing]" interests in non-agricultural land after January 1, 2025, but does not preclude Prohibited Businesses from continuing to own interests in non-agricultural land that they acquired before that date. Any Prohibited Business that acquires such a land interest on or after January 1, 2025, and is therefore found "in violation of" §

66-2-305(a), must divest itself of the interest within two years of such a finding. Tenn. Code Ann. § 66-2-305(b)(1). A failure to divest within two years may lead to an enforcement action and escheatment of the land, see Tenn. Code Ann. §§ 66-2-305(b)(2), 66-2-307(a), (c), but again, neither the divestment requirement nor the escheatment provision applies to interests in non-agricultural land acquired by Prohibited Businesses before January 1, 2025. And the criminal provision in § 66-2-305(c) likewise applies only to Prohibited Businesses owning an interest in agricultural land on or after January 1, 2025, in violation of § 66-2-305(a)—i.e., that acquire such land on or after January 1, 2025, and fail to divest their interest as required § 66-2-305(b).

In summary, Plaintiffs have failed to show that they are Prohibited Parties or Prohibited Businesses under the Act. But even if they are able to make such a showing, the Act does not ban them from continuing to own their previously acquired land interests in Tennessee or require them to divest those interests. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 14.) The Act does require Prohibited Parties or Prohibited Businesses that own previously acquired interests in agricultural and non-agricultural land to register those interests with the State, see Tenn. Code Ann. §§ 66-2-304, -306, but the failure to register leads only to a civil penalty—not escheatment, see id. §§ 66-2-304(e), 66-2-306(e); cf. id. § 66-2-307(a) (authorizing initiation of an enforcement action upon receipt of a report under Subsection (d) of § 66-2-304 or Subsection (d) of § 66-2-306).

**B.      Plaintiffs' claims are barred by sovereign immunity.**

For many of the same reasons Plaintiffs lack standing to sue, sovereign immunity also bars their claims. Defendants are all sued in their official capacities only (D.E. 24, Am. Compl. ¶¶ 16-23), and therefore enjoy sovereign immunity from suit. The exception to sovereign immunity under *Ex parte Young*, 209 U.S. 123 (1908), does not apply.

The Eleventh Amendment provides: "The Judicial Power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United State by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI; *see Russell v. Lunder-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). The sovereign immunity guaranteed by this Amendment deprives federal courts of subject-matter jurisdiction when a State is sued, unless the State waives that immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984). Tennessee has not waived its immunity under the Eleventh Amendment with respect to civil-rights suits. *See* Tenn. Code Ann. § 20-13-102(a); *ACLU v. Tennessee*, 496 F. Supp. 218 (M.D. Tenn. 1980); *Hair v. Tenn. Consol. Ret. Sys.*, 790 F. Supp. 1358 (M.D. Tenn. 1992).

A suit against a state official in his official capacity is considered to be a suit against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Wells v. Brown*, 891 F.2d 591, 592-94 (6th Cir. 1989). "However, there is an exception to the State's sovereign immunity under *Ex parte Young*, 209 U.S. 123 (1908), whereby 'a suit challenging the constitutionality of a state official's action is not one against the State." *Russell*, 784 F.3d at 1046-47. "In order to fall under the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Id.* at 1047.

The exception does not apply, however, "when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional statute." *Id.* Merely claiming that a state official has an obligation to execute the laws is not sufficient to show that the exception applies. *Id.* *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). A defendant need not have "direct criminal enforcement authority," *Universal Life*, 35 F.4th at 1040, but there must be "'a realistic possibility the official will take legal or administrative actions against the plaintiff's interests[,]'" *EMW Women's Surgical Ctr.*, 920 F.3d at 445 (quoting *Russell* 784 F.3d at 1048); *see also Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818,

828 (10th Cir. 2007) ("[S]tate officials must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty.").

As discussed above, Plaintiffs have not shown any "realistic possibility" of the Defendants taking any legal or administrative action against their interests in the foreseeable future. Although Plaintiffs assert that they may be subject to escheatment and/or criminal prosecution under the Act, again, the escheatment and criminal provisions of the Act apply only to land holdings of Prohibited Parties and Prohibited Businesses and do not apply to any interests in land acquired by Prohibited Parties and Prohibited Businesses before January 1, 2025. Plaintiffs have certainly not shown that the prosecution of any Plaintiff by any of the District Attorney Defendants or the institution of an escheatment action by the Attorney General against their ownership interests is imminent or realistically possible in the foreseeable future.

### C. Plaintiffs are not likely to succeed on the merits of their constitutional claims.

Plaintiffs' unlikelihood of success in establishing jurisdiction provides reason enough to deny preliminary injunctive relief. But even if Plaintiffs could establish jurisdiction, they would still be unlikely to succeed on their substantive claims. Indeed, lying at the heart of most of the claims on which Plaintiffs rely is their mistaken belief that, come January 1, 2025, they will be in violation of the Act.

#### 1. The Act does not violate due process.

Plaintiffs purport to challenge the Act as violating due process "both on its face and as applied to Walton Tennessee's principals, including the Individual Plaintiffs." (D.E. 24, Am. Compl. ¶ 67.) Plaintiffs say they are likely to succeed on their claims that certain provisions of the Act are impermissibly vague and ambiguous and that the Act imposes criminal penalties without sufficient due process. (D.E. 26-1, Plaintiffs' Memo in Supp., pp. 19-24, 24-27.) They are not, however, likely to succeed.

"Facial challenges are disfavored" as a general matter, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008),[15] and Plaintiffs cannot bring a facial challenge to the Act on vagueness grounds. "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand . . . . " *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). "In other words, the statute must be judged on an as-applied basis, and a facial challenge before the statute has been applied is premature." *Nat'l Rifle Ass'n of Am.,* 132 F.3d at 292. The plaintiff "bears the burden of establishing that the statute is vague as applied to his particular case, not merely that the statute could be construed as vague in some hypothetical situation." *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) (quoting *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001)); *see also Bowling v. McDonough*, 38 F.4th 1051, 1061-62 (Fed. Cir. 2022) ("Appellants' facial vagueness challenge thus fails because they have not argued or shown vagueness as applied to them."). Even if Plaintiffs could mount a facial challenge, Plaintiffs could not carry their heavy burden of showing that the Act is "impermissibly vague in all . . . applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).

Plaintiffs likely cannot establish that the Act is vague as applied to them—indeed, as discussed above, Plaintiffs have not shown that the Act will apply to them at all. Moreover, the divestment, escheatment, and criminal provisions of the Act do not apply to land holdings acquired by Prohibited Parties and Prohibited Businesses before January 1, 2025, and Plaintiffs acquired their land holdings before January 1, 2025. Furthermore, Plaintiffs have not alleged that the Act has been, or will be, enforced in an arbitrary or discriminatory manner. *See Vill. of Hoffman Ests.*,

---

[15] Facial challenges are disfavored because they attempt "to invalidate the law in each of its applications, to take the law off the books completely." *Connection Distrib. Co.*, 557 F.3d at 335. They "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented." *Grange*, 552 U.S. at 451.

455 U.S. at 503 (holding that in the absence of evidence of discriminatory enforcement, "the speculative danger of arbitrary enforcement does not render [a law] void for vagueness").

In any event, the provisions of the Act do not violate due process, which requires only "fair warning" so that a "person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited."  U.S. Const. amend. XIV, *Grayned v. Rockford*, 408 U.S. 104, 108 (1972); *see also Libertarian Party v. Husted*, 751 F.3d 403, 421 (6th Cir. 2014).  A statute is not unconstitutionally vague if it defines the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement."  *United States v. Dunning*, 857 F.3d 342, 348 (6th Cir. 2017).  In determining whether a law provides sufficient guidance, the courts look to the words used in the statute.  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 246 (6th Cir. 2018).  "[W]e can never expect mathematical certainty from our language," so even if a law has flexibility and reasonable breadth, it is not considered to be vague.  *Id.* at 246-47.  Also, when the common meaning of the statutory words provides sufficient notice, the statute's failure to define the term does not render the statute vague.  *Id.*  When the challenged language is used commonly in both legal and common settings, it will be considered sufficiently clear.  *Id.*  "Perfect clarity and precise guidance have never been required."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

The Act provides fair notice that certain prohibited entities may not acquire or own an interest in agricultural and non-agricultural land in Tennessee on or after January 1, 2025.  Despite Plaintiffs' assertions, the law provides sufficient guidance regarding the *who*, *what*, and *when* of its application.  A statute is not unconstitutionally vague simply because its "factual application will necessarily entail a case-by-case analysis."  *United States v. Heaton*, 59 F.4th 1226, 1247 (11th Cir. 2023).  And even when it is less obvious that the Act may apply, that does not render

the statute vague. It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952).

### a. The Act sufficiently defines who is prohibited from acquiring land.

Plaintiffs claim that the statutory terms "resident" and "agricultural land" are unconstitutionally vague because they fail to sufficiently define who is prohibited from owning land. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 19-23; D.E. 24, Am. Compl. ¶¶ 7, 68, 71.) Not so. The statutory language in the Act provides sufficient guidance to ordinary people regarding who is banned from owning land.

The Act provides that a Prohibited Party—a "prohibited foreign party"—means a "citizen or resident of a country subject to international traffic in arms regulations under 22 C.F.R. § 126.1." Tenn. Code Ann. § 66-2-302(9)(A)(i). While the Act does not define "resident," it does define "residence"—"a person's principal dwelling place where the person intends to remain *permanently* for an indefinite period of time." *Id.* § 66-2-302(11) (emphasis added). Plaintiffs assert that "resident" has "multiple, conflicting meanings" but also acknowledge that "resident" is defined as "[s]omeone who lives *permanently* in a particular place; specif., a person who has established a domicile in a given jurisdiction." (D.E. 24, Am. Compl. ¶ 68.) (citing *Resident, Black's Law Dictionary* (12th ed. 2024)) (emphasis added). Plaintiffs further agree that "residence" is synonymous in meaning with "domicile."[16] (D.E. 24, Am. Compl. ¶ 68.) A "prohibited foreign party," therefore, plainly includes a "resident of a county subject to international traffic in arms regulations"—i.e., a person who intends to remain in such a country "permanently for an indefinite

---

[16] A "domicile" is "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." *Domicile, Black's Law Dictionary* (12th ed. 2024).

period of time." "[O]nly reasonable interpretations can serve as a basis for concluding that a statute is ambiguous," *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 256 (6th Cir. 2020), and it would be unreasonable to interpret the Act to mean that a United States citizen who temporarily resides in a country subject to international traffic-in-arms regulations, such as China, would be a "prohibited foreign party."

Nor is the term "agricultural land" impermissibly vague—the Act includes a detailed definition of this term. "Agricultural land" means "land in [Tennessee] that is outside the corporate limits of a municipality" that is "[u]sed for forestry production, including, without limitation, land exceeding ten (10) acres in which ten percent (10%) or more of the land is stocked by trees of any size, including land that formerly had trees of any size covering the land that will be naturally or artificially regenerated" or that is "[c]urrently used for, or, if currently idle, land last used within the past five (5) years, for farming, ranching, or timber production, except land not exceeding ten (10) acres in the aggregate, if the annual gross receipts from the sale of the farm, ranch, or timber products produced on the land do not exceed one thousand dollars ($1,000), including, without limitation, land used by persons and entities for activities regulated under title 70." Tenn. Code Ann. § 66-2-302(1)(A)(i-ii).

Plaintiffs' complaint that the term "agricultural land" is undefined is of no merit. (D.E. 24, Am. Compl. ¶ 71.) A statute is not required to define commonly understood words. *Platt*, 894 F.3d at 247. A person of ordinary intelligence can understand the definition of "agricultural land." Plaintiffs claim ambiguity and conflict regarding the size of agricultural land. (D.E. 24, Am. Compl. ¶ 71.) The Act defines "agricultural land" to mean land "used for forestry production, including, without limitation, land exceeding ten (10) acres" or land that is "[c]urrently used . . . for farming, ranching, or timber production, except land not exceeding ten (10) acres in the aggregate" indicates that parties may own land that is 10 acres or less under the Act. In other

26

words, to constitute "agricultural land," the land should be more than ten (10) acres in size and located outside the corporate limits of a municipality. Tenn. Code Ann. § 66-2-302(1)(A)(i-ii). This definition is sufficiently clear and unambiguous. Moreover, the law does not require "perfect clarity and precise guidance" nor "mathematical certainty." *Ward*, 491 U.S. at 794; *Grayned*, 408 U.S. at 110. Thus, the statute provides sufficient guidance regarding prohibited owners and is not impermissibly vague.

### b. The Act sufficiently defines when land must be divested.

Plaintiffs claim that the Act fails to sufficiently define when prohibited owners must divest their interest in land. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 23-24; D.E. 24, Am. Compl. ¶ 69.) To the contrary, the statutory framework provides fair notice of an orderly divestiture process and reasonably clear guidelines for enforcement. Plaintiffs' assertion that the Act "creates three independent deadlines" for divestiture (D.E. 26-1, Plaintiffs' Memo in Supp. p. 23) results from their mistaken understanding of the Act's application and their conflation of the Act's divestiture and registration provisions.

The Act provides that a Prohibited Party or Prohibited Business (under § 66-2-303) or a Prohibited Business (under § 66-2-305) "in violation of this section shall divest itself of the interest in agricultural [or non-agricultural] land within two (2) years of the date the entity is found to be in violation." Tenn. Code Ann. §§ 66-2-303(c)(1); 66-2-305(b)(1). And under §§ 66-2-304(d) and 66-2-306(d), the Commissioner of Agriculture and the Secretary of State, respectively, make findings that a Prohibited Party or Prohibited Business "has acquired or holds title to or an interest in" agricultural or non-agricultural land in violation of §§ 66-2-303(b)(1) or 66-2-305(a). The Act plainly provides, therefore, that once there is a finding that a Prohibited Party or a Prohibited Business is in violation, the prohibited owner has two years from that date to divest its interest in the land.

Plaintiffs acknowledge as much—they say that "[w]ithin two years of the date the Prohibited Owner is found to be in violation of Public Chapter 995, he must divest his interest in land. . . ." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 24.)  Once again, though, the Act's divestiture, escheatment, and criminal provisions do not apply to interests in agricultural or non-agricultural land that were acquired before January 1, 2025.  So, contrary to Plaintiffs' further assertions (D.E. 26-1, Plaintiffs' Memo in Supp., p. 23, 24), prohibited owners need *not* divest their interest in land by January 1, 2025, and prohibited owners need *not* divest "their by-then-illegal ownership interest" by March 1, 2025.  (D.E. 26-1, Plaintiffs' Memo in Supp., p. 23, 24.)  Yes, Prohibited Parties and  Prohibited Businesses holding interests in agricultural or non-agricultural land on January 1, 2025, must register those interests with the State within 60 days, but neither the ownership of such previously acquired interests nor any failure to register those interests constitutes a criminal offense.  Tenn. Code Ann. §§ 66-2-304(e), 66-2-306(e).

### c.  The Act does not impose criminal liability without due process.

Plaintiffs claim that the Act violates due process because the Act, "without a hearing, deprives individuals of both liberty and property by making criminals of Prohibited Owners." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 24-25; D.E. 24, Am. Compl. ¶ 72; *see id.* ("On January 1, 2025, Prohibited Owners, like Walton Tennessee and Plaintiffs Misch and Silvestroni, commit a Class A misdemeanor punishable by criminal fine and imprisonment. *See* Tenn. Code Ann. § 66-2-303(d).").   This claim will fail because it is based on a flawed premise, and the Act provides adequate procedures.

First, and as discussed in Section I.A.2 above, the Act does not "make criminals" of Prohibited Parties or Prohibited Businesses owning agricultural or non-agricultural land as of January 1, 2025.  The criminal provisions of the Act, §§ 66-2-303(d) and 66-2-305(c)—along with its divestment and escheatment provisions—do not apply to agricultural or non-agricultural land

acquired by Prohibited Parties or Prohibited Businesses before January 1, 2025.[17]

Second, application of the Act's criminal provisions to the ownership of land acquired *after* January 1, 2025, comes with sufficient procedural safeguards. Again, if a Prohibited Party or Prohibited Business acquires agricultural or non-agricultural land in violation of the Act, it must divest its interest in the land within two years of such a finding by the Commissioner of Agriculture or Secretary of State. Tenn. Code Ann. §§ 66-2-303(c); 66-2-305(b). Only the failure to divest as prescribed, after having acquired land in violation of §§ 66-2-303(b) or 66-2-305(a), subjects a Prohibited Party or Prohibited Business to potential criminal liability.

A fundamental part of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 485 (6th Cir. 2014). And before criminal liability would be imposed under the Act, a Prohibited Party or Prohibited Business would be afforded the "full panoply of rights to which a defendant in a criminal proceeding is entitled," *Blackmon v. Tenn. Bd. of Paroles*, 29 S.W.3d 875, 877 (Tenn. Ct. App. 2000), including the right to a hearing. Under Tennessee law, a criminal defendant has a right to a preliminary hearing, arraignment, and trial, as well as an absolute right to appeal after a conviction. Tenn. R. Crim. P. 5.1; 10; 23; Tenn. R. App. P. 3(b).

### 2. The Act does not violate the Takings Clause.

Plaintiffs claim that the Act violates the Takings Clause, because its enforcement process culminates in an action that, if successful, requires escheatment of the agricultural or non-agricultural land. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 27-28; D.E. 24, Am. Compl. ¶¶ 82-

---

[17] Even if §§ 66-2-303(d) or 66-2-305(c) were construed in isolation to impose criminal liability for ownership of agricultural or non-agricultural land acquired by Prohibited Parties or Prohibited Businesses before January 1, 2025, they would not violate due process. The Act was signed into law on May 21, 2024, and thus provided seven months' notice before these statutes went into effect. *See State v. Roth*, 458 P.3d 150, 154 (Idaho 2020) ("[A] citizen is presumptively charged with knowledge of criminal statutes once enacted").

88.)  But the Act constitutes a reasonable regulation of the ownership of land interests that does not violate the Takings Clause.

Plaintiffs focus on the Act's escheatment provision but ignore all that must occur under the Act before escheatment may be ordered—namely, the acquiring of agricultural or non-agricultural land by a Prohibited Party or Prohibited Business in violation of the Act, Tenn. Code Ann. §§ 66-2-303(b), 66-2-305(a); a finding of such a violation by the Commissioner of Agriculture or Secretary of State, *id.* §§ 66-2-304(d), 66-2-306(d); the failure of the Prohibited Party or Prohibited Business to divest within two years of such a finding, §§ 66-2-303(c), 66-2-305(b); the Attorney General's initiation of an enforcement action, §§ 66-2-303(c)(2), 66-2-305(b)(2), 66-2-307(a);[18] and, most significantly, a finding by the court that "an interest in the agricultural land or non-agricultural land in question has been acquired or held in violation of [Part 3 of Chapter 2 of Title 66]," *id.* § 66-2-307(c)(2).  None of these things has occurred here.  Nor can they—even if Plaintiffs were Prohibited Parties or Prohibited Businesses. These provisions of the Act do not affect Plaintiffs' current real-estate holdings, all of which were acquired before January 1, 2025. For Prohibited Parties and Prohibited Businesses holding interests in land that were acquired before January 1, 2025, there is no threat of escheatment to the State under the Act.

Regardless, any escheatment ordered under the Act would not violate the Takings Clause, which states: "nor shall private property be taken for public use, without just compensation."  And as Plaintiffs assert, "[a] physical taking occurs whenever the government 'dispossess[es] the owner' of their *lawfully acquired* property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.*

_____

[18]  Plaintiffs make reference to the Attorney General's ability to initiate an enforcement action under § 66-2-307(a) "based upon the receipt of information by means other than a report" from the Commissioner of Agriculture or Secretary of State.  (D.E. 26-1, Plaintiffs' Memo in Supp., p. 7.)  Given the provisions of §§ 66-2-303(c)(2) and 66-2-305(b)(2), as well as the finding required for the court to order escheatment under § 66-2-307(c)(2), that information must still demonstrate that the Prohibited Party or Prohibited Business is in violation of §§ 66-2-303(b) or 66-2-305(a) and has failed to divest in accordance with §§ 66-2-303(c) or 66-2-305(b).

*Agency*, 535 U.S. 302, 324 n.19 (2002) (emphasis added). "To bring a takings claim, a plaintiff must first establish a valid interest in the property. A property holder cannot claim an interest in property that violates a pre-existing limitation on ownership, as defined by state law." *Pharm. Rsch. and Mfrs. of Am. v. Williams*, 715 F. Supp. 3d 1175, 1187 (D. Minn. 2024) (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021)). "If the governmental action simply enforces a pre-existing limitation on that property, the government does not effect a taking because the property owner had no legal right to use the property in such a way in the first place." *Id.*

An escheatment of land under § 66-2-307 of the Act would result from the enforcement of a pre-existing limitation on the land—namely, the Act's prohibition against Prohibited Parties or Prohibited Businesses acquiring it. As discussed, before ordering escheatment the court must find that the land had been acquired *in violation* of the Act. Since lands subject to escheatment under the Act would not have been "lawfully acquired" in the first place, Plaintiffs will not likely succeed in establishing that such escheatment would constitute an unconstitutional taking.

### 3. The Act does not violate the right against self-incrimination.

Plaintiffs claim that the registration requirements under the Act violate their right against self-incrimination. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 29-31; D.E. 24, Am. Compl. ¶¶ 76-80.) Plaintiffs contend that "Prohibited Owners that own an interest in land on January 1, 2025 have committed a crime" and that "the State thereafter compels these Prohibited Owners . . . to register with the State the facts proving their criminal status." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 29.) But this claim, too, is based on a flawed premise.

As discussed in Section I.A.2. above, the Act does not "make criminals" of Prohibited Parties or Prohibited Businesses owning agricultural or non-agricultural land as of January 1, 2025. The criminal provisions of the Act, § 66-2-303(d) and 66-2-305(c)—along with its divestment and escheatment provisions—do not apply to agricultural or non-agricultural land acquired by

Prohibited Parties or Prohibited Businesses before January 1, 2025. So even if Plaintiffs were Prohibited Parties or Prohibited Businesses and were required to register their current land interests under §§ 66-2-304 or 66-2-306 of the Act, such a requirement would not compel them to "prove their criminal status," since they would have no criminal status. For the same reason, and contrary to Plaintiffs' assertion, the registration requirements do not "target[] only those who have violated [the Act]." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 30.) They simply require Prohibited Parties or Prohibited Businesses who hold an interest in agricultural or non-agricultural land on or after January 1, 2025, to register that interest with the State. *See* Tenn. Code Ann. §§ 66-2-304(a), 66-2-306(a). For that reason alone, Plaintiffs are not likely to succeed on this claim.

Furthermore, and in any event, the Act's registration requirements involve non-testimonial, regulatory inquiries. *See United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character."). And the registration requirements are enforced only administratively through the assessment of civil penalties by the Commissioner of Agriculture, under § 66-2-304(e), and the Secretary of State, under § 66-2-306(e). The Supreme Court has held that disclosure requirements do not violate the Fifth Amendment when the statutes being challenged are regulatory measures and not intended to be criminal. *See California v. Byers*, 402 U.S. 424, 430-31 (1971); *United States v. Sullivan*, 274 U.S. 259, 262-64 (1927). Even when "incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, [that fact] does not clothe such required conduct with the testimonial privilege." *Hubbell*, 530 U.S. at 35.

### 4. The Act is not preempted by federal law.

Plaintiffs claim that the Act is impliedly preempted by federal law, both as a result of field preemption and conflict preemption. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 31-38; D.E. 24

Am. Compl. ¶¶ 90-100.)  The Act is not impliedly preempted, however, so Plaintiffs are unlikely to succeed on this claim as well.  The Act represents a proper exercise of the Tennessee General Assembly's legislative authority, and it does not infringe on the intent or purpose of any federal law.

Only "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid."  *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859 (6th Cir. 1991).  The focus of the preemption analysis is on "congressional intent, i.e., whether the statute demonstrates an intent to supplant state authority in a particular field."  *Id.*  (internal citations and quotations omitted).

"[I]mplied preemption applies in one of two forms: field or conflict."  *Id.*  "Field preemption occurs where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Id.*  (internal quotations omitted).  Conflict preemption occurs when Congress has not entirely displaced state regulation over the matter in question.  *Id.*  (internal citations omitted).  In the case of conflict preemption, "state law may be preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Id.*  (internal citations omitted).

In support of their preemption claim, Plaintiffs appear to rely primarily on two federal enactments and their corollary counterparts:  (1) U.S.C. § 4565 and the Committee on Foreign Investment in the United States (collectively "CFIUS") and later amendments and expansions to CFIUS including the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 (formerly codified at 50 U.S.C. § 2170), the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, and the Foreign Investment Risk Review

Modernization Act of 2018 ("FIRRMA"); and (2) the Agricultural Foreign Investment Act ("AFIDA") and the Farm Service Agency which implements AFIDA. Plaintiffs argue that these statutes, taken together, work to preempt the Act. None of these federal statutes, however, preempt the Act.

### a. CFIUS and its later permutations and amendments do not preempt the Act.

First, Plaintiffs argue that CFIUS (including its multiple amendments through FIRRMA) creates a field of preemption based on its pervasive regulations, precluding the agricultural and non-agricultural provisions of the Act. Second, Plaintiffs argue that 31 C.F.R. § 802.233 creates conflict preemption with Tenn. Code Ann. § 66-2-308(b). Neither of these arguments has merit.

### i. CFIUS does not create field preemption.

To determine whether a federal statute such as CFIUS creates a field of preemption, a court must analyze the scope and intent of CFIUS. *See Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013) ("We use our judgment to determine when state law creates an unconstitutional obstacle to federal law, and 'this judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects."). Most relevant here is CFIUS's definition of the covered transactions that it regulates, which are any of the following:

> **(i)** Any merger, acquisition, or takeover that is proposed or pending after August 23, 1988, by or with any foreign person that could result in foreign control of any United States business, including such a merger, acquisition, or takeover carried out through a joint venture.

> **(ii)** Subject to subparagraphs (C) and (E), the purchase or lease by, or a concession to, a foreign person of private or public real estate that--

>> **(I)** is located in the United States;

>> **(II)(aa)** is, is located within, or will function as part of, an air or maritime port; or

>> **(bb)(AA)** is in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security;

34

**(BB)** could reasonably provide the foreign person the ability to collect intelligence on activities being conducted at such an installation, facility, or property; or

**(CC)** could otherwise expose national security activities at such an installation, facility, or property to the risk of foreign surveillance; and

**(III)** meets such other criteria as the Committee prescribes by regulation, except that such criteria may not expand the categories of real estate to which this clause applies beyond the categories described in subclause (II).

**(iii)** Any other investment, subject to regulations prescribed under subparagraphs (D) and (E), by a foreign person in any unaffiliated United States business that--

**(I)** owns, operates, manufactures, supplies, or services critical infrastructure;

**(II)** produces, designs, tests, manufactures, fabricates, or develops one or more critical technologies; or

**(III)** maintains or collects sensitive personal data of United States citizens that may be exploited in a manner that threatens national security.

**(iv)** Any change in the rights that a foreign person has with respect to a United States business in which the foreign person has an investment, if that change could result in--

**(I)** foreign control of the United States business; or

**(II)** an investment described in clause (iii).

**(v)** Any other transaction, transfer, agreement, or arrangement, the structure of which is designed or intended to evade or circumvent the application of this section, subject to regulations prescribed by the Committee.

50 U.S.C. § 4565 (4)(B).

This definition demonstrates that CFIUS's purpose is to regulate transactions near United States ports, military installations, or other real estate that would allow for a foreign person to collect sensitive information at or near a military installation. Plaintiffs acknowledge as much—they assert that CFIUS is "the interagency body responsible for overseeing *issues of national security* with respect to direct foreign investment." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 8 (emphasis added).) And Plaintiffs cite the Federal Register, specifically Vol. 83, No. 197 (Oct.

35

11, 2018), at 51323. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 9.)[19] This section, and others discussing CFIUS and FIRRMA, are replete with references to *national-security* concerns.

The Federal Register identifies the background and original purpose of CFIUS, which was to allow "the Committee, to review mergers, acquisitions, and takeovers by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States, to determine the effects of such transactions on the national security of the United States." 83 Fed. Reg. 51323 (Oct. 11, 2018). The original enactment of CFIUS, however, did not even involve the topic of land purchases. *See Shen v. Simpson,* 687 F. Supp. 3d 1219, 1248 (N.D. Fla. 2023) (discussing the history of CFIUS and noting it was not until 2018 through FIRRMA that Congress further "authoriz[ed] the President to suspend or prohibit certain real estate transactions"), *appeal filed* (No. 23-12737) (11th Cir). Indeed, the term "national security" appears seven times on the page of the Federal Register relating to FIRRMA and CFIUS cited by Plaintiffs.

The congressional intent of CFIUS is not to regulate the entire field of registration of foreign-owned land in a particular state or whether states can or cannot regulate the ownership of land within their borders. Rather, Congress enacted CFIUS to protect critical United States infrastructure and allow the President to veto certain acquisitions of land if a limited set of criteria are satisfied to protect national security. *See* 50 U.S.C.A. § 4565 (4)(B); 31 C.F.R. § 802.211 (again describing regulated land in "close proximity to military installation[s]"). The intent behind this regulatory scheme is unrelated to Tennessee's statutory scheme addressing the acquisition and ownership of land located in Tennessee by certain prohibited foreign parties. Plaintiffs argue the Act "disturbs foreign relations" and enacts contrary state laws in the "face of pervasive federal law in the very same field." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 35.) Yet CFIUS, by its plain

---

[19] Plaintiffs actually cite Page 51322, but the quoted language appears on Page 51323.

text, regulates an extremely small number of land transactions, and those only for the purposes of national security.  It does not preempt the entire legal landscape for regulating land ownership by certain prohibited foreign parties.

Plaintiffs place emphasis on the purpose and intent behind the Act.  (D.E. 26-1, Plaintiffs' Memo in Supp., p. 34.)  The legislative intent behind the Act, however, is largely irrelevant to the preemption question.  The focus of the analysis is Congress's intent in passing CFIUS, not the intent of the Tennessee Legislature in passing the Act.  *See Gustafson v. City of Lake Angelus*, 76 F.3d 778, 782 (6th Cir. 1996) (noting the focus on Congress's intent to occupy the "field of regulation"); *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1254 (11th Cir. 2022) (noting the need to examine, "the statutory text, its regulatory framework, and, if necessary, the legislative history . . . to determine whether Congress made a deliberate choice to exclude").

 The intent behind CFIUS was to protect United States' national-security interests.  The goal of FIRRMA was to allow effectiveness "in identifying and addressing these national security risks."  83 Fed. Reg. 51323-51324 (Oct. 11, 2018).    The purpose of the FIRRMA pilot programs was to "to assess and address ongoing risks to the national security of the United States."  *Id*.    It simply cannot be inferred that Congress's intent in passing CFIUS was to preempt the entire field of state regulation of foreign parties' ownership of land in the States, particularly since CFIUS applies only to land at or near strategically sensitive national-security interests.

The decision of the district court in *Shen* supports this conclusion.  There the court noted that "[u]nder the federal regime, CFIUS makes an initial determination about whether certain real estate transactions threaten national security, and the President can then issue an order prohibiting those transactions."  *Shen*, 687 F. Supp. 3d at 1248.  In contrast to the Florida statute at issue in that case, the court observed that CFIUS "address[es] principally security issues."  *Id*.  The court noted "real estate transactions—or restrictions on real estate transactions—represent only one

small part of the broader CFIUS regime." *Id*. at 1249-1250. The court therefore found no field preemption, concluding that "longstanding state regulation of alien landownership counsels against a finding that Congress intended to usurp all state authority in that area without explicitly saying so." *Id*. at 1250. While Plaintiffs point to the Eleventh Circuit's issuance of an injunction pending appeal in *Shen* (D.E. 26-1, Plaintiffs' Memo in Supp., p. 32), the court did so only on a limited basis and in light of an approaching argument date. See Order, Shen v. Simpson, No. 23-12737 (11th Cir. Feb. 1, 2024) (noting oral argument was only months away, "at which point the merits panel will be better positioned to determine the issues on appeal"). The court's order does not invalidate the persuasive reasoning of the district court on the issue.

Defining "the relevant 'field'" also matters. *Torres v. Precision Indus., Inc.,* 995 F.3d 485, 491 (6th Cir. 2021). And on this issue, Plaintiffs seem to contend that the preempted field constitutes the entirety of real-estate transactions and land ownership by foreign parties. Plaintiffs point to the "supremacy of the national power in the general field of foreign affairs." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 34 (quoting *Hines v. Davidsowitz*, 312 U.S. 52, 62-63 (1941).) But even in the "general field of foreign affairs," a state statute must have "more than some incidental or indirect effect in foreign countries" to be preempted and instead must have a "great potential for disruption or embarrassment." *Zschernig v. Miller*, 389 U.S. 429, 433 (1968).

The Act passes this test. As has been discussed, the Act requires the registration of ownership interests of certain land within Tennessee's own borders and prohibits the acquisition of land interests by Prohibited Parties or Prohibited Businesses. In contrast, the federal government, through CFIUS, focuses its regulation entirely on national security and on land transactions that threaten national security. *See* 50 U.S.C.A. § 4565 (4)(B); 31 C.F.R. § 802.211. CFIUS does not preempt the entire field of land acquisition and ownership in the several States by foreign parties. Plaintiffs' assertion that the federal government has left "no room for state

regulations in the federal realm of foreign affairs," based on CFIUS's establishment of a review committee to oversee certain purchases of land near strategic national security interests, does not align with Congress's stated intent behind CFIUS or its legislative text. There is no field preemption by CFIUS.

### ii. CFIUS does not create conflict preemption.

Nor does the Act conflict with CFIUS simply because it prohibits certain real estate transactions that might otherwise be approved by or not subject to CFIUS. Again, CFIUS permits the review of a small subset of foreign land transactions defined as a "covered transactions." *See* 50 U.S.C.A. § 4565 (4)(B). Logic therefore dictates that CFIUS and its associated regulations do not apply to—and therefore cannot conflict with—those countless other land transactions involving foreign parties occurring across the United States that are not "covered transactions" as defined by CFIUS. The Act cannot be said to and does not "actually conflict" with CFIUS when the great majority of transactions which would come under the authority of the Act are not even "covered transactions" as defined by the CFIUS. It is not "impossible to comply with both state and federal law" and the state law does not "stand[] as an obstacle to the accomplishment of the full purposes and objectives of Congress." *In re Ford Motor Co.*, 65 F.4th at 859. There is nothing in the Act which stands an obstacle to the CFIUS.

Plaintiffs nevertheless argue that if a particular transaction is not subject to CFIUS, and therefore would be "approved" in the eyes of Plaintiffs, a State still cannot regulate that transaction with a foreign party, because the state regulation would create a conflict with CFIUS. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 36-37.) Acceptance of Plaintiffs' position, though, would eviscerate the authority of every State to regulate real-estate transactions within its borders involving foreign parties and would arguably give states less authority to regulate transactions with foreign parties and corporations, than it does for United States citizens.

39

Finally, Plaintiffs misconstrue the Act when they assert that the law "bans Prohibited Parties and Prohibited Businesses from owning an interest in land in Tennessee unless they apply for and received CFIUS approval." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 36.) In fact, Tenn. Code Ann. § 66-2-308(b) reads: "This part does not apply to prohibited foreign party or prohibited foreign-party-controlled business" which has met certain requirements and "has….been approved by the committee on foreign investment in the United States (CFIUS)." The statute therefore specifically *exempts* transactions approved by CFIUS. The Act's deference to approvals made by CFIUS further supports Defendants' position that the Act is not preempted by CFIUS.

### b. AFIDA does not create conflict preemption.

Plaintiffs also claim that AFIDA preempts the Act as a result of conflict preemption. Again, though, conflict pre-emption "turns on the identification of 'actual conflict.'" *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 884 (2000) (quoting *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990)). And the Act creates no "actual conflict" with AFIDA.

As discussed, the Act establishes registration requirements for Prohibited Parties and Prohibited Businesses that own interests in agricultural and non-agricultural land located in Tennessee. Tenn. Code Ann. §§ 66-2-304(a)-(c); 66-2-306(a)-(c). AFIDA establishes reporting requirements for agricultural land. *See* 7 C.F.R. § 781.3. The fact that two laws establish similar reporting requirements does not in itself create an actual conflict. And the fact that the Act creates registration requirements that differ slightly from those found in AFIDA, 7 C.F.R. § 781.3(b), does not make it "impossible to comply with both state and federal law." *In re Ford Motor Co.*, 65 F.4th at 859.

Plaintiffs point out that AFIDA registration requirements do "not include agents of foreign persons, like Walton Tennessee" (D.E. 26-1, Plaintiffs' Memo in Supp., p. 38), whereas the Act

does. But even if Walton were required to register under the Act based on its agency capacity, it could easily comply with both laws. Thus, there is no conflict preemption.[20]

### 5. The Act is not an ex post facto law.

Finally, Plaintiffs rely on their claim that the Act violates the Ex Post Facto Clause because it "criminalizes a past lawful action"—namely, their past acquisition of their land interests. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 38-41; D.E. 24, Am. Compl. ¶¶ 102-107.) But this claim will likely fail for much the same reason Plaintiffs' due-process and self-incrimination claims will likely fail—the Act does not "make criminals" of Prohibited Parties or Prohibited Businesses that acquired agricultural or non-agricultural land before January 1, 2025. It therefore does not "criminalize past lawful action."[21]

Article I, §§ 9 and 10, of the United States Constitution prohibit both Congress and state legislatures from enacting certain ex post facto laws. Article I, § 11, of the Tennessee Constitution establishes similar prohibitions. As Plaintiffs note, ex post facto laws are those that both apply retroactively and impose a criminal penalty for past conduct. *See Does #1-5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016). The "Constitution's ban on ex post facto laws does not bar *all* retroactive lawmaking, but only retroactive punishment." *Id.*

---

[20] An agent of a Prohibited Party would be required to register only those land interests that it held as an agent *for a Prohibited Party or Prohibited Business*. *See* Tenn. Code Ann. §§ 66-2-303(b)(1)(B), 66-2-305(a)(2). Walton has not shown that it holds any ownership interests in land as an agent for a Prohibited Party or Prohibited Business.

[21] Even if §§ 66-2-303(d) or 66-2-305(c) were construed in isolation to impose criminal liability for the ownership of agricultural or non-agricultural land acquired by Prohibited Parties or Prohibited Businesses before January 1, 2025, they would not be ex post facto laws. They would not impose punishment for the past acquisition of the land but for its continued ownership. See *United States v. De La Mata*, 266 F.3d 1275, 1292 (11th Cir. 2001) ("It is well settled that Congress may pass new laws which require us to alter our conduct or risk prosecution.") citing, inter alia, *Samuels v. McCurdy*, 267 U.S. 188 (1925); *Samuels*, 267 U.S. at 193 (finding no ex post facto violation because the law "does not provide a punishment for a past offense". . . "[t]he penalty it imposes is for continuing to possess the liquor after the enactment of the law").

As discussed in Section I.A.2. above, the Act applies prospectively. After its effective date of January 1, 2025, the Act will prohibit the acquisition of agricultural and non-agricultural land by Prohibited Parties or Prohibited Businesses, but it will not prohibit Prohibited Parties or Prohibited Businesses from continuing to own interests in agricultural or non-agricultural land that they acquired before January 1, 2025. *See* Tenn. Code Ann. §§ 66-2-303(b)(1), 66-2-305(a). The divestment, escheatment, and criminal provisions of the Act also do not apply to land holdings acquired by Prohibited Parties and Prohibited Businesses before January 1, 2025. In other words, and contrary to Plaintiffs' assertion, these provisions of the Act do not apply retroactively because they do not "appl[y] to events occurring before its enactment." (D.E. 26-1, Plaintiffs' Memo in Supp., p. 39.)

Plaintiffs make passing reference to the Act's registration requirements. (D.E. 26-1, Plaintiffs' Memo in Supp., p. 39.) But these provisions do not apply retroactively either. Prohibited Parties or Prohibited Businesses that "hold[] an interest" in agricultural or non-agricultural land *on or after January 1, 2025*, must register that interest with the Commissioner of Agriculture or the Secretary of State within 60 days. Tenn. Code Ann. §§ 66-2-304(a), 66-2-306(a). Even though this provision does apply to land acquired by a Prohibited Party or Prohibited Business before January 1, 2025, it is the continued "holding" of the interest that triggers the registration obligation. *See McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 16 (1st Cir. 1993) (stating that "a statute does not operate retroactively simply because its application requires some reference to antecedent facts").

But even if the registration provisions were deemed to operate retroactively, they would still not be ex post facto laws because they do not impose criminal "punishment." The registration requirement is obviously regulatory and includes a 60-day period in which to comply, Tenn. Code Ann. §§ 66-2-304(b)(2), 66-2-306(b)(2); moreover, any failure to register results only in the

assessment of a civil penalty, *id.* §§ 66-2-304(e), 66-2-306(e). Failure to register does not give rise to any divestment obligation, lead to escheatment, or subject the Prohibited Party or Prohibited Business to criminal liability. *See Does #1-5*, 834 F.3d at 699 (stating that a civil regulatory law with retroactive application should be upheld "unless the plaintiff can show by the clearest proof that what has been denominated a civil remedy is, in fact, a criminal penalty"). As such, the Act does not violate the Ex Post Facto Clause.

## II. Plaintiffs Will Not Suffer Irreparable Harm.

For all the reasons Plaintiffs lack standing because they have not shown an injury-in-fact, *see* Section I.A. above, Plaintiffs will not suffer irreparable harm when the Act goes into effect. Because they have made no showing that they qualify as Prohibited Parties or Prohibited Businesses under the Act, the Act does not apply to them. In addition, even if they qualified as Prohibited Parties or Prohibited Businesses, their pre-January 1, 2025 acquisition of their current properties greatly limits how the Act will affect them. They continue to own their land holdings, and the Act will not interfere with their ownership. They will be required to register their ownership interests with the State, but that does not constitute irreparable harm. Nor do Plaintiffs show irreparable harm with their assertions that the Act will hinder their future business activities and prospective land acquisitions. Plaintiffs contend that they will suffer irreparable harm because the Act "threatens and impairs [their] constitutional rights." (D.E., 26-1, Plaintiffs' Memo in Supp., p. 41.) But that contention is unavailing because Plaintiffs are not likely to succeed on those constitutional claims, for the reasons discussed above. *See Overstreet,* 305 F.3d at 578-579.

## III. The Balance of Equities and the Public Interest Weigh Against Granting a Preliminary Injunction.

In the absence of a showing by Plaintiffs of a likelihood of success—in either establishing jurisdiction or on the merits—enjoining enforcement of the Act would have an adverse effect on the public. *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) ("Given the failure to show a

43

substantial likelihood of success on the merits of [the plaintiff's] claim that the contribution limits are unconstitutional, the district court's conclusion that 'the [adverse] effect on the public and the public interest' from enjoining the enforcement of the statute . . . 'would be very significant' is also proper.").  The Act, which was duly enacted by the General Assembly, signed by the Governor, and is presumptively constitutional, represents an exercise of the State's police power and furthers the State's interest in protecting state lands from insidious foreign interests.  A State suffers irreparable harm whenever it is barred from enforcing its duly enacted laws. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

## CONCLUSION

For the reasons stated, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter


s/ *Tyler Sanders*
TYLER SANDERS (#36189)
Assistant Attorney General
Financial Division
P.O. Box 20207
Nashville, Tennessee  37202-0207
Tyler.Sanders@ag.tn.gov
(615) 313-5789

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed and served via the Court's electronic filing system on this 5th day of December 2024, upon Plaintiffs' legal counsel as follows:

VAN P. EAST, III
CONNOR M. BLAIR
TIMOTHY A. RODRIGUEZ
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
Telephone: (615) 252-3887
Facsimile: (615) 252-6348
veast@bradley.com
cblair@bradley.com
trodriguez@bradley.com

JOHN PARKER SWEENEY (*pro hac vice* forthcoming)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202 719-8216
Facsimile: (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs*

s/ *Tyler Sanders*
TYLER SANDERS
*Counsel for Defendants*

45