UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| WALTON TENNESSEE, LLC, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-01308 |
| | ) | |
| JONATHAN SKRMETTI, in his official | ) | District Judge Eli J. Richardson |
| capacity as the Tennessee Attorney | ) | Magistrate Judge Barbara D. Holmes |
| General & Reporter, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................................ iii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

I.  Public Chapter 995 bans individuals and businesses from disfavored countries from owning an interest in land. ................................................................................... 3

II.  Public Chapter 995 is enforced through criminal and civil penalties, onerous registration requirements, and escheatment without compensation. .................... 5

III.  Public Chapter 995 supplants the federal government's pervasive regulation of the field of foreign investment in real estate transactions. ......................................... 8

IV.  Public Chapter 995 criminalizes Walton Tennessee and its principals, including the Individual Plaintiffs, for their ownership interests in land. .................................. 11

LEGAL STANDARD ...................................................................................................... 12

ARGUMENT ................................................................................................................... 13

I.  Plaintiffs have standing to assert each of their claims. ........................................ 13

  A.  Plaintiffs have personal standing to assert each of their claims. ................ 13

  B.  Walton Tennessee has third party standing to assert claims on behalf of its principals. ............................................................................................... 17

II.  Plaintiffs are likely to succeed on the merits of their claims. ............................. 19

  A.  Public Chapter 995 likely violates the Due Process Clause. ..................... 19

    1.  Public Chapter 995 fails to sufficiently define who is banned from owning an interest in land. ............................................................... 19

    2.  Public Chapter 995 fails to sufficiently define by when Prohibited Owners must divest their land. ................................................................ 23

    3.  Public Chapter 995 imposes criminal penalties without sufficient due process or a post-deprivation remedy. ........................................... 24

  B.  Public Chapter 995 likely violates the Takings Clause because it effects a taking without just compensation. ............................................................... 27

  C.  Public Chapter 995 likely violates the right against self-incrimination because it requires those who have violated Public Chapter 995 to self-report their criminal activity. ...................................................................................................... 29

  D.  Public Chapter 995 likely violates the Supremacy Clause because it is impliedly preempted by federal law. ......................................................................... 31

    1.  Federal law field preempts Public Chapter 995. ............................... 33

    2.  Federal law conflict preempts Public Chapter 995. ......................... 36

  E.  Public Chapter 995 likely violates the Ex Post Facto Clauses of the United States and Tennessee Constitutions because it criminalizes a past lawful action. .............. 38

i

III.    Walton Tennessee and its principals, including the Individual Plaintiffs, will suffer irreparable harm if Public Chapter 995 goes into effect. .....................................................41

IV.    The balance of equities and the public interest favor granting preliminary injunctive relief. ............................................................................................................................42

CONCLUSION ....................................................................................................................... 42

CERTIFICATE OF SERVICE ................................................................................................ 44

# TABLE OF AUTHORITIES

**Cases**

*Albertson v. Subversive Activities Control Bd.*,
   382 U.S. 70 (1965) ................................................................................................31

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ........................................................................................35, 37

*Am. Immigr. Laws. Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) ..........................................................................19

*Anderson v. TOL, Inc.*,
   927 F. Supp. 2d 475 (M.D. Tenn. 2013) ...........................................................12

*Arizona v. United States*,
   567 U.S. 387 (2012) ..............................................................................................34

*Babbitt v. Youpee*,
   519 U.S. 234 (1997) ..............................................................................................27

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) .......................................................22, 24

*Baltimore City Dep't of Soc. Servs. v. Bouknight*,
   493 U.S. 549 (1990) ..............................................................................................31

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ..............................................................................................35

*Barber v. Charter Twp. of Springfield, Mich.*,
   31 F.4th 382 (6th Cir. 2022) ................................................................................27

*Barrows v. Jackson*,
   346 U.S. 249 (1953) ..............................................................................................17

*Belle Maer Harbor v. Charter Twp. of Harrison*,
   170 F.3d 553 (6th Cir. 1999) ...............................................................................22

*Bongo Prods., LLC v. Lawrence*,
   548 F. Supp. 3d 666 (M.D. Tenn. 2021) ........................................................41, 42

*Bonnell v. Lorenzo*,
   241 F.3d 800 (6th Cir. 2001) ...............................................................................41

*Buchanan v. Warley*,
   245 U.S. 60 (1917) ...........................................................................................14, 15

*Carman v. Yellen,*
   112 F.4th 386 (6th Cir. 2024) ...................................................................13, 14

*Cedar Point Nursery v. Hassid,*
   594 U.S. 139 (2021)...............................................................................................27

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati,*
   363 F.3d 427 (6th Cir. 2004) ................................................................................42

*Chicago & Alton R.R. Co. v. Tranbarger,*
   238 U.S. 67 (1915)................................................................................................40

*Citizens to Establish a Reform Party in Ark. v. Priest,*
   970 F. Supp. 690 (E.D. Ark. 1996).......................................................................24

*City of Louisville v. Thompson,*
   339 S.W.2d 869 (Ky. 1960)..................................................................................40

*Copeland v. Machulis,*
   57 F.3d 476 (6th Cir. 1995) (per curiam).............................................................25

*Craig v. Boren,*
   429 U.S. 190 (1976)........................................................................................17, 18

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000).................................................................................33, 34, 37

*D.T. v. Sumner Cnty. Schs.,*
   942 F.3d 324 (6th Cir. 2019) .........................................................................12, 41

*Daily Servs., LLC v. Valentino,*
   756 F.3d 893 (6th Cir. 2014) ................................................................................25

*Does #1–5 v. Snyder,*
   834 F.3d 696 (6th Cir. 2016) ................................................................................39

*Does #1–9 v. Lee,*
   574 F. Supp. 3d 558 (M.D. Tenn. 2021)..........................................................39, 42

*Eastman v. Univ. of Mich.,*
   30 F.3d 670 (6th Cir. 1994) ..................................................................................21

*Elrod v. Burns,*
   427 U.S. 347 (1976)........................................................................................13, 41

*FDA. v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024)........................................................................................13, 16

iv

*FemHealth USA, Inc. v. City of Mount Juliet*,
    458 F. Supp. 3d 777 (M.D. Tenn. 2020)............................................................12, 13

*Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*,
    680 F. Supp. 3d 1291 (N.D. Fla. 2023)..........................................................20

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs.*
    *Litig.*,
    65 F.4th 851 (6th Cir. 2023) ........................................................................32

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)......................................................................................31

*Gilbert v. Homar*,
    520 U.S. 924 (1997)....................................................................................26

*In re Grand Jury Subpoena Duces Tecum to John Doe 1*, 368 F. Supp. 2d 846,
    857 (W.D. Tenn. 2005) ...............................................................................30

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)....................................................................................19

*Hardaway v. Lee*,
    No. 3:22-cv-00395, 2023 WL 2749369 (M.D. Tenn. Mar. 31, 2023)..................39

*Haw. House. Auth. v. Midkiff*,
    467 U.S. 229 (1984)....................................................................................27

*Haynes v. United States*,
    390 U.S. 85 (1968)..............................................................................29, 30, 31

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..............................................................................34, 36, 38

*Hodel v. Irving*,
    481 U.S. 704 (1987)....................................................................................28

*Johnson v. Morales*,
    946 F.3d 911 (6th Cir. 2020) ...................................................................24, 26

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)....................................................................................17

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)....................................................................................28

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................13

*Mathews v. Eldridge,*
   424 U.S. 319 (1976)..........................................................................25, 26

*Md. Shall Issue, Inc. v. Hogan,*
   971 F.3d 199 (4th Cir. 2020) .............................................................17

*Miller v. City of Cincinnati,*
   622 F.3d 524 (6th Cir. 2010) .............................................................20

*Nken v. Holder,*
   556 U.S. 418 (2009)............................................................................13

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) .............................................................41

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.,*
   715 F.3d 1268 (11th Cir. 2013) .........................................................38

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
   758 F.3d 296 (D.C. Cir. 2014)............................................................33

*Ramsey v. Bd. of Educ. of Whitley Cnty., Ky.,*
   844 F.2d 1268 (6th Cir. 1988) ...........................................................26

*Reno v. Am. Civ. Liberties Union,*
   521 U.S. 844 (1997)......................................................................21, 22

*Shen v. Simpson,*
   23-12737 (11th Cir. Feb. 1, 2024) .....................................................32

*Shuti v. Lynch,*
   828 F.3d 440 (6th Cir. 2016) .............................................................22

*Singleton v. Wulff,*
   428 U.S. 106 (1976)............................................................................18

*Suitum v. Tahoe Reg'l Plan. Agency,*
   520 U.S. 725 (1997)............................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
   535 U.S. 302 (2002)............................................................................27

*Texaco, Inc. v. Short,*
   454 U.S. 516 (1982)............................................................................40

*Thole v. U.S. Bank, N.A.,*
   590 U.S. 538 (2020)............................................................................17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..........................................................................................13

*United Pet Supply, Inc. v. City of Chattanooga*,
    768 F.3d 464 (6th Cir. 2014) .............................................................................25

*United States v. Alkhafaji*,
    754 F.2d 641 (6th Cir. 1985) .......................................................................29, 31

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 434 (1993) ..........................................................................................26

*United States v. Kruger*,
    838 F.3d 786 (6th Cir. 2016) .............................................................................39

*United States v. Pink*,
    315 U.S. 203 (1942) ....................................................................................35, 36

*United States v. Salisbury*,
    983 F.2d 1369 (6th Cir. 1993) ...........................................................................22

*United States v. Trupin*,
    117 F.3d 678 (2d Cir. 1997)...............................................................................40

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ..........................................................................................20

*Wilkinson v. Leland*,
    27 U.S. (2 Pet.) 627 (1829) ...............................................................................14

*Wis. Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991)...........................................................................................31

*Women's Med. Pro. Corp. v. Voinovich*,
    130 F.3d 187 (6th Cir. 1997) .............................................................................20

*Yellowhammer Fund v. Att'y Gen. of Ala.*,
    --- F. Supp. 3d ----, 2024 WL 1999546 (M.D. Ala. May 6, 2024) ..................18, 19

*Zablocki v. Redhail*,
    434 U.S. 374 (1978)...........................................................................................14

*Zinermon v. Burch*,
    494 U.S. 113 (1990) ..........................................................................................24

*Zschernig v. Miller*,
    389 U.S. 429 (1968)...........................................................................................35

**Statutes**

50 U.S.C. § 2170 ..................................................................................................................8

50 U.S.C. § 4565 ..................................................................................................................8

50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa) ...............................................................................8, 9

50 U.S.C. § 4565(a)(4)(B)(ii)(II)(bb) ...............................................................................8, 9

50 U.S.C. § 4565(f)(9)(A) ...................................................................................................33

50 U.S.C. § 4565(f)(9)(B) ...................................................................................................33

Fla. Stat. § 692.202(1) .........................................................................................................32

Fla. Stat. § 692.203(1) .........................................................................................................32

Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 ....................................................9

Pub. L. No. 100-418 ..............................................................................................................8

Pub. L. No. 110-49, 121 Stat. 246 ........................................................................................8

Tenn. Code Ann. § 66-2-302(1) .................................................................................4, 10, 37

Tenn. Code Ann. § 66-2-302(7) .............................................................................................5

Tenn. Code Ann. § 66-2-302 (9) ................................................................................2, 4, 20

Tenn. Code Ann. § 66-2-302(10) ...........................................................................................4

Tenn. Code Ann. § 66-2-302(11) ....................................................................................4, 20

Tenn. Code Ann. § 66-2-302 (12) ..........................................................................................2

Tenn. Code Ann. § 66-2-302(a)(1) (2023) ...........................................................................3

Tenn. Code Ann. § 66-2-302(c) (2023) ................................................................................3

Tenn. Code Ann. § 66-2-303(b) .............................................................................................3

Tenn. Code Ann. § 66-2-303(c) ...........................................................................................23

Tenn. Code Ann. § 66-2-303(c)(1) ........................................................................................6

Tenn. Code Ann. § 66-2-303(c)(2) ...................................................................................6, 17

Tenn. Code Ann. § 66-2-303(d) ..................................................................................... *passim*

Tenn. Code Ann. § 66-2-304 ................................................................2

Tenn. Code Ann. § 66-2-304(a) .......................................................16, 29

Tenn. Code Ann. § 66-2-304(b)(2) ...........................................5, 23, 29

Tenn. Code Ann. § 66-2-304(c) ............................................................6

Tenn. Code Ann. § 66-2-304(c)(2)(7) .................................................10

Tenn. Code Ann. § 66-2-304(c)(7) .......................................................6

Tenn. Code Ann. § 66-2-304(d) .......................................................6, 17

Tenn. Code Ann. § 66-2-304(e) ............................................................7

Tenn. Code Ann. § 66-2-305(a) ............................................................2

Tenn. Code Ann. § 66-2-305(b)(1) .......................................................6

Tenn. Code Ann. § 66-2-305(b)(2) ...................................................6, 17

Tenn. Code Ann. § 66-2-305(c) .......................................................5, 16, 39

Tenn. Code Ann. § 66-2-306 ................................................................2

Tenn. Code Ann. § 66-2-306(a) .......................................................16, 29

Tenn. Code Ann. § 66-2-306(b)(2) .......................................................6

Tenn. Code Ann. § 66-2-306(c) ............................................................6

Tenn. Code Ann. § 66-2-306(c)(2)(7) .................................................10

Tenn. Code Ann. § 66-2-306(d) ...........................................................17

Tenn. Code Ann. § 66-2-306(e) ............................................................7

Tenn. Code Ann. § 66-2-307(a) .......................................................6, 7, 26

Tenn. Code Ann. § 66-2-307(c)(2) ...............................................*passim*

Tenn. Code Ann. § 66-2-308(b) ...........................................................35

Tenn. Code Ann. § 692.203(3)(a) .......................................................32

**Other Authorities**

7 C.F.R. § 781 ...........................................................................9, 37

Case 3:24-cv-01308     Document 35     Filed 12/06/24     Page 10 of 56 PageID #: 588

7 C.F.R. § 781.2 ................................................................................................10

7 C.F.R. § 781.2(b) .........................................................................................9, 37

7 C.F.R. § 781.3(b) ...............................................................................................37

7 C.F.R. § 781.3(e) ...............................................................................................10

7 C.F.R. § 781.4 ............................................................................................10, 38

22 C.F.R. § 126.1 ....................................................................................................4

31 C.F.R. § 800.214 ..............................................................................................37

31 C.F.R. § 800.215 ..............................................................................................37

31 C.F.R. § 802 .......................................................................................................8

31 C.F.R. § 802.101 ..............................................................................................36

31 C.F.R. § 802.212 ..............................................................................................35

31 C.F.R. § 802.233 ..............................................................................................35

31 C.F.R. § 802.701 ..............................................................................................32

U.S. Const. amend. I .............................................................................................22

U.S. Const. amend. V .................................................................................... *passim*

U.S. Const. amend. XIV ......................................................................15, 16, 20, 26

U.S. Const. amend. XIV, § 1 ............................................................................15, 23

U.S. Const. art. I, § 10, cl. 1 ...................................................................................8

U.S. Const. art I, § 10, cl. 2 .....................................................................................8

U.S. Const. art. II, § 2, cl. 2 .....................................................................................8

U.S. Const. art. VI, § 1, cl. 2 .................................................................................31

1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 2.4(b), at
142 & n.48 (1986) ..........................................................................................40

Alan Rappeport, *Spreading State Restrictions on China Show Depths of Distrust
in the U.S.*, N.Y. Times (Aug. 21, 2023) .......................................................35

Resident, Black's Law Dictionary (12th ed. 2024) ...............................................20

x

CFIUS Frequently Asked Questions, *Post-FIRRMA Regulations*, *available at* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-frequently-asked-questions (last accessed 10/21/2024) ...................................................................................36

Ella Wales, *East TN Leaders Raise Concern Over Foreign-Owned Land in Loudon County*, WATE (Mar. 18, 2024) ...................................................................33

Fed. Reg. Vol. 83, No. 197 (Oct. 11, 2018), at 51322 ...................................................9

Marsha Blackburn (@marshablackburn), X (Mar. 3, 2023, 2:48 PM), https://x.com/MarshaBlackburn/status/1631758389964357632 ...........................36

Rachel Hatzipanagos, *Laws Banning Chinese from Buying Property Dredge Up Old History*, Wash. Post (Aug. 21, 2023) ...............................................................34

State Representative Kelly Keisling, *End of Session Capitol Review from State Rep. Kelly Keisling*, *available at* https://www.kellykeislingtn.com/post/end-of-session-capitol-review-from-state-rep-kelly-keisling (last accessed 10/31/2024) ................................................................................................................34

*Tennessee*, Hatchie Press (Dec. 7, 2023), https://hatchiepress.com/successfully-keeping-chinese-and-other-sanctioned-foreign-entities-from-owning-land-in-tennessee/ ...................................................................................................................33

**INTRODUCTION**

At the stroke of midnight on December 31, 2024, a new Tennessee law will make criminals of Tennessee landowners who happen to be a "citizen or resident" of a country disfavored by the General Assembly. Public Chapter 995 of the Tennessee Public Acts of 2024 ("Public Chapter 995") also makes criminals of these individuals' agents as well as businesses owned by these individuals.

The law does not stop there. Public Chapter 995 requires those who suddenly find themselves criminals to facilitate their own prosecutions by self-reporting their crimes to the State or face additional penalties for failing to incriminate themselves. The State then takes their land without compensation. In situations where banned and non-banned individuals own land together as tenants in common, the State takes the entire property and compensates none of the landowners.

None of this is permissible under the Constitution.

Walton Tennessee, LLC ("Walton Tennessee") is a company that facilitates real estate investment, providing an opportunity for individuals, including Stephen Misch, Jason Vance, and Alessandro Silvestroni (the "Individual Plaintiffs"), acting through their trusts, to purchase undivided interests in land as tenants in common with each other and with Walton Tennessee. Walton Tennessee is an agent for these individuals. Many of Walton Tennessee's principals live overseas and are citizens or residents of disfavored countries.

Walton Tennessee and its principals will suffer irreparable injury the moment Public Chapter 995 takes effect because the law instantly criminalizes their lawful status as landowners, subjecting them to criminal punishment, civil liability, and the registration requirements. The law also subjects Walton Tennessee's and its principals' land interests to escheatment. Public Chapter 995 threatens the investments of Walton Tennessee and its principals. It also threatens Walton Tennessee's business as a going concern.

1

Plaintiffs are likely to succeed on the merits of their claims because Public Chapter 995 is unconstitutional in many respects. The law violates the Due Process Clause by failing to sufficiently define who is banned from owning an interest in land in Tennessee, by failing to sufficiently define by when they must divest their interests, and by failing to define what land they may not own. It also imposes criminal penalties without sufficient due process or a post-deprivation remedy. The law violates the Takings Clause by taking land without compensation. It violates the Fifth Amendment right against self-incrimination by compelling those in violation of the law to report their violations to the State. The law violates the Supremacy Clause because it is preempted by the federal government's pervasive regulations in the field of foreign investment in real estate transactions. Contrary to federal law that analyzes foreign investment in real estate on a transaction-by-transaction basis, Public Chapter 995 categorically bans entire groups from land ownership, failing to distinguish between ownership of tiny, undivided interests in undeveloped investment property owned by individuals (like Walton Tennessee and its principals here) and nefarious land ownership near a military installation or large agricultural properties owned by, say, the People's Republic of China. The law violates the Ex Post Facto clauses of the United States and Tennessee constitutions by criminalizing a past lawful action.

To maintain the status quo while this Court has the opportunity to review Plaintiffs' constitutional challenges to Public Chapter 995, a preliminary injunction should be entered.[1]

---

[1]Plaintiffs seek to preliminarily enjoin the following portions of Public Chapter 995:
- Tenn. Code Ann. §§ 66-2-303(b)–(d) and 66-2-305(a)–(c) unconstitutionally ban owning an interest in agricultural and/or non-agricultural land based on national origin, create criminal liability without due process, and criminalize previously lawful behavior.
- Tenn. Code Ann. §§ 66-2-302 (9) and (12) are unconstitutionally vague because they fail to provide sufficient notice of who is banned from owning an interest in land in Tennessee.
- Tenn. Code Ann. §§ 66-2-304 and 306 unconstitutionally require Prohibited Owners to incriminate themselves, are unconstitutionally vague because they fail to provide sufficient notice of when certain criminal penalties attach and criminalize previously lawful behavior.

**STATEMENT OF FACTS**

**I. Public Chapter 995 bans individuals and businesses from disfavored countries from owning an interest in land.**

Prior to 2023, Tennessee had no law regulating foreign investment in real estate transactions. Tennessee has in the last two years enacted successively more extreme laws that ban foreign ownership of land.

In 2023, Tennessee enacted Title 66 Chapter 2 Part 3 of the Tennessee Code, banning prospective land purchases by sanctioned nonresident aliens, sanctioned foreign businesses, and sanctioned foreign governments. *See* Act of May 11, 2023, 2023 Tenn. Pub. Acts, § 3 (codified at Tenn. Code Ann. § 66-2-302(a)(1) (2023)). The 2023 law prohibited the purchase of new property but contained a grandfather provision permitting any prohibited foreign party "who h[eld] real property in [Tennessee] on July 1, 2023, [to] continue to own or hold the real property." Tenn. Code Ann. § 66-2-302(c) (2023).

The very next year, Tennessee enacted Public Chapter 995, rewriting Title 66 Chapter 2 Part 3 of the Tennessee Code. When this new law goes into effect on January 1, 2025, "Prohibited Parties" and "Prohibited Businesses" will be banned from owning or acquiring "agricultural land," and "Prohibited Businesses" will be banned from owning or acquiring "non-agricultural land." *See* Tenn. Code Ann. § 66-2-303(b).

A "Prohibited Party" includes a "**citizen or resident** of countries regulated by the International Traffic in Arms Regulations under 22 C.F.R. § 126.1" and his "agent, trustee, or fiduciary." *Id.* § 66-2-302(9) (emphasis added) (countries regulated by ITAR are referred to

---

- Tenn. Code Ann. § 66-2-307(c)(2) unconstitutionally permits the State to take land for a public use without just compensation through escheatment.
- The entirety of Public Chapter 995 unconstitutionally regulates foreign investment in land, which is impliedly preempted—through field and conflict preemption—by federal law, which pervasively regulates the field of foreign investment in land.

3

collectively herein as "ITAR Countries").[2] Public Chapter 995 excludes "resident alien[s]" from the scope of Prohibited Parties. *Id.* A resident alien is "not a citizen of the United States" but is instead a "resident of . . . the United States" or a "State." *Id.* § 66-2-302(12). The term "resident" is not defined by Public Chapter 995. But the term "residence" is defined in Public Chapter 995 to mean "a person's principal dwelling place where the person intends to remain permanently for an indefinite period of time." *Id.* § 66-2-302(11). The term residence is not used in Public Chapter 995 outside of its definition. A "Prohibited Business" includes "a corporation, company, association, firm, partnership, society, joint-stock company, trust, estate, or other legal entity whose controlling interest is owned by a [Prohibited Party]." *Id.* § 66-2-302(10).

Both Prohibited Parties and Prohibited Businesses are banned from owning agricultural land in Tennessee. Agricultural land includes land "outside the corporate limits of a municipality and is (i) used for forestry production, including, without limitation, land exceeding ten (10) acres in which ten percent (10%) or more of the land is stocked by trees of any size, including land that formerly had trees of any size covering the land that will be naturally or artificially regenerated; or (ii) currently used for, or, if currently idle, land last used within the past five (5) years, for farming, ranching, or timber production, except land not exceeding ten (10) acres in the aggregate, if the annual gross receipts from the sale of the farm, ranch, or timber products produced on the land do not exceed one thousand dollars ($1,000), including, without limitation, land used by persons and entities for activities regulated under title 70." *Id.* § 66-2-302(1).

---

[2] ITAR Countries include China (which also includes Hong Kong for purposes of ITAR), Belarus, Burma, Cuba, Iran, North Korea, Syria, Venezuela, Afghanistan, Central African Republic, Cyprus, Democratic Republic of Congo, Ethiopia, Eritrea, Haiti, Iraq, Lebanon, Libya, Nicaragua, Russia, Somalia, South Sudan, Sudan, and Zimbabwe.

4

Prohibited Businesses, but not Prohibited Parties, are banned from owning non-agricultural land, which includes "all public or private land in [Tennessee] other than agricultural land." *Id.* 66-2-302(7).

Public Chapter 995's ban is both prospective and retroactive. Prohibited Parties and Prohibited Businesses may not acquire a new interest in land. Nor may they maintain their interests in their land that they currently, lawfully own. Public Chapter 995 forces them to divest their interests or face criminal punishment, civil liability, and escheatment. It also subjects their tenants in common who are not Prohibited Parties or Prohibited Businesses to escheatment of their land.

## II. Public Chapter 995 is enforced through criminal and civil penalties, onerous registration requirements, and escheatment without compensation.

Public Chapter 995 is enforced through criminal and civil penalties. On January 1, 2025, a Prohibited Party or Prohibited Business owning an interest in agricultural land in Tennessee "commits a Class A misdemeanor, punishable by a fine of one thousand five hundred dollars ($1,500) or confinement for not more than eleven (11) months and twenty-nine (29) days, or both." *Id.* § 66-2-303(d). A Prohibited Business owning an interest in non-agricultural land in Tennessee also commits a Class A misdemeanor that carries these same punishments. *Id.* § 66-2-305(c). These penalty provisions provide no opportunity for a hearing before or after the determination that a Prohibited Party or Prohibited Business owns an interest in land in violation of Public Chapter 995 (a Prohibited Party or Prohibited Business owning an interest in agricultural land and a Prohibited Business owning an interest in non-agricultural land is referred to as a "Prohibited Owner"). Under Tennessee law, District Attorneys General have authority to prosecute "all violations of the state criminal statutes" in their judicial districts. *See* Tenn. Code Ann. § 8-7-103(1). Here, the District Attorneys General Defendants have authority to prosecute Plaintiffs for violations of Public Chapter 995.

Public Chapter 995 is also enforced through its registration requirements. Those—and only those—who own an interest in land in violation of Public Chapter 995 must register their illegal ownership interests with the State within 60 days of January 1, 2025 (or from whenever they acquire the land). *See id.* §§ 66-2-304(b)(2) (Prohibited Parties and Prohibited Businesses must register their interests in agricultural land with the Commissioner of Agriculture (the "Commissioner")); 66-2-306(b)(2) (Prohibited Businesses must register their interests in non-agricultural land with the Secretary of State (the "Secretary")).

The registration requirements are the same for all Prohibited Owners. To comply with the registration requirements, a Prohibited Owner must provide his personal information or the information of who owns a controlling interest in the Prohibited Owner, as applicable; the personal information of the agent, trustee, or fiduciary of the Prohibited Owner; a statement of the purpose for conducting business in Tennessee; a description of the business purpose for owning an interest in the land; and the personal information for the Prohibited Owner's affiliates. *See id.* §§ 66-2-304(c) (agricultural land); 66-2-306(c) (non-agricultural land). The registration requirements also require a Prohibited Owner to list "all other interests in agricultural land that are held directly or indirectly by the registering party, parent of the registering party, or subsidiary or intermediary of the parent in the United States that exceeds, in the aggregate, two hundred fifty (250) acres." *Id.* § 66-2-304(c)(7).

Failure to self-report as a criminal carries civil liability. "If the [Commissioner or Secretary] finds that a [Prohibited Party] violated this part by failing to timely register as required under this section, then the [Commissioner or Secretary] shall assess a civil penalty not to exceed two thousand dollars ($2,000) for each violation." *See id.* §§ 66-2-304(e) (agricultural land); 66-2-

306(e) (non-agricultural land). The law does not make clear whether this civil penalty is assessed daily, as a one-time penalty, or otherwise, inviting arbitrary enforcement of the law.

After complying with the registration requirements, a Prohibited Owner has two years to divest his ownership interest in his land. *Id.* §§ 66-2-303(c)(1) (agricultural land); 66-2-305(b)(1) (non-agricultural land). Otherwise, the Attorney General may commence an enforcement action to escheat the land to the State. *Id.* §§ 66-2-303(c)(2) (agricultural land); 66-2-305(b)(2) (non-agricultural land).

The State uses the information it gains from the registration requirements to initiate escheatment, Public Chapter 995's ultimate enforcement mechanism. "If the [Commissioner or Secretary] finds that a [Prohibited Owner] has acquired or holds title to or an interest in agricultural [or non-agricultural] land in this state in violation of this part, then the [Commissioner or Secretary] shall report the violation to the attorney general and reporter." *Id.* §§ 66-2-304(d) (agricultural land); 66-2-306(d) (non-agricultural land). The Attorney General uses this information to initiate an escheatment action. *Id.* § 66-2-307(a). The Attorney General may also initiate an enforcement action "based upon the receipt of information by means other than a report from the [C]ommissioner … or [S]ecretary." *Id.* This sudden-death enforcement method provides no notice to Prohibited Owners that they have violated Public Chapter 995 until the Attorney General files an enforcement action.

The Attorney General files the enforcement action in state court:

> If the court finds that an interest in the agricultural land or non-agricultural land in question has been acquired or held in violation of this part, then the court shall declare the agricultural land or non-agricultural land escheated to the state and order the sale of the agricultural land or non-agricultural land in the manner provided by law for the foreclosure of a mortgage on real estate for default of payment. The proceeds of the sale must be used to pay court costs, and the remaining funds, if any, must be disbursed to lien holders, in the order of priority, except for liens which under the terms of the sale are to remain on the land.

7

*Id.* § 66-2-307(c)(2).

The escheatment remedy removes all discretion from the court twice over. The only determination the court makes is whether interest in land is held by a Prohibited Owner. If so, the court "shall" declare the land escheated to the State. *Id.*

### III. Public Chapter 995 supplants the federal government's pervasive regulation of the field of foreign investment in real estate transactions.

The federal government pervasively regulates the field of foreign investment in real estate transactions for the purposes of maintaining national security and conducting reliable, cogent foreign affairs. The federal government—through statutes, regulations, and executive power—has left no room for the states to add regulation in this field.

The Constitution vests in the federal government exclusive regulation over foreign investment, foreign affairs, and national security—forbidding the states to act in those areas:

> No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspections Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

U.S. Const. art I, § 10, cl. 2. Likewise, only the President has the power to make treaties, *see id.* art. II, § 2, cl. 2, a power that states are expressly prohibited from exercising, *see id.* art. I, § 10, cl. 1.

Congress has also made clear that only the federal government may regulate foreign investment in real estate transactions. The Committee on Foreign Investment in the United States ("CFIUS"), for instance, is the interagency body responsible for overseeing issues of national security with respect to direct foreign investment, including in real estate transactions. *See* 50 U.S.C. § 4565; 31 C.F.R. § 802. CFIUS has a broad mandate and significant authority to advise the President on foreign investment transactions and to recommend that some transactions be

suspended or blocked. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 (formerly codified at 50 U.S.C. § 2170). Over time, CFIUS's scope has been focused "to reform the process by which [foreign] investments are examined for any effect they may have on national security." Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246. In 2018, the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA") significantly expanded CFIUS's authority to investigate and review foreign investments, including in real estate transactions, in which a foreign government may have a direct or indirect substantial interest. *See* 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa), (bb). Congress enacted FIRRMA to address concerns that "the national security landscape has shifted in recent years, and so has the nature of the investments that pose the greatest potential risk to national security." Fed. Reg. Vol. 83, No. 197 (Oct. 11, 2018), at 51322. FIRRMA further authorizes CFIUS to consider whether some countries were of "special concern" to national security. 132 Stat. 2176. FIRRMA's real estate provisions, for instance, apply to property Congress deemed sensitive, such as property "in close proximity to," or what might facilitate "foreign surveillance" of a military instillation. 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa), (bb).

CFIUS is not the federal government's only tool to regulate foreign investment in real estate. The United States Treasury Department has the Office of Foreign Assets Control ("OFAC"), which administers and enforces economic and trade sanctions in support of national security and foreign policy objectives. *See* International Emergency Economic Powers Act of 1977, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29. OFAC maintains a list of Specially Designated Nationals and Blocked Persons ("SDN List") whose assets are blocked, and with whom United States persons are generally prohibited from engaging in business transactions. The SDN List is available online: https://sanctionslist.ofac.treas.gov/Home/SdnList.

9

Congress further designated the federal government to regulate foreign investment in real estate transactions through the Agricultural Foreign Investment Disclosure Act ("AFIDA"). Consistent with Congress's considered policy not to ban per se all foreign investment in the United States, AFIDA maintains a nationwide system for collecting information about foreign ownership of agricultural land in the United States. The Farm Service Agency implements AFIDA through regulations codified at 7 C.F.R. part 781, *et seq.*, and submits an annual report to Congress detailing foreign agricultural land ownership by county. Unlike Public Chapter 995, AFIDA's registration requirements apply only to "foreign person[s]." It does not apply to their agents. *See* 7 C.F.R. § 781.2 (defining "foreign person"). Public Chapter 995 also goes further than AFIDA by requiring that registrants list all other interests in agricultural land and non-agricultural land "held directly or indirectly by the registering party, parent of the registering party, or subsidiary or intermediary of the parent in the United States that exceeds, in the aggregate, two hundred fifty (250) acres." Tenn. Code Ann. §§ 66-2-304(c)(2)(7); 66-2-306(c)(2)(7); *see also* 7 C.F.R. § 781.3(e) (listing AFIDA's registration requirements that do not include affiliate listing). And AFIDA's registration reporting violations result in civil fines but no criminal penalties. *See* 7 C.F.R. § 781.4.

Public Chapter 995 bans some transactions that the federal government's pervasive regulation of foreign investment in real estate transactions permit, creating conflict and confusion in a sensitive area. Whereas the federal government evaluates foreign investment in real estate on a transaction-by-transaction basis, Public Chapter 995 categorically bans individuals or business from certain countries from owning an interest in land in Tennessee. Public Chapter 995 conflicts with the delicate balance struck by the federal government, encroaching on the federal government's national security and foreign affairs aims.

## IV. Public Chapter 995 criminalizes Walton Tennessee and its principals, including the Individual Plaintiffs, for their ownership interests in land.

Walton Tennessee is a Tennessee limited liability company that is not, by itself, a Prohibited Party or Prohibited Business. Walton Tennessee exists to facilitate individuals' investment in real estate in Tennessee. Declaration of Robert Nixon ("Nixon Decl.") ¶ 5. Its business model works as follows: Walton Tennessee purchases undeveloped land in Tennessee. After purchasing the land, Walton Tennessee sells its land to and co-owns its land with its investors. *Id*. ¶ 7. Rather than sell its land to a large investor like a hedge fund, Walton Tennessee sells undivided interests in its land to micro-investors from overseas, providing an opportunity for individuals, acting through trusts, to purchase land in Tennessee. *Id*. This provides these individual overseas investors an opportunity to diversify their investments by investing in a sound asset and achieving a reasonable return. *Id*. Each investor owns an undivided interest in the land as a tenant in common with each other and with Walton Tennessee, who retains an undivided ownership interest in the land as a tenant in common with the investors. *Id*. ¶ 9. As agent for its investors, Walton Tennessee manages the land, and arranges for the sale of the land to a third-party buyer, who is oftentimes an established residential development company. *Id*. ¶ 6. Walton Tennessee, for instance, works with local officials and the buyer on issues like zoning, managing and marketing the land, and securing a buyer. *Id*. ¶ 7. When Walton Tennessee sells the land to a third-party buyer, each investor receives a share of the net proceeds. *Id*. ¶ 9.

Walton Tennessee's principals, including the Individual Plaintiffs, each purchased their ownership interests in land in Tennessee through Walton Tennessee. *See* Declaration of Jason Floyd Vance ("Vance Decl.") ¶ 7; Declaration of Stephen Misch ("Misch Decl.") ¶ 6; Declaration of Alessandro Silvestroni ("Silvestroni Decl.") ¶ 6. Many are repeat customers. Nixon Decl. ¶ 10. But for Public Chapter 995, they would maintain their interests in their land to maximize their

11

investment profits. Nixon Decl. ¶ 10; Misch. Decl. ¶ 12; Vance Decl. ¶ 15; Silvestroni Decl. ¶ 17. They would also, but for Public Chapter 995, purchase more land in Tennessee through Walton Tennessee. Nixon Decl. ¶ 10.

Walton Tennessee's business model depends on its principals' legal ability to purchase and own an interest in land in Tennessee. *Id.* ¶ 8. Public Chapter 995 threatens this business model because many of Walton Tennessee's principals are Prohibited Parties or Prohibited Businesses, making Walton Tennessee, as their agent, a Prohibited Party and a co-owner of non-agricultural land with Prohibited Businesses. *Id.* ¶¶ 12–13, 16. Some of Walton Tennessee's principals, like Plaintiff Vance, are not Prohibited Owners but nevertheless face escheatment of their land to the State because their co-owners are Prohibited Owners. *See id.* ¶ 12; Vance Decl. ¶ 13.

On January 1, 2025, the Prohibited Owners become criminals under Public Chapter 995. They face imprisonment and civil fines without a hearing if they do not comply with a law that fails to provide sufficient notice of what is prohibited and what is required. Perhaps most unfair of all, Walton Tennessee, and its principals, including the Individual Plaintiffs, face escheatment of their land despite lawfully purchasing and owning their interests in land. Walton Tennessee faces additional injury from Public Chapter 995: it threatens Walton Tennessee's business as a going concern by threatening its business model.

The harm that Public Chapter 995 will inflict on Walton Tennessee and its principals, including the Individual Plaintiffs, once it takes effect on January 1, 2025, is severe and irreparable.

## LEGAL STANDARD

Four factors guide this Court's consideration of whether to grant a preliminary injunction: "(1) whether the [Plaintiffs are] facing immediate, irreparable harm, (2) the likelihood that the [Plaintiffs] will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). To establish the likelihood of success

on the merits of their claims, Plaintiffs must demonstrate only "that success is more likely than not." *Anderson v. TOL, Inc.*, 927 F. Supp. 2d 475, 486 (M.D. Tenn. 2013). "The district court must balance [the] four factors when considering a motion for preliminary injunction . . . ." *FemHealth USA, Inc. v. City of Mount Juliet*, 458 F. Supp. 3d 777, 785 (M.D. Tenn. 2020). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). All four factors weigh in favor of a preliminary injunction here.

In ruling on a motion for preliminary injunction, "all of the well-pleaded allegations [in Plaintiffs'] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *See Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). This Court also may take as true facts that are: "(1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice." *FemHealth USA*, 458 F. Supp. 3d at 782 n.1.

## ARGUMENT

**I.  Plaintiffs have standing to assert each of their claims.**

### A. Plaintiffs have personal standing to assert each of their claims.

To have standing, Plaintiffs must demonstrate that they (i) "suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that . . . was likely caused by the defendant; and (iii) . . .would likely be redressed by judicial relief." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The Sixth Circuit has recently made clear that "[w]hen there is no doubt that the plaintiff is the direct object of the law, regulation, or government action, 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Carman v. Yellen*, 112 F.4th 386, 407 (6th Cir. 2024) (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The Supreme Court is likewise clear that laws "that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements," and, for that reason, "standing is usually easy to establish." *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

Plaintiffs are the direct objects of Public Chapter 995, which bans them from owning an interest in land in Tennessee, requires them to divest their interests in their land, and requires them to register their interests with the State. There is little question that Plaintiffs have standing to assert their claims.

Regardless, Plaintiffs satisfy each of the standing requirements. Each has suffered an injury in fact for purposes of their pre-enforcement challenge because each has "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that . . . is arguably . . . proscribed by the statute at issue; and (3) that the threat of future enforcement . . . is substantial." *See Carman*, 112 F.4th at 400 (cleaned up).

Plaintiffs satisfy each of the three injury in fact requirements. First, Plaintiffs intend to engage in a course of conduct arguably affected with a constitutional interest. Walton Tennessee and the Individual Plaintiffs each own an interest in land in Tennessee, and each intend to maintain their ownership interests without registering the interest with the State. *See* Nixon Decl. ¶ 13; Misch Decl. ¶ 12; Silvestroni Decl. ¶ 17. Public Chapter 995 subjects each Plaintiff but Mr. Vance to divestiture of their ownership interests and registration, and each Plaintiff faces a threat to his investment through either premature divestment of the properties or escheatment to the State.

The right to own and maintain property is a fundamental right, which is, as its name suggests, one "'of fundamental importance.'" *See Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (collecting cases). The Supreme Court has long recognized that the "fundamental maxims of a free

14

government seem to require[] that the rights of personal liberty and private property[] should be held sacred." *Wilkinson v. Leland*, 27 U.S. (2 Pet.) 627, 657 (1829); *see also Buchanan v. Warley*, 245 U.S. 60, 78–79 (1917) ("Property is more than the mere thing which a person owns. It is elementary that [it] includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property."); *id.* at 74 (describing the Fourteenth Amendment's "purpose" in protecting "those fundamental rights in property"). Indeed, the Due Process Clauses protect "life, liberty, or **property**" without qualification. U.S. Const. amend. XIV, § 1 (emphasis added); U.S. Const. amend. V (prohibiting government deprivations of "life, liberty, or property," without due process of law). Public Chapter 995 interferes with a fundamental right based on the country in which an individual is a resident.

Public Chapter 995 violates Plaintiffs' constitutional interests. It violates Plaintiffs' constitutional rights under the Due Process Clause by banning them from owning land but failing to clearly define who is included among those banned, failing to clearly define by when they must divest their land, failing to define what land they may not own, criminalizing Plaintiffs' conduct without notice, and failing to provide an adequate post-deprivation process. It violates Plaintiffs' rights under the Takings Clause by taking their land without compensation. It violates Plaintiffs' constitutional right against self-incrimination by compelling them to report their criminal statuses with the State. It violates their rights under the Supremacy Clause by enacting regulations that are preempted by federal law. It violates their rights under the Ex Post Facto Clauses of the United States and Tennessee constitutions by punishing past, lawful conduct. And it violates their Fourteenth Amendment right to equal protection by discriminating based on national origin and treating similarly situated individuals differently.

Second, Plaintiffs' intended conduct is proscribed by Public Chapter 995. Plaintiffs Misch and Silvestroni are Prohibited Parties banned by Public Chapter 995 from owning an interest in agricultural land in Tennessee. *See* Misch Decl. ¶ 11; Silvestroni Decl. ¶ 15. Walton Tennessee, as an agent of its principals that are Prohibited Parties, including Plaintiffs Misch and Silvestroni, is therefore also a Prohibited Party banned by Public Chapter 995 from having an interest in agricultural land in Tennessee. Nixon Decl. ¶ 12. Plaintiffs Misch's and Silvestroni's trusts are Prohibited Businesses banned by Public Chapter 995 from having an interest in non-agricultural land in Tennessee. *See* Misch Decl. ¶ 11; Silvestroni Decl. ¶ 16. Plaintiff Vance is not a Prohibited Party or Prohibited Business. Vance Decl. ¶ 13. But he owns an undivided interest in land in Tennessee as a tenant in common with a Prohibited Party, a Prohibited Business, or both. Vance Decl. ¶¶ 13–14. Under Public Chapter 995, therefore, his property is subject to escheatment unless all of the Prohibited Parties and/or Prohibited Businesses with which he owns an undivided interest in land divest their land.

Third, the threat of future enforcement of Public Chapter 995 against Plaintiffs is substantial. On Public Chapter 995's effective date, the Plaintiffs will be in violation of Public Chapter 995, rendering each Plaintiff subject to imprisonment and a fine. *See* Tenn. Code Ann. §§ 66-2-303(d) (agricultural land); 66-2-305(c) (non-agricultural land). Plaintiffs must shortly thereafter self-report their criminal status with the State, *see id.* §§ 66-2-304(a) (agricultural land); 66-2-306(a) (non-agricultural land), who uses that information to escheat Plaintiffs' land, *id.* § 66-2-307(c)(2).

Plaintiffs' injuries are caused by Defendants, who are tasked with enforcing Public Chapter 995—including its criminal punishment, civil fines, registration requirement, and forced escheatment—against Plaintiffs. *See* Tenn. Code Ann. §§ 66-2-304(d); 66-2-306(d); 66-2-

303(c)(2); 66-2-305(b)(2). It bears repeating that "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements," and in those cases "standing is usually easy to establish." *Hippocratic Med.*, 602 U.S. at 382.

Plaintiffs' injuries would be redressed by judicial relief because injunctive relief will bar enforcement of Public Chapter 995 against Plaintiffs, enjoining their injuries caused by Public Chapter 995. *Thole v. U.S. Bank, N.A.*, 590 U.S. 538, 540 (2020); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 213–14 (4th Cir. 2020) (redressability satisfied "if a favorable outcome would repeal the 'burdens' on" protected conduct).

### B. Walton Tennessee has third party standing to assert claims on behalf of its principals.

Separate and distinct from its personal standing to bring suit on its own behalf, Walton Tennessee has standing to assert the rights of its principals and potential principals. These individuals not only buy their interests in their land through Walton Tennessee but also assign to Walton Tennessee all rights and obligations to maintain and manage the land. *Supra* Statement of Facts, IV. Enforcement of Public Chapter 995 against Walton Tennessee therefore results indirectly in the violation of its principals' rights to buy and own land. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Craig v. Boren*, 429 U.S. 190, 194–95 (1976); *Barrows v. Jackson*, 346 U.S. 249, 255–56 (1953).

Walton Tennessee—in its roles as both the seller of the land to its principals and future principals as well as the manager of the land for its principals—is no different than the "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig*, 429 U.S. at 195. Indeed, "[c]ourts have . . . consistently held that a vendor has

17

third-party standing to pursue claims on behalf of its customers, regardless of whether a vendor's customers are hindered in bringing their own claims." *Md. Shall Issue*, 971 F.3d at 216 (collecting cases). Enforcement of Public Chapter 995 against Walton Tennessee prevents Walton Tennessee's principals from owning land in Tennessee. *Supra* Statement of Facts, IV. Walton Tennessee therefore has third party standing.

Walton Tennessee also has third party standing to assert its principals' rights for a second, independent reason: it has a close relationship with them, and they are hindered from bringing suit. Walton Tennessee has a close relationship with its principals. The Supreme Court has explained that "the relationship of the litigant to the person whose right he seeks to assert" is sufficiently close "[i]f the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976). Because Walton Tennessee's principals' ability to acquire and own an interest in land is inextricably bound up with Walton Tennessee's ability to sell and manage that land, *see supra* Statement of Facts, IV, Walton Tennessee and its principals have a close relationship. Moreover, Walton Tennessee is "fully, or very nearly, as effective a proponent of the right as [its principals]." *Singleton*, 428 U.S. at 115. Walton Tennessee and its principals—as tenants in common—are subject to the same criminal, civil, and forfeiture penalties, giving Walton Tennessee and its principals identical interests. Nixon Decl. ¶ 10. Walton Tennessee also advocates for its principals in maintaining their land interests, *see supra* Statement of Facts, IV.

In addition, Walton Tennessee's principals are hindered from bringing suit against the State. The hindrance requirement does not require an inability to bring suit. *Singleton*, 428 U.S. at 117. It is met for instance, when an individual's privacy concern discourages him from bringing suit. *See id.* (A third party's privacy concern becomes a hindrance where he "may be chilled from [an]

assertion [of his own rights] by a desire to protect the very privacy of her decision from the publicity of a court."); *see also Yellowhammer Fund v. Att'y Gen. of Ala.*, --- F. Supp. 3d ----, 2024 WL 1999546, at *9–10 (M.D. Ala. May 6, 2024) (finding third party standing where privacy interests, the impracticability of resolving individual merit suits in a timely fashion, and the "time and expense of litigation" hindered the third parties). Many of Walton's principals live in China, *see* Nixon Decl. ¶ 5, and are therefore culturally averse to filing a lawsuit against the government, which chills their willingness to assert their own rights in this lawsuit against the State. Even though their names are available through scouring the land records in various Tennessee counties, many of Walton Tennessee's principals are fearful of joining a lawsuit against the State. Fear of revealing information to the world if embroiled in a lawsuit is a concrete hindrance to bringing suit. *See Yellowhammer Fund*, 2024 WL 1999546, at *10 (permitting third party standing even though anonymity through pseudonym's may have remedied privacy concerns). Walton Tennessee's principals' privacy concern is compounded by the time and expense of traveling from overseas to Tennessee to litigate their rights, further hindering their willingness to join suit as a plaintiff. *See Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (individuals who "reside far from the courthouse are hindered when it comes to taking legal action").

## II. Plaintiffs are likely to succeed on the merits of their claims.

### A. Public Chapter 995 likely violates the Due Process Clause.

#### 1. Public Chapter 995 fails to sufficiently define who is banned from owning an interest in land.

Public Chapter 995 bans from owning an interest in land "[a] citizen or resident" of an ITAR Country. Tenn. Code Ann. § 66-2-302(9). The term "resident" as it is used in Public Chapter 995 is unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A court should strike a term as vague when its "prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (quotation omitted).

"'[T]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment.'" *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 197 (6th Cir. 1997) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). A "relatively strict" test is required when, like here, "criminal penalties are at stake," *id.*, and when, like here, a law "threatens to inhibit the exercise of constitutionally protected rights," *Hoffman Estates*, 455 U.S. at 499; *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1319 (N.D. Fla. 2023) ("the Fourteenth Amendment tolerates a lower degree of vagueness for laws . . . that impose criminal liability").

A stringent vagueness test is required here because criminal penalties are at stake and because Public Chapter 995 inhibits the exercise of Walton Tennessee's and its principals' constitutionally protected rights, including the rights of Walton Tennessee and its principals to associate, to own land, to be free of vague and preempted laws, and to have pre-deprivation remedies, including just compensation.

The term "resident" is not defined in Public Chapter 995. This is problematic because, standing alone without elaboration, the term resident has two, conflicting meanings. Black's Law provides two definitions: (1) one's domicile or (2) the place where one lives. *See* Resident, Black's Law Dictionary (12th ed. 2024) ("1. Someone who lives permanently in a particular place; specif., a person who has established a domicile in a given jurisdiction. 2. Someone who has a home in a

particular place. In sense 2, a resident is not necessarily either a citizen or a domiciliary."). The Sixth Circuit has confirmed that the terms resident and domicile have different, conflicting meanings:

> Generally, an individual's "domicile" is his true, fixed, and permanent home and principal establishment. It is the place to which he returns whenever he is absent. "Residence," in contrast, requires both physical presence and an intention to remain some indefinite period of time, but not necessarily permanently. Thus, domicile is an individual's permanent place of abode where he need not be physically present, and residence is where the individual is physically present much of the time. An individual consequently may have several residences, but only one domicile.

*Eastman v. Univ. of Mich.*, 30 F.3d 670, 672–73 (6th Cir. 1994) (citations and quotations omitted). Public Chapter 995 defines the term "residence" to mean "a person's principal dwelling place where the person intends to remain permanently for an indefinite period of time." Tenn. Code Ann. § 66-2-302(11). But that the term is not used anywhere in Public Chapter 995 outside of its definition. It is therefore not clear how or even whether the term "residence" defines the term "resident."

Many of Walton Tennessee's principals reside in one place but are domiciled in another. Public Chapter 995's failure to clearly define who is banned from land ownership leaves Walton Tennessee's principals who reside in an ITAR Country but are domiciled in a non-ITAR Country, like Steven Misch, and vice versa, like Alessandro Silvestroni, unable to readily identify whether their ownership interests in land risk criminal and civil penalties, require registering with the State, and could be lost to escheatment. Misch Decl. ¶ 11; Silvestroni Decl. ¶¶ 15–16. This vagueness also leaves Walton Tennessee unable to readily identify to whom it may sell an interest in land and with whom it may be a tenant in common, damaging its business model. Nixon Decl. ¶ 11.

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), demonstrates that Public Chapter 995 is void for vagueness. At issue in *Reno* was the scope of the Communications Decency Act, which regulated both "indecent" material and material that "in context, depicts or describes,

in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." *Id*. at 871. Neither term was defined, and the statute's vagueness "provoke[d] uncertainty among speakers about how the two standards relate to each other and just what they mean." *Id*. The lower court held that the law was unconstitutionally vague under both the First and Fifth Amendments, and the Supreme Court affirmed that these provisions were unconstitutionally vague under the First Amendment without reaching whether they were also unconstitutionally vague under the Due Process Clause. *Id*. at 870–71.

This Court has relied on *Reno* to analyze the vagueness of statutes under the Due Process Clause. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 832 n.6 (M.D. Tenn. 2013) (holding that "conflicting provisions [that] create two standards that do not give a person of average intelligence fair warning of the elements of the conduct proscribed by the statute") (citing *Reno*, 521 U.S. at 871)). And courts of course find statutes void for vagueness outside the First Amendment context. *See, e.g.*, *Shuti v. Lynch*, 828 F.3d 440, 445–46 (6th Cir. 2016) (collecting immigration cases); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) (local ordinance restricting water use unconstitutionally vague); *United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) (voting rights).

Like in *Reno* where the federal government failed to clearly define what material was banned, Public Chapter 995 fails to clearly define who is banned from owning an interest in land. Public Chapter 995's failure to define this critical prohibitive term has created two potential standards for determining who is banned from owning land in Tennessee: (1) those who live in an ITAR Country or (2) those who are domiciled in an ITAR Country. These conflicting potential standards fail to provide fair warning to those, including many of Walton Tennessee's principals and two of the Individual Plaintiffs, who may be subject to Public Chapter 995's criminal penalties.

Not only does Public Chapter 995 fail to sufficiently define who is a Prohibited Party, it fails to sufficiently define what land Prohibited Parties and Prohibited Businesses are banned from owning. Public Chapter 995's definition of "agricultural land" contains undefined and conflicting terms such that Walton Tennessee and the Individual Owners have insufficient notice of whether they own interests in "agricultural land" under Public Chapter 995. Specifically, the term "production" is undefined. *See* Tenn. Code Ann. § 66-2-302(1)(A). Parties thus have no guidance on what "forestry production" or "timber production" mean. The term "production" suggests that some type of action needs to take place beyond just having trees on the land, but the definition is unclear. The definition of "agricultural land" is further vague because the two size limitations conflict. Subsection (A)(i) defines "agricultural land" as land "[u]sed for forestry production, including, without limitation, land exceeding ten (10) acres . . . ." Yet the next Subsection's definition counts "land last used … for farming, ranching, or timber production, *except* land not exceeding ten (10) acres in the aggregate." *Id.* § 66-2-302(1)(A)(ii) (emphasis added). So in one Subsection, Public Chapter 995 uses "including," and in the other, "except." If these terms are to have different meanings, then there is no amount of land used for forestry production that is *not* agricultural land. But that interpretation reads out the "not exceeding ten (10) acres" limitation. Either way, a party with land less than ten acres with forestry on the property has insufficient notice whether its land is agricultural land under Public Chapter 995.

### 2. Public Chapter 995 fails to sufficiently define by when Prohibited Owners must divest their land.

Public Chapter 995 also fails to clearly define by when Prohibited Owners must divest their interest in land. It instead creates three independent deadlines by when they must divest.

1. By January 1, 2025, Prohibited Owners must divest their interest in land or their ownership interest is criminalized. Tenn. Code Ann. § 66-2-303(d).

23

2. By March 1, 2025, Prohibited Owners must divest their interest in the land or register their by-then-illegal ownership interest with the State. Tenn. Code Ann. § 66-2-304(b)(2).

3. Within two years of the date the Prohibited Owner is found to be in violation of Public Chapter 995, he must divest his interest in land or the land escheats to the State. *Id.* § 66-2-303(c).

Statutes are struck as void for vagueness when, like here, they create "two alternative . . . deadlines." *See, e.g.*, *Citizens to Establish a Reform Party in Ark. v. Priest*, 970 F. Supp. 690, 700 (E.D. Ark. 1996). Public Chapter 995's **three** inconsistent deadlines cannot be reconciled, leaving Prohibited Owners unable to readily identify by when they must divest their interests in their land. *See* Nixon Decl. ¶ 11. Such an enforcement regime is "too vague to provide fair warning to potential violators or to ensure non-discriminatory enforcement." *Backpage.com*, 939 F. Supp. 2d at 834.

### 3. Public Chapter 995 imposes criminal penalties without sufficient due process or a post-deprivation remedy.

The Due Process Clause prohibits states from depriving individuals of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. "When evaluating a claim alleging a property deprivation without due process, we first determine whether due process applies. If it does, we then determine what process is due." *Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020).

Due process is required here. "It is the general rule that due process 'requires some kind of a hearing before the States deprives a person of liberty or property.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). Contrary to this general rule, Public Chapter 995, without a

hearing, deprives individuals of both liberty and property by making criminals of Prohibited Owners. Tenn. Code Ann. §§ 66-2-303(d) (agricultural land); 66-2-305(c) (non-agricultural land).

The general rule comes with two exceptions, neither of which apply here because both exceptions require a post-deprivation process, which is absent from Public Chapter 995. First, when "a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 485–86 (6th Cir. 2014). Second, if a post-deprivation remedy is provided and the following conditions apply: "(1) the deprivation was unpredictable or 'random'; (2) the predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014) (quoting *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (per curiam)). Neither exception applies here for the simple reason that Public Chapter 995 provides **no** post-deprivation hearing whatsoever.

The test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), confirms that the State must provide a hearing before subjecting Walton Tennessee and its principals to criminal penalties. The *Mathews* test weighs three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Each factor weighs in favor of requiring a hearing here. First, Public Chapter 995 affects the right to own, maintain, and sell property, which is a fundamental right. *See infra* Argument, I.A. In the due process context, the "right to maintain control over [one's] home, and to be free

from governmental interference, is a private interest of historic and continuing importance." *United States v. James Daniel Good Real Prop.*, 510 U.S. 434, 53–54 (1993); *see also id.* at 54 (holding that the seizure of property deprived plaintiff of "valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents"). Public Chapter 995 also impacts Walton Tennessee's and its principals' liberty and financial interests by subjecting them to criminal and civil penalties and the total loss of their investment should their land escheat to the State. Public Chapter 995 threatens Walton Tennessee's business as a going concern. Nixon Decl. ¶¶ 8, 10, 20. "The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess." *Ramsey v. Bd. of Educ. of Whitley Cnty., Ky.*, 844 F.2d 1268, 1273 (6th Cir. 1988).

Second, the State's interest here is ostensibly tied to pretextual national security concerns regarding foreign investment in Tennessee land. But those interests are reserved for the federal government, not Tennessee. *Infra* Argument, II.D. Even if the Court accepted that Tennessee had a substantial interest in ensuring land in Tennessee was not owned by citizens or residents of ITAR Countries, the "fiscal and administrative burdens that [] additional or substitute procedural requirements would entail" would nevertheless weigh against the State. *See Johnson*, 946 F.3d at 923 (quoting *Mathews*, 424 U.S. at 335). It is neither impractical nor financially burdensome for the State to provide a pre- or post-deprivation hearing in cases where the State "loses no money by allowing" Plaintiffs to maintain their property interest before a hearing, *id.*, as would certainly be the case here.

Third, "[w]ithout a pre-deprivation hearing, due process generally requires some other way to ensure that reasonable grounds exist to support the deprivation of a property interest." *Id.* at 924

(citing *Gilbert v. Homar*, 520 U.S. 924, 934 (1997)). Public Chapter 995 provides no procedural guardrails whatsoever to protect against arbitrary enforcement or erroneous deprivation. Public Chapter 995 permits the Attorney General to initiate, without any required due diligence, an enforcement action "based on the receipt of information" from any source irrespective of the credibility of the information or the source. Tenn. Code Ann. § 66-2-307(a). Providing no pre- or post-deprivation remedies, like a hearing, exacerbates the risk of erroneous deprivation. Public Chapter 995 also provides no private cause of action or avenue for appeal.

For these reasons, Plaintiffs are likely to succeed on the merits of their Due Process Clause claims.

## B. Public Chapter 995 likely violates the Takings Clause because it effects a taking without just compensation.

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: '[N]or shall private property be taken for public use, without just compensation.'" *Barber v. Charter Twp. of Springfield, Mich.*, 31 F.4th 382, 387 (6th Cir. 2022) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021)).

Public Chapter 995 effects a taking because its enforcement process culminates in an enforcement action by the Attorney General that, if successful, requires:

> [T]he court shall declare the agricultural land or non-agricultural land escheated to the state and order the sale of the agricultural land or non-agricultural land in the manner provided by law for the foreclosure of a mortgage on real estate for default of payment.

Tenn. Code Ann. § 66-2-307(c)(2).

Escheatment of land to the State is the axiomatic example of a physical taking. *See, e.g.*, *Babbitt v. Youpee*, 519 U.S. 234, 243 (1997) (forced escheatment of tribal land was a taking). A physical taking occurs whenever the government "dispossess[es] the owner" of their lawfully acquired property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302,

27

324 n.19 (2002). It does not matter that the State has not yet taken Plaintiffs' land because facial challenges to laws like Public Chapter 995 "are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997). Public Chapter 995 effects a taking of Walton Tennessee's and its principals', including the Individual Plaintiffs, land.

Public Chapter 995 violates the Takings Clause because it fails to provide any compensation to the landowner. This omission is contrary to the requirement that, under the Takings Clause, "where government requires an owner to suffer a permanent physical invasion of her property—however minor—it **must** provide just compensation." *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 538 (2005) (emphasis added); *see also Hodel v. Irving*, 481 U.S. 704, 726 (1987) (Stevens, J., concurring) ("The sovereign has no license to take private property without paying for it . . . ."). Statutes that fail to expressly require the State to provide compensation, like Public Chapter 995, fail this mandate. *See Hodel*, 481 U.S. at 709 (statute failed to provide compensation for a taking because it "made no provision for the payment of compensation to the owners of the interests" that escheated).

Like with the statute at issue in *Hodel*, Public Chapter 995 does not require the State to compensate the owner for the taking. It instead provides only that "[t]he proceeds of the sale," which occurs after escheatment, "must be used to pay court costs, and the remaining funds, if any, must be disbursed to lien holders, in the order of priority, except for liens which under the terms of the sale are to remain on the land." Tenn*. Code Ann. § 66-2-307(c)(2). Under Public Chapter 995, the State may impermissibly take Plaintiffs' land without compensation.

For these reasons, Plaintiffs are likely to succeed on the merits of their Takings Clause claim.

**C. Public Chapter 995 likely violates the right against self-incrimination because it requires those who have violated Public Chapter 995 to self-report their criminal activity.**

The Fifth Amendment confers the right against self-incrimination, providing that "No person . . . shall be compelled in any criminal case to be a witness against himself." The registration requirements mandated by Public Chapter 995 violate this right.

Prohibited Owners that own an interest in land on January 1, 2025 have committed a crime. The State thereafter compels these Prohibited Owners, including Walton Tennessee, many of its principals, and Plaintiffs Misch and Silvestroni, to register with the State the facts proving their criminal status. *See* Tenn. Code Ann. §§ 66-2-304(b)(2) (agricultural land) and 66-2-306(b)(2) (non-agricultural land). Only Prohibited Owners are required to register with the State. Each Prohibited Owner must provide the State with a formal acknowledgment of his violation of Public Chapter 995 and several pieces of his personal identifying information that could be used by the State to facilitate his arrest and conviction. *Supra*, Statement of Facts, II.; Tenn. Code Ann. §§ 66-2-304(a) and 66-2-306(a). Registering is compulsory because failing to do so results in a civil penalty of its own. *See id.* §§ 66-2-304(e) and 66-2-306(e).

Public Chapter 995's registration requirements violate the right against self-incrimination. Courts examine three factors to determine whether a registration requirement violates this right. *United States v. Alkhafaji*, 754 F.2d 641, 643 (6th Cir. 1985) (collecting case law). First, whether the requirement targets "a highly selective group inherently suspect of criminal activities" rather than the general public. *Id*. Second, whether the claimed protection occurs in a non-criminal and regulatory realm or an area "permeated with criminal statutes." *Id.* Third, whether compliance with the requirement "would create a substantial likelihood of prosecution." *Id.*

*Haynes v. United States*, 390 U.S. 85 (1968), is instructive. There, the Court held that the National Firearms Act's requirement to register illegal firearms as well as personal identifying

information impermissibly "compelled [petitioner] to provide information incriminating himself." *Id* at 96. The Court held that this requirement satisfied the first and third factors because "[t]he registration requirement is thus directed principally at those persons who have obtained possession of a firearm without complying with the [law], and who therefore are immediately threatened by criminal prosecutions." *Id*. Unlike a licensing or registration scheme that asks the general public whether they have violated certain laws, the NFA—like Public Chapter 995—required only those who committed a specific crime to register that violation with the State. It therefore targeted only those who "are unmistakably persons 'inherently suspect of criminal activities." *Id*. "[A] prospective registrant realistically can expect that registration will substantially increase the likelihood of his prosecution" because, like with Public Chapter 995, "they are compelled, on pain of criminal prosecution, to provide to the [State] both a formal acknowledgment of their possession of firearms, and supplementary information likely to facilitate their arrest and eventual conviction." *Id*. at 97. For this same reason, the Court held that the second factor was satisfied: failing to register came with its own punishment. *Id*. at 98–99. For these reasons, the Court held that this registration requirement violated the Fifth Amendment's right against self-incrimination. *Id*. at 100 (reversing the Fifth Circuit's holding to the contrary).

Just like in *Haynes*, all three factors confirm that Public Chapter 995 violates the right against self-incrimination. First, as in *Haynes*, Public Chapter 995's registration requirements target a highly selective group inherently suspect of criminal activities because it targets only those who have violated Public Chapter 995. *See also In re Grand Jury Subpoena Duces Tecum to John Doe 1*, 368 F. Supp. 2d 846, 857 (W.D. Tenn. 2005) (holding that law requiring individuals who violated a statute "to maintain records of illegal activity that would be directly incriminatory" targeted a highly selective group). When courts have found that a requirement is not targeted, it is

because the requirement swept up lawful individuals. *See, e.g.*, *Alkhafaji*, 754 F.2d at 647 ("Many people who would fall into this group would not be acting unlawfully."); *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 556 (1990) (holding that right to self-incrimination is not impacted "with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws") (emphasis added)). Here, those who have not violated Public Chapter 995 do not need to comply with its registration requirements. Second, also like in *Haynes*, Plaintiffs are compelled to provide to the State both a formal acknowledgment that they own land in violation of Public Chapter 995 as well as supplementary personal identifying information likely to facilitate their arrest and conviction. Third, again like in *Haynes*, reporting one's status as a criminal more than creates a substantial likelihood of prosecution, it essentially guarantees it. *See Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 77 (1965) (holding that requiring registration of admission in the Communist Party presented a "sufficient threat of prosecution" because membership in the Communist party could be used to prosecute the registrant under multiple criminal statutes).

For these reasons, Plaintiffs are likely to succeed on the merits of their Fifth Amendment self-incrimination claim.

### D. Public Chapter 995 likely violates the Supremacy Clause because it is impliedly preempted by federal law.

The Supremacy Clause instructs that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, § 1, cl. 2. State laws that interfere with or are contrary to federal law are therefore preempted. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991). Federal law may preempt state law expressly or impliedly. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

Federal law impliedly preempts Public Chapter 995 through both field and conflict preemption. "Field preemption occurs where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859–60 (6th Cir. 2023) (cleaned up).

> Conflict preemption may instead be present when Congress has not entirely displaced state regulation over the matter in question. In that circumstance, state law may be preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Id.* (cleaned up).

The federal government has struck a delicate balancing act regulating foreign investments, alien registration, foreign affairs, and its national security policies. In a case challenging Florida's anti-foreign investment law on preemption grounds, the Eleventh Circuit has granted a preliminary injunction for some of the individual plaintiffs pending an appeal, holding that the plaintiffs showed a substantial likelihood of success that Florida's law is preempted by FIRRMA and CFIUS regulations, specifically 31 C.F.R. § 802.701. *See* Order, *Shen v. Simpson*, 23-12737 (11th Cir. Feb. 1, 2024). Like Public Chapter 995, Florida's law sweeps more broadly than the federal regime, undermines the federal government's discretion to conduct foreign affairs, and categorically bans **all** purchases, conflicting with the transaction-specific approach that Congress created. Florida's law imposes civil and criminal penalties for violations, which primarily concern whether people from seven "foreign countries of concern" own or acquire property near infrastructure or military facilities. Fla. Stat. §§ 692.202(1) and .203(1). Yet in at least one key respect, Tennessee's law is even harsher than Florida's law, which does not disturb the property rights of those who owned or

acquired property before the law's enactment. *Id.* § 692.203(3)(a). Public Chapter 995 is also likely preempted by federal law.

### 1. Federal law field preempts Public Chapter 995.

The federal government pervasively regulates the field of foreign investment in real estate transactions through FIRRMA, CFIUS, OFAC, and AFIDA. Taken together, Congress and federal agencies pervasively govern foreign investment in real estate by approving, rejecting, or unwinding foreign investment in real estate transactions on a case-specific basis (CFIUS and FIRRMA), economic and trade sanctions in support of national security and foreign policy objectives (OFAC), and registration of foreign ownership of agricultural land (AFIDA). *See also* Compl. ¶¶ 45–57, 84–95. The federal government monitors foreign investments in land, agricultural or otherwise, while maintaining a unified foreign policy that allows the executive branch "to speak for the Nation with one voice in dealing with other governments" and their citizens. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000).

Congress has crafted a policy that does not prohibit any transactions outright but leaves the discretion to approve, reject, or unwind specific foreign investment transactions to the President with the advice of CFIUS. Congress's decision demonstrates the potential foreign policy consequences of blocking any particular purchase, let alone a blanket restriction on individuals or entities from particular countries. *See* 50 U.S.C. § 4565(f)(9)(A)–(B), (11). Congress instructs the President to consider when reviewing each particular transaction, the "relationship of such country with the United States" and "such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation. *Id*. These decisions involve "judgment in the realm of foreign policy and national security." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014).

33

Public Chapter 995 impermissibly substitutes Tennessee's preferred policies for the federal government's preferred policies. It appears that the purpose Public Chapter 995 was to "protect[] property in Tennessee from being purchased by hostile foreign nations" and foreign "investors," like Walton Tennessee's principals. *See, e.g.*, State Representative Kelly Keisling, *End of Session Capitol Review from State Rep. Kelly Keisling*, *available at* https://www.kellykeislingtn.com/post/end-of-session-capitol-review-from-state-rep-kelly-keisling (last accessed 10/31/2024). State Representative Jason Zachary, who co-sponsored House Bill 2553, which became Public Chapter 995, made clear that China was singled out as a hostile foreign nation: "Certainly, we're no friend of China and China is no friend of ours." *See* Ella Wales, *East TN Leaders Raise Concern Over Foreign-Owned Land in Loudon County*, WATE (Mar. 18, 2024)) (quoting State Representative Jason Zachary). State Senator Page Walley, who co-sponsored the Senate Bill that was substituted for House Bill 2553, also made clear that "China was singled out to ensure Chinese foreign nationals are prohibited from purchasing land." State Senator Page Walley, *Successfully Keeping Chinese and Other Sanctioned Foreign Entities from Owning Land in Tennessee*, Hatchie Press (Dec. 7, 2023), https://hatchiepress.com/successfully-keeping-chinese-and-other-sanctioned-foreign-entities-from-owning-land-in-tennessee/.

But the United States Constitution makes clear "the supremacy of the national power in the general field of foreign affairs." *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941) ("When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land."). The federal government similarly occupies the fields of foreign affairs through immigration and alien status, *see Arizona v. United States*, 567 U.S. 387, 400, 408–10 (2012), and commerce, *see Crosby*, 530 U.S. at 374–75.

"[A]t some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealing with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)). For instance, in *Zschernig v. Miller*, 389 U.S. 429 (1968), the Supreme Court recognized that even without an operative treaty or federal law, a state law is unconstitutional if it "disturb[s] foreign relations" or "establish[es] its own foreign policy." *Id.* at 440–41. A state cannot "rewrite our foreign policy to conform to its own domestic policies." *United States v. Pink*, 315 U.S. 203, 233 (1942).

Here, Public Chapter 995 disturbs foreign relations and establishes its own foreign policy in the face of pervasive federal law in the very same field. And other countries, particularly China, have taken notice of such measures. The Chinese Embassy, for instance, has issued statements objecting to Florida's law for politicizing land investment in a way that fuels anti-Asian sentiment. *See, e.g.*, Rachel Hatzipanagos, *Laws Banning Chinese from Buying Property Dredge Up Old History*, Wash. Post (Aug. 21, 2023), https://www.washingtonpost.com/nation/2023/08/18/florida-chinese-land-laws. And the "Chinese government is especially concerned about a proliferation of state-level restrictions," which "is likely to complicate diplomacy with China and could draw retaliation." *See* Alan Rappeport, *Spreading State Restrictions on China Show Depths of Distrust in the U.S.*, N.Y. Times (Aug. 21, 2023), https://www.nytimes.com/2023/08/21/us/politics/china-restrictions-distrust.html. This tension underscores why the federal government, not states, may establish laws regarding foreign investment of real estate. Federal officials from Tennessee have made that point—on a federal scale. *See* Marsha Blackburn (@marshablackburn), X (Mar. 3, 2023,

2:48 PM), https://x.com/MarshaBlackburn/status/1631758389964357632 ("Communist China should not be allowed to buy any farmland in the United States.").

The federal government left no room for state regulation in the federal realm of foreign affairs. Yet that's exactly what Public Chapter 995 does. Because "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively," *Pink*, 315 U.S. at 233, federal law field preempts Public Chapter 995.

### 2. Federal law conflict preempts Public Chapter 995.

Public Chapter 995 not only intrudes on a field pervasively regulated by the federal government, it also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and the federal government's foreign affairs and national security aims in regulating foreign investment in real estate transactions. *Hines*, 312 U.S. at 67 (holding that Pennsylvania's alien registration law was preempted by federal law).

Here, Public Chapter 995 conflicts with federal law governing foreign investments in real estate transactions. Public Chapter 995 bans Prohibited Parties and Prohibited Businesses from owning an interest in land in Tennessee unless they apply for and receive CFIUS approval. Tenn. Code Ann. § 66-2-308(b). CFIUS works in the opposite way. When a real estate transaction with a foreign person grants the foreign person certain property rights, *see* 31 C.F.R. § 802.233, CFIUS considers that a "covered real estate transaction," *id.* § 802.212, which CFIUS examines for "credible evidence" that "the foreign person engaging in a covered real estate transaction might take action that threatens to impair the national security of the United States," *id.* § 802.101. Whereas Public Chapter 995 categorically bans certain parties from owning land unless those parties are approved by CFIUS, CFIUS permits transactions of foreign investment in real estate unless, after a transaction-specific evaluation of national security factors, it has reason to reject that specific transaction. *See* CFIUS Frequently Asked Questions, *Post-FIRRMA Regulations*

("FIRRMA does not prohibit investments from any country."), *available at* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-frequently-asked-questions (last accessed 10/30/2024). For this reason, Public Chapter 995 "conflict[s] with express foreign policy" of federal law, "requir[ing] preemption of the state law." *Garamendi*, 539 U.S. at 420.

Public Chapter 995's categorical ban demonstrates its conflicts with federal law and foreign affairs and natural security priorities. CFIUS evaluates foreign investment in real estate transactions on a transaction-by-transaction basis to carefully weigh national security concerns while avoiding across the board bans on certain countries. OFAC maintains a list of Specially Designated Nationals and Blocked Persons whose assets are blocked, and with whom United States persons are generally prohibited from engaging in business transactions. Like CFIUS, OFAC does not designate every citizen or resident of more than two dozen countries blocked from doing business in the United States.

Public Chapter 995, by contrast, sweeps far more broadly. Its bulldozer approach compromises the federal government's considered precision regarding foreign investment in real estate. If states are allowed to set their own foreign policy agendas, and enact their own foreign commerce rules, the federal government loses the "capacity . . . to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381.

Federal laws like FIRRMA and FINSA give CFIUS nuanced authority to evaluate transactions on a transaction-by-transaction basis, with a special focus on transactions affecting "critical infrastructure" and "critical technologies." *See* 31 C.F.R. §§ 800.214–.215. CFIUS provides exceptions to its regulations that Public Chapter 995 omits. Public Chapter 995 therefore "plainly conflicts with federal law because it does not countenance any of the federal regime's

exceptions." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1282 (11th Cir. 2013).

Public Chapter 995's registration requirements also conflict with how Congress monitors foreign ownership of agricultural land. AFIDA establishes a nationwide system for collecting information pertaining to foreign ownership of agricultural land in the United States. The Farm Service Agency implements AFIDA through regulations codified at 7 C.F.R. part 781, *et seq*. Public Chapter 995's requirements go much further than AFIDA, which has registration requirements for "any foreign person who held, holds, acquires, or transfers any interest in . . . agricultural land." 7 C.F.R. § 781.3(b). Unlike Public Chapter 995, AFIDA's registration requirements, and AFIDA's definition of "foreign person," do not include agents of foreign persons, like Walton Tennessee. And registration reporting violations result in fines, but no criminal penalties. *See id.* § 781.4. Like CFIUS and OFAC, AFIDA does not categorically ban foreign investors from specific countries. *See* Compl. ¶ 57. Public Chapter 995 therefore encroaches on and conflicts with the rules and regulations Congress saw fit to enact for registration regarding foreign agricultural land investment. *Hines*, 312 U.S. at 62–63 ("When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute.").

For these reasons, Plaintiffs are likely to succeed on the merits of their Supremacy Clause claims.

### E.  Public Chapter 995 likely violates the Ex Post Facto Clauses of the United States and Tennessee Constitutions because it criminalizes a past lawful action.

To succeed on an Ex Post Facto claim, a plaintiff must establish two elements. First, the law must be enforced against him retroactively—that is, "it must apply to events occurring before

its enactment." *United States v. Kruger*, 838 F.3d 786, 790 (6th Cir. 2016). Second, the law must "disadvantage the offender affected by it." *Id.* The clearest case of disadvantaging the offender is imposing criminal punishment. *Does #1–5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016). The Ex Post Facto analysis of Public Chapter 995 is straightforward.

The first element is satisfied here. Public Chapter 995 is enforced against Plaintiffs retroactively because it applies to events occurring before its enactment. "[T]he application of the Ex Post Facto Clause to a given situation can typically be ascertained simply by identifying the law at issue, placing the law in context, and piecing together the chronology of the law's adoption and the underlying criminal offense—without the need for a deep dive into any individual offender's circumstances." *Does #1–9 v. Lee*, 574 F. Supp. 3d 558, 562–63 (M.D. Tenn. 2021). In *Hardaway v. Lee*, No. 3:22-cv-00395, 2023 WL 2749369, at *3 (M.D. Tenn. Mar. 31, 2023), the Court held that the State was "right" to concede the retroactivity of a challenged law that was enacted in 2004 punished conduct that was committed in 1991.

Here, Plaintiffs lawfully purchased their land interests before Public Chapter 995's enactment. *See* Vance Decl. ¶¶ 9, 11; Silvestroni Decl. ¶¶ 8, 10; Misch Decl. ¶ 8. Public Chapter 995 is therefore retroactive.

The second element is also satisfied here because Public Chapter 995 criminalizes Plaintiffs' past, lawful behavior. Violating Public Chapter 995 is a Class A misdemeanor punishable by fine and imprisonment. *See* Tenn. Code Ann. §§ 66-2-303(d); 66-2-305(c). Public Chapter 995 also imposes the registration requirements and causes the land to escheat. Public Chapter 995 imposes criminal (as well as civil) punishment.

In addition, Public Chapter 995 fails to provide a sufficient grace period that could alleviate these ex post facto concerns. Courts have found that statutes punishing previously lawful conduct

may avoid ex post facto concerns by "allow[ing] a reasonable grace period for compliance." *United States v. Trupin*, 117 F.3d 678, 686 (2d Cir. 1997) (allowing three months to dispossess of a stolen painting) (citing *Chicago & Alton R.R. Co. v. Tranbarger*, 238 U.S. 67, 74 (1915)); *see also Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982) (holding a two-year grace period was sufficient to allow property owners to register their land interests with the state to protect their interests). The absence of a grace period is problematic, especially when "considerable effort will be needed to change the condition" of the affected parties. *See* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 2.4(b), at 142 & n.48 (1986); *City of Louisville v. Thompson*, 339 S.W.2d 869, 873 (Ky. 1960) ("a reasonable time must be allowed [for] the affected parties in which to comply" with a new law).

Public Chapter 995 requires considerable effort from Walton Tennessee to comply with the law. It is practically impossible for Walton Tennessee to bring itself into compliance with Public Chapter 995 before January 1, 2025. Nixon Decl. ¶ 18. It takes months to negotiate and contract to buy and sell hundreds of acres of land for development, and its takes even longer for these transactions to fully close because the buyers typically purchase the properties in phases over several years. *Id*. As part of its duties as an agent, Walton Tennessee markets its properties to third-party buyers. *Id*. Three of the five properties at issue in this lawsuit are under contract with third-party buyers, and it will likely take years for those transactions to fully close. *Id*. Walton Tennessee has been attempting to sell the other two properties since they were acquired, which was long before Public Chapter 995 was enacted. *Id*. Despite its good faith efforts, Walton Tennessee has thus far been unable to sell these properties. *Id*.

Nor can Walton Tennessee simply buy out the Prohibited Owners from the properties. Doing so would be cost-prohibitive. *Id.* ¶ 19. Public Chapter 995 also requires considerable effort and, importantly, time, from Walton Tennessee's principals to exit their investments. *Id.*

Despite the effort it requires from Walton Tennessee and its principals, Public Chapter 995 offers no grace period. Prohibited Owners are automatically made criminals on January 1, 2025— the very day Public Chapter 995 takes effect. Even if Public Chapter 995 were deemed to provide a several month grace period between its enactment and effective date, this grace period is not reasonable in the context of real property generally, much less as applied to Walton Tennessee and its principals, because of the time it takes to divest real property. Public Chapter 995 fails to provide a sufficient grace period for Walton Tennessee and its principals to comply with it.

For these reasons, Plaintiffs are likely to succeed on the merits of their Ex Post Facto Clause claims.

### III. Walton Tennessee and its principals, including the Individual Plaintiffs, will suffer irreparable harm if Public Chapter 995 goes into effect.

Public Chapter 995 threatens and impairs Plaintiffs' constitutional rights. "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."). Indeed, "a violation of a person's constitutional rights is, in and of itself, an irreparable harm." *Bongo Prods., LLC v. Lawrence*, 548 F. Supp. 3d 666, 685 (M.D. Tenn. 2021).

There are no uncertainties here that "rule out the 'certain and immediate' harm needed for a preliminary injunction." *D.T.*, 942 F.3d at 327. Plaintiffs own interests in land and will not (and, practically, cannot) divest those interests before January 1, 2025, certainly not without lost profit

and investment. Nixon Decl. ¶¶ 18–19. For all of Public Chapter 995's vagueness in critical respects, it is crystal clear at least on one point: come January 1, 2025, Prohibited Owners face fines, imprisonment, onerous registration requirements, and escheatment of their land to the State.

These injuries are as severe as they are immediate and certain by operation of Public Chapter 995 and the credible threat of its enforcement by Defendants. Criminal and civil sanctions and forfeiture of real property are concrete and imminent injuries warranting preliminary relief.

## IV.    The balance of equities and the public interest favor granting preliminary injunctive relief.

"It is well-established that 'the public interest is served by preventing the violation of constitutional rights.'" *Does 1–9*, 574 F. Supp. 3d at 563 (quoting *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004)). Moreover, there is no public interest in Tennessee enforcing an unconstitutional law. When a "court finds a high likelihood of success with regard to the plaintiffs' constitutional challenges, it finds a low likelihood that the injunctive relief would intrude on any powers legitimately retained by the State of Tennessee. Ultimately, then, these factors weigh strongly in favor of granting the injunction." *Bongo Prods.*, 548 F. Supp. 3d at 687.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: November 14, 2024          Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

/s/ *Connor M. Blair*
Van P. East, III
Connor M. Blair
Timothy A. Rodriguez
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 252-3887
Facsimile: (615) 252-6348
veast@bradley.com
cblair@bradley.com
trodriguez@bradley.com

John Parker Sweeney (*pro hac vice* pending)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 719-8216
Facsimile: (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs*

43

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on November 14, 2024, a true and correct copy of the foregoing has been served on counsel below for all Defendants through operation of the Court's electronic filing system and, by agreement with counsel for Defendants, email:

Tyler Sanders (#36189)
Assistant Attorney General
Financial Division
P.O. Box 20207
Nashville, Tennessee 37202
Tyler.Sanders@ag.tn.gov
Telephone: (615) 313-5789

*Counsel for Defendants*

/s/ *Connor M. Blair*
Connor M. Blair